FILED

NOV - 2 2004

LARRY W. PROPES, CLERK
FLORENCE, SC

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### FLORENCE DIVISION

CONTINENTAL CASUALTY COMPANY, )
                                    )
      Plaintiff,                 )
                                      )
      vs.                      )   **Case No.: 4:04-1782-27**
                                        )
GEORGE T. SAMAHA, III, CAROLYN )
HILLS, VICTORIA DOUGHERTY, AND )
MICHAEL DOUGHERTY,           )
                                      )
      Defendants.              )
                                      )

## MEMORANDUM IN SUPPORT OF CONTINENTAL CASUALTY COMPANY'S MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### INTRODUCTION

In this insurance coverage dispute, Plaintiff Continental Casualty Company ("Continental") seeks a declaration that there is no coverage under an insurance policy issued by Continental to George T. Samaha, III (the "Insured") for two lawsuits filed against him because Samaha had a basis to believe, prior to the inception of the policy, that an act or omission in the performance of legal services might reasonably be expected to be the basis of a claim against him.

The underlying lawsuits arise out of Samaha's representation of Francis P. McLure and Lillian McLure and, specifically, certain actions Samaha allegedly took under a power of attorney Samaha himself drafted for Mrs. McLure. At a probate court hearing four months before the first lawsuit against Samaha was filed – and more than three weeks before the policy incepted – counsel for the estate of Mr. McLure (the "Estate") charged Samaha with "gross impropriety" and "crooked" behavior, and asked the court to take over

1

21



administration of the Estate. The court appeared to agree with Estate counsel's assertions and ordered that the Estate be administered under the court's authority. The court also appointed a special administrator for the Estate, appointed a guardian ad litem for Mrs. McLure, appointed a visitor and an examiner to opine on Mrs. McLure's mental and physical health, "froze" Samaha's power of attorney, and "froze" the fee received by Samaha from Mrs. McLure.

Shortly after the hearing – and still before the insurance policy incepted – the court issued a written order in which it found, among other findings, that Samaha had abused the authority he had under the power of attorney and as trustee and that at least some of Samaha's testimony at the hearing was not credible. The court also enjoined Samaha from taking any action affecting Mr. or Mrs. McLure's assets and ordered him to pay the fee he received from Mrs. McLure to the Estate's special administrator. In addition, the court directed that a copy of its order be submitted to Disciplinary Counsel at the Commission on Lawyer Conduct.

About four months later, the special administrator for the Estate and the co-guardians and co-conservators for Mrs. McLure filed a lawsuit against Samaha; about fifteen months after that, the co-guardians and co-conservators for Mrs. McLure and the co-trustees of Mrs. McLure's trust filed a second lawsuit against Samaha. The lawsuits allege that, among other wrongful conduct, Samaha drafted documents appointing himself as Mrs. McLure's attorney-in-fact and trustee of a trust, of which Mrs. McLure was the primary beneficiary, at a time when he knew that she was incompetent to manage her affairs; liquidated assets held by Mrs. McLure and her deceased husband in order to pay himself an exorbitant fee; created unnecessary tax liabilities for Mrs. McLure; sold



Mrs. McLure's house for less than fair-market value; improperly and imprudently invested the proceeds of assets he liquidated; and paid himself a 25% contingency fee for "marshalling" Mrs. McLure's assets.

The Policy issued by Continental expressly precludes coverage in situations exactly like this one – where, before the inception date of the policy, the insured had a basis to believe that an act or omission might reasonably be expected to be the basis of a claim against him. Here, Samaha had a clear basis to believe that a claim might be made against him where, prior to the policy inception, Estate counsel accused him of negligent and fraudulent conduct that hurt the Estate, and the Probate Court had rebuked him, issued written findings that he acted wrongfully, and ordered him not to take any other actions affecting his clients' assets.

## I.   STATEMENT OF UNDISPUTED FACTS

### A.   The Hills Actions

Two lawsuits have been filed against Samaha, one captioned *Carolyn Hills as special administrator for the Estate of Francis P. McLure and Carolyn Hills and Victoria Dougherty as co-guardians and co-conservators for Lillian McClure v. George T. Samaha, III d.b.a. George T. Samaha III Law Firm*, Case No. 2002-CP-26-4198, filed on July 26, 2002 in the Court of Common Pleas for the Fifteenth Judicial Circuit, County of Horry, South Carolina (the "*Hills I* Action")[1], and one captioned *Carolyn Hills and Victoria*

---

[1] A copy of the Amended Complaint filed in the *Hills I* Action is attached to the Declaration of Amy Ledoux ("Ledoux Decl.") as Exhibit A. In ruling on a motion for judgment on the pleadings, a court may consider documents extraneous to the complaint, without converting the motion into one for summary judgment, if such documents are integral to and explicitly relied on in the complaint and their authenticity is not in question. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Colin v. Marconi*
(continued on the next page)

*Dougherty as co-guardians and co-conservators for Lillian McClure, and Victoria Dougherty and Michael J. Dougherty as co-trustees of the Lillian McLure Irrevocable Trust v. George T. Samaha, III d.b.a. George T. Samaha III Law Firm*, Case No. 2003-GC-75, filed on November 5, 2003 in the Probate Court for the Fifteenth Judicial Circuit, County of Horry, South Carolina (the "*Hills II* Action") (collectively, the "*Hills* Actions")[2]. Complaint, ¶¶ 13-14; Answer of Defendant George T. Samaha, III ("Samaha Answer"), ¶ 10; Answer of Defendants Carolyn Hills, Victoria Dougherty and Michael Dougherty ("Hills Answer"), ¶ 7.

The *Hills* Actions arise out of Samaha's representation of Mr. and Mrs. McLure. Complaint, ¶ 12; Samaha Answer, ¶ 10; Hills Answer, ¶ 7. Samaha allegedly drafted wills and powers of attorney for Mr. and Mrs. McLure several months before Mr. McLure died. Plaintiffs allege that the two wills Samaha drafted for Mr. McLure conflicted. Complaint, ¶ 15; Samaha Answer, ¶ 11; Hills Answer, ¶ 8. The powers of attorney named Ann McLure, Mr. McLure's sister-in-law, as attorney-in-fact. Complaint, ¶¶ 16-17; Samaha Answer, ¶ 11; Hills Answer, ¶ 8. After Mr. McLure's death on January 3, 2001, the *Hills* plaintiffs allege, Samaha drafted a new power of attorney for Mrs. McLure, naming himself as attorney-in-fact (the "Samaha Power of Attorney") and drafted a trust for the benefit of

---

(Continuation from previous page)

*Commerce Sys. Employees' Retirement Plan*, 335 F. Supp.2d 590 (M.D.N.C. Sept. 1, 2004). Alternatively, the court may convert the motion into one for summary judgment. *See, e.g.*, *Jones v. GE Life & Annuity Assurance Co.*, No. 1:03CV241, 2004 WL 691749 (M.D.N.C. Mar. 17, 2004) (a copy of which is attached to the Ledoux Declaration as Exhibit B).

[2] A copy of the Complaint filed in the *Hills II* Action is attached to the Ledoux Declaration as Exhibit C.

Mrs. McLure, appointing himself as trustee. Complaint, ¶ 18; Samaha Answer, ¶ 11; Hills Answer, ¶ 8. At that time, plaintiffs allege, Samaha knew or should have known that Mrs. McLure was not competent to manage her affairs. Ledoux Decl., Ex. A, ¶¶ 29-30.

Acting under the Samaha Power of Attorney, Samaha allegedly took a number of actions that caused Mrs. McLure to lose a significant amount of money. For example, plaintiffs allege that Samaha caused Mrs. McLure to incur unnecessary penalties, fees, surrender charges, and/or tax liability by liquidating certain assets; that he transferred those assets into his own name; that he sold Mrs. McLure's house for less than its fair market value; that he made unauthorized gifts using Mrs. McLure's money; and that he made inappropriate investments on behalf of Mrs. McLure. Complaint, ¶¶ 19-20; Samaha Answer, ¶ 11; Hills Answer, ¶ 8. Plaintiffs also contend that Samaha received an excessive fee of at least $115,000 from Mrs. McLure for "marshalling" her assets, pursuant to a 25% contingency fee agreement with her. Complaint, ¶ 22; Samaha Answer, ¶ 11; Hills Answer, ¶ 9. The *Hills I* plaintiffs further assert that on or about March 12, 2002, the Insured filed a lawsuit purportedly on Mrs. McLure's behalf, containing facts he knew to be false. Complaint, ¶ 21; Samaha Answer, ¶ 11; Hills Answer, ¶ 9.

Plaintiffs in the *Hills I* Action assert causes of action against Samaha for breach of fiduciary duty, negligence, fraud, negligent misrepresentation, violation of the South Carolina Unfair Trade Practices Act, constructive trust, and unjust enrichment. Complaint, ¶ 23; Samaha Answer, ¶ 11; Hills Answer, ¶ 9. Plaintiffs in the *Hills II* Action assert causes of action against Samaha for breach of fiduciary duty, negligence, constructive trust, and conversion. Complaint, ¶ 24; Samaha Answer, ¶ 11; Hills Answer, ¶ 9.

**B.**    <u>The March 12, 2002[3] Probate Court Hearing and Subsequent Order</u>

About four months before the *Hills I* Action was filed, the Probate Court for the Fifteenth Judicial Circuit for Horry County, South Carolina, held a hearing concerning the Estate, the Trust, and other matters relating to Mrs. McLure. The hearing, held on March 12, 2002 (the "March 12 Hearing"), was prompted by the filing by counsel for the Estate of a petition for a "Part 5 Administration"[4] and for the appointment of a special administrator. Complaint, ¶ 25; Samaha Answer, ¶ 12; Hills Answer, ¶ 10; Petition for Administration under Part 5 (the "Part 5 Petition"), a true and correct copy of which is attached to the Ledoux Declaration as Exhibit D. Counsel for the Estate applied for a Part 5 Administration on the basis that "[u]pon information and belief, certain and substantial funds of the Decedent have not been preserved but rather have dissipated without accounting or according to law." Ledoux Decl., Ex. D, ¶ 2.

At the March 12 Hearing, counsel for the Estate and counsel for Ann McLure called Samaha as a witness and questioned him extensively about his representation of Mr. and Mrs. McLure and about the $115,000 fee Samaha paid himself for "marshalling" Mrs. McLure's assets. Complaint, ¶ 27; Samaha Answer, ¶ 12; Hills Answer, ¶ 10; Transcript of the March 12 Hearing (the "Transcript"), a true and correct copy of which is

---

[3] Hearing transcript cover sheet incorrectly references hearing date as March 11, 2002, but all other references are to Tuesday, March 12, 2002. Also, March 12, 2002, was a Tuesday.

[4] Administration under Part 5 of the South Carolina Probate Code is a proceeding to secure complete administration and settlement of a decedent's estate under the continuing authority of the court. S.C. Code Ann. § 62-3-501. Where a decedent's will does not direct administration under Part 5, such administration may be ordered "only upon a finding that it is necessary for protection of persons interested in the estate" or where the court finds it "necessary under the circumstances." *Id.*, § 62-3-502.



attached to the Ledoux Declaration as Exhibit E, 71-73. Through their questioning, counsel

for the Estate and for Ann McLure sought to establish that Samaha spent minimal time and

effort "marshalling," i.e., liquidating, Mrs. McLure's assets, and that, at most, Samaha

should have been entitled to the fee that a personal representative would have received for

marshalling Mrs. McLure's assets, which would have been five percent (rather than 25

percent) of the marshaled assets. *See* Ledoux Decl., Ex. E, 38-39, 42-43, 74. Counsel also

sought to establish that Samaha failed to identify several potential assets and sources of

income for Mrs. McLure. *See id.* at 55 (military benefits); 58 (pension and employer death

benefits); 60 (AARP benefits); 61 (life insurance policy). In his closing statement, counsel

for the Estate stated, in part:

> I think we have seen today something that surprises even me.
> I think we know why there's been a reason to delay probating
> this will. Well, a 100,000 reasons to know why this will has
> been so fought to be probated and why Mrs. McLure is not
> here today and why she's being kept away from us. There is
> gross impropriety going on here, Your Honor, and I would
> request that this Court order a constructive trust on the fee [of]
> over $100,000 that Mr. Samaha has taken from this estate. . . .
> We need a Part Five Administration here as soon as possible
> because I've never seen a case that more cries out for this.
> There's something crooked going on here, Judge, and you
> need to grab control of it.

*Id.*, Ex. E, 93-95.

After hearing testimony and argument, the Court placed the Estate under a Part 5

Administration, appointed a special administrator, appointed a guardian ad litem for

Mrs. McLure, appointed experts to provide opinions as to Mrs. McLure's mental and

physical health, "froze" the Samaha Power of Attorney, and "froze" the fee received by the

Insured. In so ruling, the Court found that Mrs. McLure was "vulnerable" and needed the

Court's protection. The Court also commented that she was "angry" and that the case was



"one of two of the absolute wors[t] cases" over which she had presided in almost four years.
Complaint, ¶¶ 29-30; Samaha Answer, ¶ 13; Hills Answer, ¶ 11; Ledoux Decl., Ex. E, 109-
15.

Following the March 12 hearing, the Court issued a written order, dated March 19,
2002 (the "March 19 Order") (a certified copy of which is attached to the Ledoux
Declaration as Exhibit F), in which it made the following findings:

<blockquote>

a. Samaha liquidated all of Mrs. McLure's assets of which he had
knowledge, including Mrs. McLure's personal residence;

b. Mrs. McLure received no independent legal advice for the sale of her
residence, and the sale price equaled the county appraiser's tax-
assessed value;

c. there was no evidence, other than Samaha's testimony, to support the
whereabouts of Mrs. McLure's assets, and Samaha's testimony on
that topic was "self-serving and vague";

d. a full and complete accounting was required;

e. Samaha paid himself at least $115,000 for "marshalling"
Mrs. McLure's assets;

f. Samaha "may have attempted to hide this Marshalling Charge from
the Court and the estate's attorneys by submitting a markedly
incomplete and untimely accounting which did not include the
Marshalling Charge and by giving evasive testimony regarding the
assets" of Mrs. McLure's trust;

</blockquote>

g.    the accounting prepared by Samaha "is not current and has substantial gaps of time where no information is provided";

h.    Samaha's marshalling fee "is exorbitant and bears no rational relationship to services rendered";

i.    Samaha "apparently has abused the powers granted to him" under the Samaha Power of Attorney and the Trust;

j.    "The Court has grave concerns regarding [Mrs. McLure's] failure to appear at the hearing dated March 12, 2002 . . . [Mrs. McLure] was intentionally placed beyond the subpoena power of the Court by Samaha or those acting in concert with Samaha";

k.    "Samaha's testimony regarding [Mrs. McLure's] failure to appear, the safety of the estate's assets, and [Mrs. McLure's] mental and physical state are not credible"; and

l.    "Since [Mr. McLure's] death, at least $245,000.00 has been removed from assets of [Mrs. McLure] or [Mr. McLure's] estate without proper justification.  An emergency exists for [Mrs. McLure] in that her financial affairs are in disarray, she is without a permanent residence and she is susceptible to financial victimization."

Ledoux Decl., Ex. F, ¶¶ 8-27.

In its March 19 Order, the Court enjoined Samaha from taking any further action under the Samaha Power of Attorney or the Trust or any action that would affect any assets of Mr. or Mrs. McLure.  Complaint, ¶ 32; Samaha Answer, ¶ 14; Hills Answer, ¶ 12.  The

Court also ordered Samaha to return the marshalling fee he received[5] and to provide to the special administrator an accounting, sworn to under oath, detailing every financial transaction taken on behalf of Mrs. McLure.  Complaint, ¶ 33; Samaha Answer, ¶ 14; Hills Answer, ¶ 12.  The Court also ordered that a copy of the March 19 Order be submitted to disciplinary counsel at South Carolina's Commission on Lawyer Conduct.  Complaint, ¶ 34; Samaha Answer, ¶ 14; Hills Answer, ¶ 12.

### C.    THE CONTINENTAL POLICY

Continental issued Lawyers Professional Liability Policy No. 169861433, which is a claims made and reported policy, to the Insured for the period April 5, 2002 to April 5, 2003.  Complaint, ¶ 35; Samaha Answer, ¶ 14 (the "Policy," a true and correct copy of which is attached to the Declaration of Ernest Rosado ("Rosado Decl.") as Exhibit A.)  The Policy is the first policy issued by Continental, or any subsidiary or affiliate of Continental, to the Insured.  Complaint, ¶ 36, Samaha Answer, ¶ 14.  The Policy affords certain coverage subject to limits of liability of $1 million for each claim and in the aggregate, including claim expenses.  Coverage under the Policy also is subject to a $5,000 aggregate deductible, which applies to claim expenses.  Complaint, ¶ 37; Samaha Answer, ¶ 14.

Subject to all of its terms and conditions, the Policy provides that Continental will pay on behalf of its insureds:

---

[5] On appeal of the March 12 Order by Samaha, the Court of Common Pleas reversed the Probate Court's finding that the marshalling fee was exorbitant and the order to return it on the basis that the issue of Samaha's fee was outside of the noticed scope of the hearing. The Court of Common Pleas did not rule on the merits of the Probate Court's finding with regard to the fee and noted that the Probate Court, upon proper notice, could schedule a hearing on the issue. *See* Order dated July 26, 2004, a copy of which is attached to Hills Answer.



all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable . . . .

Rosado Decl., Ex. A, § I.A.  (Terms in bold print are defined terms in the Policy).

The Policy provides that Continental's duty to pay sums on behalf of its insureds is subject to the condition that:

> 3. prior to:
> a. the inception date of the first policy issued by the **Company** or any subsidiary or affiliate of the **Company**, if continuously renewed; or,
> b. the date the **Insured** first became a member or employee of the **Named Insured** or **predecessor firm**, whichever is later, no **Insured** had a basis to believe that any such act or omission, or **related act or omission**, might reasonably be expected to be the basis of a **claim**; . . . .

Rosado Decl., Ex. A, § I.A.

As part of the underwriting process for the Policy, Samaha warranted that he was "not aware of any claim or circumstances which might be expected to be the basis of a claim which has not been previously disclosed" to his current carrier.  Samaha signed this warranty, a copy of which is attached to the Ledoux Declaration as Exhibit G, on March 28, 2002.  Complaint, ¶ 40; Samaha Answer, ¶ 14.

## III.  ARGUMENT

### A.  Standard for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed.  *S&S Constr., Inc. of Anderson v. Reliance Ins. Co.*, 42 F. Supp.2d 622, 623 (D.S.C. 1998).  The applicable standard for judgment on the pleadings is "whether [...], when viewed in the light most favorable to the party against



whom the motion is made, genuine issues of material fact remain or whether the case can be decided as a matter of law." *Tollison v. B&J Mach. Co., Inc.*, 812 F. Supp. 618, 619 (D.S.C. 1993) (citation omitted); *see also Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002) (judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered considering the substance of the pleadings and any judicially noticed facts).

**B.    The Policy Does Not Provide Coverage For The *Hills* Actions Because, Prior To The Inception of the Policy, Samaha Had A Basis To Believe That A Claim Might Be Made Against Him**

The Policy does not provide coverage for the claims asserted against Samaha in the *Hills* Actions because Samaha had a reasonable basis to believe -- before the Policy began -- that his conduct might reasonably be expected to be the basis of a claim against him.  It is well settled that claims-made policies are not intended to provide coverage for alleged wrongdoing about which the insured knows or has reason to know before the policy incepts. As one court has explained:

> The reasonableness of excluding claims based on prior conduct that the insured could reasonably have foreseen might serve as the basis for a future claim is apparent.  The insurance company is entitled to protect itself against the professional who, recognizing his past error or omission, rushes to purchase a "claims made" policy before the error is discovered and a claim is asserted against him.  [The] insurance company concern has been termed the "moral hazard."

*Zuckerman v. National Union Fire Ins. Co.*, 495 A.2d 395, 403-04 n.3 (N.J. 1985) (citation omitted).

Accordingly, provisions such as the one at issue here preclude coverage for "claims based on conduct that occurred before the policy was issued and that was known to have claim potential." *Truck Ins. Exch. v. Ashland Oil, Inc.*, 951 F.2d 787, 791 (7th Cir. 1992).

Like exclusions for known preexisting conditions in health insurance policies, such "prior knowledge" provisions are a critical part of an insurer's risk-assessment process. They "induc[e] would-be insureds to disclose potential or actual breaches of professional duty," making the insurer "better able to assess the risk of extending insurance." *Worth v. Tamarack Am., Division of Great Am. Ins. Co.*, No. 99-2037, 2000 WL 101227, *9 (7th Cir. Jan. 26, 2000) (a copy of this case is attached to the Ledoux Declaration as Exhibit H).

Courts find provisions similar to the one at issue here to be "uncontroversially proper" and routinely enforce them. *See, e.g., Truck Ins.*, 951 F.2d at 791 (affirming summary judgment for insurer where prior to policy inception insured almost certainly knew he likely would be charged with fraud); *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 221 (5th Cir. 1986) (affirming summary judgment for insurer where prior to policy inception law firm had knowledge of circumstance that eventually resulted in malpractice claim). Otherwise, an insurer would be forced to provide coverage for preexisting claims – unknown to it but known to the insured – for which it would have no reasonable basis for estimating the risk.

In evaluating an insured's prior knowledge, courts apply an objective standard. Thus, the proper inquiry is whether a reasonable person in the insured's position would have foreseen that a claim might be made. In other words, application of a policy's prior knowledge provision does not require any judgmental or subjective evaluation; the subjective intent of the insured is not at issue. *See, e.g., Worth*, 2000 WL 101227, *6 (applying objective standard and finding that reasonable attorney in insured's position would have believed he had breached professional duty before effective date of policy coverage; *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 944 (6th Cir. 1993) (applying

13

objective standard to exclusion for "Wrongful Acts ... if the Insured or any person for whose action the Insured is legally responsible, knew or could have reasonably foreseen . . . that such Wrongful Acts would result in a claim or suit against the insured"); *International Surplus Lines Ins. Co. v. University of Wyo. Research Corp.*, 850 F. Supp. 1509, 1521 (D. Wyo. 1994), *aff'd*, 52 F.3d 901 (10th Cir. 1995) (applying objective inquiry standard and explaining that prior knowledge provision "does not require that the person know that a claim has already been threatened, but only whether [...] a claim could reasonably be anticipated in the future – as a matter of probabilities – and in keeping with the facts known to exist at the time"); *Mt. Airy Ins. Co. v. Thomas*, 954 F. Supp. 1073, 1079 (W.D. Pa. 1997) *aff'd*, 149 F.3d 1165 (1997) (applying objective standard to prior knowledge exclusion and finding policy provided no coverage for claim where reasonable person aware of facts could have expected malpractice claim might result, despite insured's subjective belief that client did not intend to file claim); *International Ins. Co. v. Peabody Int'l Corp.*, 747 F. Supp. 477, 481-482 (N.D. Ill. 1990) (holding that policy provided no coverage to law firm where "[f]rom an objective standpoint, there can be no doubt that on the effective date of the policy, [the insured] knew of the acts, errors or omissions that ultimately [led to the claim]").

Accordingly, it is irrelevant here whether Samaha *subjectively* thought that a claim would be made. Samaha undoubtedly will argue that he did not expect a claim to be made. Nor is it relevant whether the insured disputes – as Samaha does – the merits of the allegations made against him.[6] The Policy conditions coverage on the insured having no

---

[6] Samaha contended in his Answer, *see* Samaha Answer, ¶ 36, that the basis for Continental's denial of coverage -- in Samaha's words, "that Samaha knew the claim or the
(continued on the next page)



basis to believe that any act or omission in the performance of legal services might reasonably, *i.e.*, objectively, be expected to be the basis of a claim, regardless of whether the claim is legitimate or ultimately successful. A reasonable attorney in possession of the facts Samaha possessed before the Policy incepted would have had a basis to believe that a claim might be made against him.

Prior to the inception of the Policy, Samaha knew:

- that counsel for the Estate had asked the court to take over administration of the Estate, a remedy he characterized as "very unusual" and "very strenuous";

- that counsel for the Estate had asserted that the Estate was in "chaos" and charged Samaha with "gross impropriety" and "crooked" conduct, with taking $130,000 worth of assets from the Estate, and with "secreting" Mrs. McLure away from court and preventing her from attending the hearing;

- that it was the view of counsel for the Estate that a reasonable fee for Samaha, at most, would have been five percent, rather than 25 percent, of Mrs. McLure's marshaled assets;

---

(Continuation from previous page)

basis of a claim regarding the attorney's fees charged by him" – was vitiated by the fact that portions of the Probate Court's March 19 Order were reversed on appeal. First, it should be noted that Continental's denial of coverage is not limited to Samaha's prior knowledge of the allegations regarding his fee. Second, the portions of the Order that were reversed were extremely limited, as discussed above, *see supra* 9, and were not reversed on their merits. Third, and most significantly, the decision by the Court of Common Pleas has absolutely no bearing on what Samaha knew prior to the inception of the Policy. As of the inception date of the Policy, the March 19 Order was in full force and effect.

- that the court largely agreed with Estate counsel's allegations against Samaha and issued written findings that Samaha had abused his authority under the Power of Attorney and Trust, that his testimony about the Estate's assets was "self-serving," "vague," "evasive" and "not credible," and that Samaha may have tried to hide his "exorbitant" fee from the court and Estate counsel;

- that the court enjoined Samaha from taking any other actions affecting Mr. and Mrs. McLure's assets and ordered Samaha to return the marshalling fee; and

- that the court directed that a copy of its order be sent to disciplinary counsel.

Under these circumstances, Samaha clearly had a basis to believe that his actions might reasonably be expected to be the basis of a claim. Indeed, the charges made by Estate counsel against Samaha during the March 12 Hearing were among the very allegations ultimately included in the *Hills* complaints.

In *Truck Insurance*, the court held that a policy provided no coverage for a lawsuit filed against an accountant's corporation where the accountant "almost certainly knew" at the time he purchased the policy that a claim would be made against him. *Truck Ins.*, 951 F.2d at 791. Before the policy incepted, a lawsuit already had been filed relating to a former client of the accountant. *Id.* Although the lawsuit did not name the accountant or his corporation as a defendant, the accountant had been deposed in the lawsuit before the policy's inception. *Id.* After the policy incepted, the corporation was named as a defendant and sought coverage under the policy at issue.

Similarly, here, while no lawsuit was filed against Samaha before the Policy incepted, a legal proceeding, (the Part 5 Petition) aimed at Samaha's conduct had been commenced. The Part 5 Petition prompted a judicial hearing, at which Estate counsel questioned Samaha in an adversarial manner, accused him of wrongdoing in his representation of the McLures, and asked the court to intervene. The upshot of the March 12 Hearing and the March 19 Order was that the Probate Court not only agreed with Estate counsel's charges against Samaha but also was of the view that Samaha should be disciplined for his conduct. Any reasonable attorney in Samaha's situation would have expected that a legal malpractice claim might be asserted against him; indeed, given the circumstances, it would have been very surprising if one had not been asserted. Thus, the Policy does not provide coverage for the *Hills* Actions.

Respectfully submitted this 2 day of November, 2004.


By: _____

J. Boone Aiken, III
Federal I.D. No. 269
Aiken, Bridges, Nunn, Elliott & Tyler, P.A.
181 East Evans Street
Suite 409
Florence, SC  29506
Phone: 843.669.8787
Fax:    843.664.0097

*Counsel for Plaintiff*
*Continental Casualty Company*

Of Counsel:

Richard A. Simpson
Amy Ledoux
ROSS, DIXON & BELL, L.L.P.
2001 K Street, N.W.
Washington, D.C. 20006-1040
Telephone:  202.662.2000
Fax:          202.662.2190

Civil Action No.: 4:04-1782-27

# ATTACHMENT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### FLORENCE DIVISION

| | | |
|---|---|---|
| CONTINENTAL CASUALTY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 4:04-1782-27 |
| | ) | |
| GEORGE T. SAMAHA, III, CAROLYN | ) | |
| HILLS, VICTORIA DOUGHERTY, AND | ) | |
| MICHAEL DOUGHERTY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF AMY LEDOUX

I, Amy Ledoux, declare as follows:

1.    I am an associate at the law firm of Ross, Dixon & Bell, L.L.P., which represents the plaintiff in this case. I submit this Declaration in support of Continental's contemporaneously filed Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment. I am familiar with the documents identified below, and I am competent to testify thereto.

2.    Attached to this Declaration as Exhibit A is a true and correct copy of the Amended Complaint filed in the lawsuit captioned *Carolyn Hills as special administrator for the Estate of Francis P. McLure and Carolyn Hills and Victoria Dougherty as co-guardians and co-conservators for Lillian McClure v. George T. Samaha, III d.b.a. George T. Samaha III Law Firm*, Case No. 2002-CP-26-4198, filed on July 26, 2002 in the Court of Common Pleas for the Fifteenth Judicial Circuit, County of Horry, South Carolina.

310060 v1

3.      Attached to this Declaration as Exhibit B is a true and correct copy of the decision in *Jones v. GE Life & Annuity Assurance Co.*, No. 1:03CV241, 2004 WL 691749 (M.D.N.C. Mar. 17, 2004).

4.      Attached to this Declaration as Exhibit C is a true and correct copy of the Complaint filed in the lawsuit captioned *Carolyn Hills and Victoria Dougherty as co-guardians and co-conservators for Lillian McClure, and Victoria Dougherty and Michael J. Dougherty as co-trustees of the Lillian McLure Irrevocable Trust v. George T. Samaha, III d.b.a. George T. Samaha III Law Firm*, Case No. 2003-GC-75, filed on November 5, 2003 in the Probate Court for the Fifteenth Judicial Circuit, County of Horry, South Carolina.

5.      Attached to this Declaration as Exhibit D is a true and correct copy of the Petition for Administration under Part 5 (the "Part 5 Petition"), filed in the Matter of Francis G. McLure, Case No. 2001 ES 2600820, in the Probate Court for the Fifteenth Judicial Circuit, County of Horry, South Carolina.

6.      Attached to this Declaration as Exhibit E is a true and correct copy of the transcript of the hearing held on March 12, 2002 on the Part 5 Petition.

7.      Attached to this Declaration as Exhibit F is a certified copy of the written order, dated March 19, 2002, issued by the court following the March 12, 2002 hearing.

8.      Attached to this Declaration as Exhibit G is a true and correct copy of the warranty signed by defendant George T. Samaha III as part of the underwriting for the insurance policy at issue in this case.

9.      Attached to this Declaration as Exhibit H is a true and correct copy of the decision in *Worth v. Tamarack Am., Division of Great Am. Ins. Co.*, No. 99-2037, 2000 WL 101227, *9 (7th Cir. Jan. 26, 2000).

I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing statement is true and correct.

Amy Ledoux

October **29** , 2004

Civil Action No.:  4:04-1782-27

# EXHIBIT A

STATE OF SOUTH CAROLINA )    IN THE COURT OF COMMON PLEAS
COUNTY OF HORRY )    CASE NO. 2002-CP-26- 4198
)
CAROLYN HILLS as special administrator )
for THE ESTATE OF FRANCIS P. )
MCLURE and CAROLYN HILLS AND )
VICTORIA DOUGHERTY as co-guardians )
and co-conservators for LILLIAN MCLURE,)
)
      Plaintiffs, )    **AMENDED COMPLAINT**
)     **(Jury Trial Demanded)**
      v. )
)
GEORGE T. SAMAHA, III. d.b.a. GEORGE )
T. SAMAHA III LAW FIRM, )
)
      Defendant. )
)

The Plaintiffs, above named, complaining of the Defendant herein, allege and will show as follows:

1.    Carolyn Hills is a citizen and resident of Horry County in the State of South Carolina and the duly appointed special administrator for the Estate of Francis P. McLure (hereinafter referred to as "Estate") and the co-guardian and co-conservator for Lillian McLure.

2.    Victoria Dougherty is a citizen and resident of the State of New York and the co-guardian and co-conservator for Lillian McLure.

3.    Francis P. McLure (Francis P. McLure hereinafter referred to as "Decedent") was a citizen and resident of Horry County in the State of South Carolina at the time of his death.

4.    Lillian McLure (hereinafter referred to as "Widow") is a citizen of the State of South Carolina and is the widow of Decedent.

5.    Upon information and belief, the Defendant, George T. Samaha, III d/b/a. George T. Samaha, III Law Firm (George T. Samaha, III, hereinafter referred to as "Samaha"), is a citizen and resident of Horry County in the State of South Carolina.

Georgetown: 87664

2

## BACKGROUND FACTS

6.    Lillian McLure is the widow of Decedent.

7.    Decedent was born on October 17, 1923.

8.    Widow was born on September 3, 1922.

9.    Widow and Decedent were married on July 29, 1950.

10.   Upon information and belief, Widow was raised as an orphan, possesses an eighth grade education, has never been employed outside of the home and has no more than an elementary understanding of financial affairs.

11.   During the fifty (50) year marriage between Widow and Decedent, Decedent handled all financial matters and important decisions and doted on Widow.

12.   Widow and Decedent did not have any children.

13.   Prior to August of 2000, Decedent was diagnosed with terminal cancer.

14.   In or about August of 2000, Samaha acted as the attorney for both Widow and Decedent.

15.   In or about August of 2000, Samaha drafted a Power of Attorney for Widow naming Decedent's sister-in-law, Ann McLure, as Attorney-in-Fact.

16.   In or about August of 2000, Samaha drafted a Power of Attorney for Decedent naming Ann McLure as Attorney-in-Fact.

17.   In or about August of 2000, Samaha, as attorney for Widow, drafted and caused to be executed a Last Will and Testament for Widow.

18.   In or about August of 2000, Samaha, as attorney for Decedent, drafted and caused to be executed a Last Will and Testament for Decedent (hereinafter "August Will").

*same a*
*the area*

*TF 18419*
*Omitted in Complaint*
*orig.*  Georgetown: 87664

3

19.     The August Will left all of Decedent's assets to Widow and named Ann McLure, Decedent's sister-in-law, as personal representative.

20.     In or about October of 2000, Samaha advised Decedent to execute a second Last Will and Testament (hereinafter "October Will").

21.     This October Will was drafted to appease Ann McLure, who, upon information and belief, was making demands on Decedent to be named as a beneficiary under Decedent's will.

22.     The October Will provides for specific bequests of roughly $130,000 to Ann McLure, her friends and relatives, with all remaining estate assets to Widow.

23.     The October Will also named Ann McClure as personal representative.

24.     At or about the time the October Will was executed, Samaha advised Decedent that the October Will was a "sham" and provided Ann McLure no legally enforceable rights in the Decedent's estate.

25.     The Decedent died on or about January 3, 2001.

26.     Following the Decedent's death, Ann McLure was instructed by Samaha that she was not required to probate either the August or October Will as the Decedent died without any probate assets.

27.     Samaha also instructed Ann McLure to use her Power of Attorney to fund the specific bequests of approximately $130,000 with assets from a joint bank account held by Widow and Decedent.

28.     Ann McLure, acting under the Power of Attorney entered into by the Widow, subsequently withdrew approximately $130,000 from the joint bank accounts to satisfy the specific bequests.

29.     Upon information and belief, sometime in or around the summer of 2001, Samaha

Georgetown: 87664                                4

caused the Widow's Power of Attorney, which had named Ann McLure as attorney-in-fact, to be

revoked and drafted a new Power of Attorney ("New POA") naming himself as attorney-in-fact.

Samaha failed to ascertain the competency of Widow to enter and appreciate the consequences and

effects of entering into the New POA relationship./At or around this time Samaha knew or should
                                                 *— added sentence
have known that Widow was unable to manage her property and affairs and that she had property

which would be wasted or dissipated without proper management/ Further, Samaha failed to

advise Widow that she should seek independent advice as to the consequences and effect of the

New POA and whether she should enter the relationship and appoint Samaha as attorney-in-fact.

¶34        30.    Upon information and belief, Samaha, at or near the same time he drafted the New

POA, drafted a trust ("Trust") for Widow wherein he appointed himself as Trustee. Samaha failed

to ascertain the competency of Widow to enter and appreciate the consequences and effects of

entering into the Trust relationship./At or around this time Samaha knew or should have known that
                                      *  added sentence
Widow was unable to manage her property and affairs and that she had property which would be

wasted or dissipated without proper management.\Further, Samaha failed to advise Widow that she

should seek independent advice as to the consequences and effect of the Trust and whether she

should enter the relationship and appoint Samaha as trustee.

#35        31.    Under the alleged authority of the New POA, Samaha liquidated assets which were

jointly held by Widow and Decedent.

#36        32.    Samaha's liquidation of jointly held assets was unnecessary and imprudent and

caused Widow and/or the Estate of Decedent to incur penalties, fees, assessments and/or surrender

charges.

# 37       33.    Samaha's liquidation of the assets created an unnecessary tax liability of

approximately $23,000.



34.     Upon information and belief, following the liquidation, Samaha transferred the assets held jointly by Widow and Decedent into his own name.

35.     Upon information and belief, in or about December 2001, Samaha, as attorney-in-fact, sold Widow's primary residence located at 4222 Bonaire Lane (hereinafter referred to as "Primary Residence") for the tax assessed value.

36.     Upon information and belief, at or near December 2001 Samaha, in a representative capacity for Widow, made gifts to Victoria Valenti and Jill O'Kane in the aggregate amount of Seventy-five Thousand and No/100 ($75,000.00) Dollars. Such gifts were inappropriate and without authority and made by Samaha at a time when he knew or should have known that Widow was unable to manage her property and affairs.

37.     With the proceeds of the liquidated assets, Samaha purchased a $300,000 annuity and a $100,000 annuity for Widow's Trust that, upon information and belief, do not provide Widow with any income until 2009. Additionally, both annuities have an initial surrender charge of 9%, which decreases by 1% annually until maturity. By these actions, Samaha failed to exercise due care in making this investment and breached his fiduciary duties to Widow because the investment was not in the best interests of widow, a substantial commission was charged as opposed to other investments, the surrender charge is substantial and an inappropriate investment in light of Widow's age, health and other resources.

38.     On August 27, 2001, following a hearing of the Probate Court, the October Will was deemed to be the Last Will and Testament of the Decedent.

39.     Upon information and belief, in or about October 2001, Widow, at the direction of Samaha, was transferred to an assisted living facility in New York.

40.    Upon information and belief, on October 26, 2001, Samaha, unilaterally and without consolation or approval from Widow, wrote a letter to the assisted living facility in New York instructing the staff that Widow should be prohibited from having a telephone in her room and from receiving phone calls from anyone not listed in his correspondence.

41.    On or about March 12, 2002, Samaha filed a lawsuit ostensibly on behalf of Widow.

42.    The lawsuit contained facts that Samaha knew to be false at the time of its filing.

43.    On March 12, 2002, the Probate Court held another hearing.

44.    At the March 12, 2002 hearing, Samaha falsely testified before the Court that he did not know of Widow's whereabouts and that he did not have a phone number for her.

45.    Samaha also testified before the Probate Court that he charged Widow a contingency fee of approximately $115,000 for the liquidation and "marshalling" of the Widow's assets.

46.    At the conclusion of the March 12, 2002 hearing, the Probate Court ordered that the funds used to satisfy the specific bequests by Ann McLure and the fee charged by Samaha be placed in a court monitored trust account pending further order of the Probate Court.

47.    On March 20, 2002, Samaha instructed Victoria Dougherty (Victoria Dougherty hereinafter referred to as "Dougherty"), Widow's niece, that it was important and necessary to have Widow execute a new Power of Attorney appointing Dougherty as attorney-in-fact.

48.    Subsequently, on March 22, 2002, Widow executed a new Power of Attorney appointing Dougherty as attorney-in-fact.

49.    On April 16, 2002, the Probate Court held a hearing. Thereafter it appointed Carolyn Hills, Esquire and Victoria Dougherty as co-guardians and co-conservators for Widow.

## FOR A FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty)

50.    Plaintiffs reallege Paragraphs 1 through 49 as if set forth verbatim herein.

51.    Samaha served as attorney, trustee and attorney-in-fact for Widow. Samaha served as attorney for Decedent. Decedent and Widow reposed special trust and confidence in Samaha. Samaha accepted Decedent's and Widow's trust and confidence.

52.    In his capacity as attorney to Decedent and as attorney, trustee and attorney-in-fact for Widow, Samaha owed fiduciary duties to Decedent and Widow in accordance with the common and statutory law of South Carolina.

53.    The Defendant breached his fiduciary duties to the Decedent and Widow by:

a) advising and taking action to create the October Will;

b) failing to deliver the Decedent's wills to the Probate Court as required by S.C. Code Ann. §62-2-901;

c) instructing Ann McLure to satisfy the specific bequests contained in the October Will with funds in a joint account held by Widow and Decedent;

d) drafting instruments appointing himself as attorney-in-fact and trustee without advising Widow of the legal consequences, reasonableness and necessity of the instruments and that she should seek independent legal advice;

e) liquidating of assets held jointly by Widow and Decedent for, among other wrongful purposes, i.e. to pay himself an exorbitant fee;

f) creating additional tax liabilities through the unnecessary liquidation of assets held jointly by Widow and Decedent;

g) selling Widow's primary residence for less than fair market value;

h) failure to provide for an accounting of the proceeds from the sale of Widow's Primary Residence and other assets;

i) the improper and imprudent investment of the proceeds of the liquidated assets;

j) paying himself, as attorney for the Widow, a 25% contingency fee of approximately $115,000.00 for the "marshalling" of the Widow's assets;

k) filing a lawsuit based upon facts Samaha knew to be false;

l) failing to account to the Special Administrator for his activities as attorney, trustee and attorney-in-fact for Decedent and Widow;

m) failing to cooperate with and actually hindering The Special Administrator, Guardians and Conservators in the performance of their duties;

n) allowing the Decedent to have two conflicting wills in existence at the time of his death;

o) entering into a contingency fee agreement with Widow for the marshalling and liquidation of assets held jointly by Widow and Decedent;

p) entering into a fee agreement with Widow without ensuring Widow's competency to enter into such agreement; and

q) unilaterally causing Widow's Power of Attorney naming Ann McLure as the attorney-in-fact to be revoked and drafting a new Power of Attorney naming himself as attorney-in-fact.

r) recommending, drafting and causing to be executed a "sham" will;

s) by making the gifts referenced herein under the conditions set forth herein; and

t) otherwise acting in a manner against the best interests of the Widow and Decedent.

54.    As a proximate result of these breaches, the Decedent, his Estate, and Widow have incurred a pecuniary loss.

55.    That by reason of the acts and omissions of the Defendant as set forth above, the Plaintiffs are informed and believe that they are entitled to an award of actual and punitive damages, for the costs of this action, and for such other and further relief as this Court might deem just and proper.

**FOR A SECOND CAUSE OF ACTION**
**(Negligence)**

56.    The Plaintiffs reallege Paragraphs 1 through 55 as if set forth verbatim herein.

57.    Samaha was the attorney, trustee and attorney-in-fact for Widow and attorney for Decedent. Accordingly, Samaha had a duty to the Decedent and Widow.

58.    Samaha breached his duty to the Decedent and Widow and failed to exercise reasonable care under the circumstances by:

a) advising and taking action to create the October Will;

b) failing to deliver the Decedent's wills to the Probate Court as required by S.C. Code Ann. §62-2-901;

c) instructing Ann McLure to satisfy the specific bequests contained in the October Will with funds in a joint account held by Widow and Decedent;

d) drafting instruments appointing himself as attorney-in-fact and trustee without advising Widow of the legal consequences, reasonableness and necessity of the instruments and that she should seek independent legal advice;

e) liquidating of assets held jointly by Widow and Decedent for, among other wrongful purposes, to pay himself an exorbitant fee;

f) creating additional tax liabilities through the unnecessary liquidation of assets held jointly by Widow and Decedent;

g) selling Widow's primary residence for less than fair market value;

h) failure to provide for an accounting of the proceeds from the sale of Widow's Primary Residence;

i) the improper and imprudent investment of the liquidated assets;

j) paying himself, as attorney for the Widow, a 25% contingency fee of approximately $115,000.00 for the "marshalling" of the Widow's assets;

k) filing a lawsuit based upon facts Samaha knew to be false;

l) failing to account to the Special Administrator for his activities as attorney, trustee and attorney-in-fact for Widow;

m) failing to cooperate with and actual hindrance of the Special Administrator in the performance of her duties as ordered by the Probate Court,

n) allowing the Decedent to have two conflicting wills in existence at the time of his death;

o) entering into a contingency fee agreement with Widow for the marshalling and liquidation of assets held jointly by Widow and Decedent;

p) entering into a fee agreement with Widow without ensuring Widow's competency to enter into such agreement;

q) unilaterally causing Widow's Power of Attorney naming Ann McLure as the attorney-in-fact to be revoked and drafting a new Power of Attorney naming himself as attorney-in-fact;

new – replacing *q) in comp*  r) by making gifts as referenced herein under the conditions set forth herein; and

new addition  s) otherwise breaching his duty of care to Widow and Decedent.

# 63    59.    As the proximate cause of the Defendant's actions, the Widow, Decedent and his estate suffered and have and are likely to continue to suffer damages.

60.    The Defendant's actions and omissions were negligent, grossly negligent, reckless, willful and wanton.

61.    That by reason of the acts and omissions of the Defendant as set forth above, the Plaintiffs are informed and believe that they are entitled to an award of actual and punitive damages, for the costs of this action, and for such other and further relief as this Court might deem just and proper.

## FOR A THIRD CAUSE OF ACTION
### (Fraud)

62.    The Plaintiffs realleges Paragraphs 1 through 61 as if set forth verbatim herein.

63.    Samaha represented to Widow that a contingency fee agreement was an appropriate agreement between him and Widow for the marshalling and liquidation of assets.

64.    These representations were false and made without ensuring Widow's competency to enter into such agreement.

65.    To the extent widow could handle her financial affairs these representations were material to Widow's decision to enter into the contingency fee agreement and to not seek alternative representation.

66.    Samaha knew of, or exhibited a reckless disregard for, the representation's falsity and failed to ensure that Widow was competent to enter into such agreement.

67.    The representations were made with the intent that the Widow would enter into the contingency fee agreement.

68.    Widow had no knowledge that Samaha's representations were false.

69.    To the extent widow could handle her financial affairs Widow relied upon the misrepresentations in making her decision to enter into the contingency fee agreement.

70.    Widow was justified in her reliance on the representations made by Samaha.

#77   71.   As a proximate result of the misrepresentations, Widow has suffered pecuniary losses and Plaintiffs are entitled to an award of actual and punitive damages, for the costs of this action, and for such other and further relief as this Court might deem just and proper.

## FOR A FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

#78   72.   The Plaintiffs reallege Paragraphs 1 through 71 as if set forth verbatim herein.

#79   73.   Samaha represented to Widow that a contingency fee agreement was an appropriate agreement between him and Widow for the marshalling and liquidation of assets.

#80   74.   Samaha knew, or should have known, that the representations were false and should have investigated Widow's competency to enter into such agreement./Samaha made the *added sentence* representations at a time he knew or had reason to know Widow was unable to handle her financial affairs./

#81- reworded   75.   To the extent widow could handle her financial affairs, Samaha's representations were material to Widow's decision to enter into the contingency fee agreement.

#82 reworded   76.   To the extent widow could handle her financial affairs Widow relied upon the representations in making her decision to enter into the contingency fee agreement.

#83   77.   Samaha had a pecuniary interest in making the misrepresentations.

#84   78.   Samaha had a duty of care to ensure that he communicated truthfully with Widow.

#85   79.   Samaha breached that duty by failing to exercise the reasonable degree of care to ensure only truthful communication with Widow.

#86   80.   As a proximate result of that breach of duty of care, Widow has suffered pecuniary losses.

#87 - reworded   81.   That by reason of the acts and omissions of the Defendant, as set forth above, Plaintiffs are informed and believes that they are entitled to an award of actual and punitive

damages, for the costs of this action, and for such other and further relief as this Court might

deem just and proper.

*6th cause in orig Comp*
*# 88*

## FOR A FIFTH CAUSE OF ACTION
### (Violation of South Carolina Unfair Trade Practices Act)

*# 88*    82.    The Plaintiffs reallege Paragraphs 1 through 81 as if set forth verbatim herein.

*# 89*    83.    Samaha's actions constitute unfair or deceptive acts or practices in the conduct of

commerce and as such are illegal under the Unfair Trade Practices Act as defined by S.C. Code Ann

§ 39-5-20.

*# 90*    84.    Samaha is currently engaged in the practice of law effecting commerce in South

Carolina.

*#91*    85.    Due to the actions of Samaha, Widow has suffered actual and ascertainable

damages.

*#92*    86.    Based on the fact that the Samaha is currently engaged in the practice of law and

represents other clients, the unfair and deceptive acts or practices have an impact upon the public

interest and have the potential for repetition.

*#93*    87.    The actions and omissions of Samaha that constitute a violation of the South

Carolina Unfair Trade Practices Act were done willfully and knowingly.

*#94*    88.    Under S.C. Code Ann. §39-5-140 the Plaintiffs seeks three times the actual damages

sustained, such other relief as the court deems necessary or proper, and reasonable attorney's fees

and costs.

*7th Cause in orig Comp*

## FOR A SIXTH CAUSE OF ACTION
### (Constructive Trust)

*#95*    89.    The Plaintiffs reallege Paragraphs 1 through 88 above as if set forth verbatim herein.

Georgetown: 87664                              14

90.    Through the activities as alleged throughout this Complaint, Samaha has obtained money that does not in equity and good conscience belong to him. Said money has been obtained by Samaha by accident, mistake of fact or fraud or has been obtained through a breach of trust and/or breach of fiduciary duty and/or as otherwise set forth in this Complaint.

91.    As a result of Samaha's actions and omissions, Widow has suffered damages.

92.    Accordingly, Plaintiffs pray that the Court create a constructive trust by operation of law over the assets of Widow obtained by Samaha and return the corpus to Widow.

### FOR A SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

93.    The Plaintiffs reallege Paragraphs 1 through 92 above as if set forth verbatim herein.

94.    Samaha has wrongfully obtained a benefit contrary to law, equity and good conscience from Widow through the receipt of a contingency fee of approximately $115,000 for the liquidation and marshalling of the jointly held assets.

95.    By and through his actions and omissions as alleged throughout this Complaint, Defendant Samaha has been unjustly enriched and the Plaintiff has been damaged.

96.    Accordingly, Defendant Samaha should be required to disgorge all of his ill-gotten gains as calculated by the law and the trier of fact.

### PRAYER

WHEREFORE, Plaintiffs, having fully set out their Complaint would pray unto this Honorable Court that this Court award Plaintiffs damages to include, but not limited to, actual damages, three times actual damages, punitive damages, attorneys fees and costs, pre-judgment interest and any other relief that this Court deems just and proper.

Respectfully submitted,

McNAIR LAW FIRM, P.A.

Richard M. Smith, Esquire
George E. McDowell, Jr.
Post Office Drawer 418
Georgetown, S.C. 29442
(843) 546-6102
Attorneys for Plaintiff

Georgetown, South Carolina
This _17_ day of July 2002

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
COUNTY OF HORRY ) CASE NO. 2002-CP-26-4198
)
CAROLYN HILLS as special administrator )
for THE ESTATE OF FRANCIS P. )
MCLURE and CAROLYN HILLS AND )
VICTORIA DOUGHERTY as co-guardians )
and co-conservators for )
LILLIAN MCLURE, )
) **CERTIFICATE OF SERVICE**
)
Plaintiffs, )
)
v. )
)
GEORGE T. SAMAHA, III. d.b.a. )
GEORGE T. SAMAHA III LAW FIRM, )
)
Defendant. )
_____ )

I, Amanda Bone, an employee of McNair Law Firm, P.A., do hereby certify that on

October 17, 2002 I served a true and correct copy of Plaintiff's Amended Summons and

complaint in the above-referenced action via U.S. Postal Service, with proper postage affixed

thereto, addressed as follows:

R. David Howser, Esquire
Howser, Newman & Besley, LLC
Post Office Box 12009
Columbia, SC 29211

*Amanda L Bone*
Amanda Bone

Georgetown, South Carolina

Civil Action No.:  4:04-1782-27

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d
2004 WL 691749 (M.D.N.C.)
**(Cite as: 2004 WL 691749 (M.D.N.C.))**

Page 1

C
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
M.D. North Carolina.

Yvonne H. JONES, Plaintiff,
v.
GE LIFE AND ANNUITY ASSURANCE
COMPANY, Defendant.

**No. 1:03CV241.**

March 17, 2004.

Woodberry L. Bowen, Bowen Berry Powers &
Slaughter, PLLC, Wilmington, NC, Craig L. Lowell
, Dennis G. Pantazis, Gordon Silberman Wiggins &
Childs, Jeff S. Daniel, Daniel Law Firm,
Birmingham, AL, Robert M. Foote, Ted Meyers,
Foote Meyers Mielke & Flowers, LLC, Geneva, IL,
Robert Carroll Slaughter, III, Office of the Norfolk
Commonwealth's Attorney, Norfolk, VA, for
Plaintiff.

David William Sar, James T. Williams, Jr., Stanley
Leigh Rodenbough, IV, Brooks Pierce Mclendon
Humphrey & Leonard, Greensboro, NC, James F.
Jorden, Paul A. Fischer, Jorden Burt, LLP,
Washington, DC, for Defendant.

MEMORANDUM OPINION

TILLEY, Chief J.

*1 This matter is now before the Court on
Defendant's Motion for Judgment on the Pleadings
pursuant to Federal Rule of Civil Procedure 12(c)
[Doc. # 14]. For the reasons discussed below,
Defendant's Motion to Dismiss will be GRANTED.

I.

The facts in the light most favorable to the
Plaintiff, the non-moving party, are as follows.
Plaintiff Yvonne H. Jones purchased a "Flexible
Premium Adjustable Life Insurance Policy" [FN1]
("the policy") from the predecessor of GE Life and
Annuity Assurance Company ("GE Life"). (Def.'s
Mem. Mot. J. Pleadings Ex. A.) The particular
policy sold to Ms. Jones is a uniform contract of
insurance sold by GE Life nationwide. According to
the terms of the policy, GE Life would calculate a
"cost of insurance rate" that would be used to
determine a monthly "cost of insurance charge."
The cost of insurance charge would be paid each
month by the policyholder, either directly or
through a deduction from the accumulated cash
value of the policy.

> FN1. GE Life describes this type of policy
> as follows:
> Universal life insurance policies ... offer
> flexibility with respect to the payment of
> premiums. Unlike traditional ordinary life
> policies where the required premium
> charged under the policy is calculated and
> guaranteed to provide a fixed death benefit
> for the life of the policy, universal life
> policyholders are given a certain flexibility
> to choose and adjust the level of their
> premium payments, if any, and/or the
> amount of the death benefit. Universal life
> policies are generally cash value driven-so
> long as there is sufficient cash value in the
> policy to support a particular death benefit,
> coverage exists. However, if interest rate
> levels decrease or cost of insurance
> charges increase, the policy's cash value
> may be insufficient to support a particular
> death benefit without additional and/or
> higher out-of-pocket premium payment(s);
> or a reduction in the policy's death benefit
> may be necessary to keep the policy from
> lapsing.
> (Def.'s Mem. Mot. J. Pleadings at 3-4,
> *citing* Kenneth Black, Jr. & Harold D.
> Skipper, Jr., *Life & Health Insurance,*
> 113-16 (13th ed.2000).)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 2
2004 WL 691749 (M.D.N.C.)
(Cite as: 2004 WL 691749 (M.D.N.C.))

In 1992, tax laws were changed in a manner that increased GE Life's overall tax liability. [FN2] As a result, GE Life increased its cost of insurance rates. On January 28, 2003, Ms. Jones filed a class action Complaint in Guilford County Superior Court. [Doc. # 1]. The Complaint alleges that GE Life breached its contract with Ms. Jones, and others similarly situated, by increasing the applicable cost of insurance rates to compensate for GE Life's increased tax liability. On March 14, 2003, GE Life removed the action to the Middle District of North Carolina based on diversity of citizenship [Doc. # 1], and filed an Answer to the Complaint [Doc. # 3]. On September 18, 2003, GE Life filed a Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). [Doc. # 14].

> FN2. The specific nature of the tax code changes are irrelevant to the issues before the Court.

## II.
### a.

In considering a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), facts [FN3] presented in the pleadings and the inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir.1999). In this respect, the standard applied to a motion for judgment on the pleadings is the same as that applied to a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), i.e. the motion should only be granted if, after taking all well pleaded allegations in the complaint as true, the plaintiff can prove no set of facts entitling her to relief. *Id.* at 243.

> FN3. For purposes of a 12(c) motion, the movant "concedes the accuracy of the *factual* allegations in his adversary's pleading, [but] does not admit other assertions that constitute conclusions of law, legally impossible facts, or matters that would not be admissible at trial." Wright & Miller, *Fed. Practice & Procedure,* § 1368 (emphasis added).

### b.

In deciding GE Life's 12(c) motion, the life insurance policy itself will be considered along with the factual allegations of the Complaint and Answer. The policy is integral to and explicitly relied upon in the Complaint, and its authenticity is unchallenged. [FN4] For the reasons discussed below, the pleadings establish that Ms. Jones' claim is barred by the applicable statute of limitations. Therefore, GE Life's other arguments need not be addressed, and GE Life's Motion for Judgment on the Pleadings will be GRANTED.

> FN4. Generally, only the allegations of the pleadings are considered in deciding a motion to dismiss pursuant to Rule 12(c). *Eagle Nation, Inc. v. Mkt. Force, Inc.,* 180 F.Supp.2d 752, 754 (E.D.N.C.2001). When "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(c); *see also Eagle Nation,* 180 F.Supp.2d at 754.
> However, in analyzing a 12(c) motion, a district court may consider documents extraneous to the complaint in certain circumstances without converting the motion into one for summary judgment. Specifically, documents that are "integral to and explicitly relied on in the complaint" *may* be considered, if the authenticity of such documents is not in question. *Phillips v. LCI Intern., Inc.,* 190 F.3d 609, 618 (4th Cir.1999) (discussion in context of Rule 12(b)(6) motion); *see also Eagle Nation,* 180 F.Supp.2d at 754.

*2 The essence of Ms. Jones' Complaint is that GE Life breached the parties' contract by increasing the cost of insurance rate in a manner contrary to that set out in the policy language. The relevant provision from the policy is as follows:

> *Cost of Insurance Rate.* The monthly rate is based on insured's sex, obtained age, policy duration and risk class. The rates are determined by [GE Life] according to our expectations of future experience. We can change rates from time to time, but they will never be more than the maximum rates shown in the Table of Guaranteed Maximum Insurance Rates. A change in rates will

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 691749 (M.D.N.C.)
(Cite as: 2004 WL 691749 (M.D.N.C.))

Page 3

apply to all persons of the same age, sex and risk class and whose policies have been in effect for the same length of time.
(Def.'s Mem. Mot. J. Pleadings Ex. A. at 9.)

Ms. Jones contends that this provision prohibits GE Life from calculating the cost of insurance rate using any factors other than the insured's sex, age, policy duration, and risk class. Therefore, she contends that GE Life breached the contract by increasing the cost of insurance rate in 1992 in response to GE Life's increased tax liability. Because GE Life used the increased rate set in 1992 to calculate each subsequent month's cost of insurance charge, she contends the breach is ongoing.

In contrast, GE Life contends that the provision gives it discretion to change the cost of insurance rates, subject only to the guaranteed maximum rates provided in the referenced tables. It contends that, when read as a whole, the provision provides that the cost of insurance rates may be changed by GE Life, even though the initial rates flow from and are based on tables identifying rates applicable to each insured depending on "sex, attained age, and risk class" and the "policy duration."

Because Ms. Jones' claim is barred by the statute of limitations, further interpretation of the above-quoted contract provision is unnecessary. Both parties agree that the statute of limitations governing Ms. Jones' breach of contract claim is found in N.C. Gen.Stat. § 1-52, which provides a three-year statute of limitations for breach of contract actions. [FN5] The three-year period begins at the time of the breach giving rise to the cause of action. *Penley v. Penley,* 314 N.C. 1, 19, 332 S.E.2d 51 (1985).

> FN5. When federal jurisdiction rests on diversity of citizenship, as it does here, the federal court applies the substantive law of the state in which the court sits. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Security Ins. Co. of Hartford v. Arcade Textiles, Inc.,* 40 Fed. Appx. 767 (4th Cir.2002). For purposes of analysis under *Erie,* state statute of limitations periods are considered substantive. *Guaranty Trust*

*Co. v. York,* 326 U.S. 99, 110-12, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Therefore, the North Carolina statute of limitations for breach of contract actions governs in this case.

Here, the parties disagree as to the date of any alleged breach. GE Life contends that the Complaint references the date of the cost of insurance rate increase as 1992. Because the rate increase is what Ms. Jones contends constitutes the breach of contract, the statute of limitations began to run in 1992 and expired in 1995, years before Ms. Jones filed her Complaint.

Ms. Jones agrees that an alleged breach occurred in 1992 at the time of the rate increase. However, she argues that a new breach occurred in every subsequent month, when GE Life calculated the monthly cost of insurance charge using the "incorrect" cost of insurance rate. Therefore, Ms. Jones contends that the contract in question is divisible, and that because the statutory period begins anew for each successive breach, the three-year statute of limitations does not bar her recovery. Instead, she contends it *limits* her recovery to the three-year period preceding her filing of the Complaint, that is, the period from 2000 to 2003.

*3 Absent an agreement to the contrary, a life insurance contract is to be interpreted as an entire contract for the life of the policy, and not a divisible contract subject to continuous breach. *N.Y. Life Ins. Co. v. Statham,* 93 U.S. 24, 28, 23 L.Ed. 789 (1876) ; *McMaster v. N.Y. Life Ins. Co.,* 183 U.S. 25, 35, 22 S.Ct. 10, 46 L.Ed. 64 (1901); *see also* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 69:5 (3d ed., West). In other words, life insurance contracts are contracts for life, or for the term specified in the policy, in consideration of periodic payments. Each payment is not consideration for the period in which it is paid, but is part consideration for the entire contract.

Ms. Jones argues that the authority discussed above does not apply to modern universal life insurance policies, as these type policies were not even created at the time the cases were decided. However, Ms. Jones provides no applicable support for her view that universal life policies should be

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 691749 (M.D.N.C.)
**(Cite as: 2004 WL 691749 (M.D.N.C.))**

Page 4

treated as divisible contracts instead of being governed by the general rule.

Further, the face of Ms. Jones' Complaint makes it clear that only one breach is alleged, the 1992 increase in the cost of insurance rate. The Complaint does state that GE Life continued to use the new rate in calculating the cost of insurance charge each month. However, the provision of the policy alleged to have been breached addresses only the calculation of the cost of insurance rate, and not the cost of insurance charge. Accordingly, the policy in question is properly treated as an entire contract, and the three-year statute of limitations period began in 1992.

### III.

In short, viewing the factual allegations of the pleadings in the light most favorable to Ms. Jones establishes that more than three years elapsed between the alleged breach of contract and Ms. Jones' filing of suit. Therefore, the claims are barred, and GE Life's Motion for Judgment on the Pleadings will be GRANTED.

### JUDGMENT

For the reasons stated in a contemporaneously filed Memorandum Opinion, Defendant's Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c) [Doc. # 14] is GRANTED.

2004 WL 691749 (M.D.N.C.)

Motions, Pleadings and Filings (Back to top)

• 1:03CV00241  (Docket)

(Mar. 14, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Civil Action No.:  4:04-1782-27

# EXHIBIT C

STATE OF SOUTH CAROLINA   )   IN THE PROBATE COURT
                            )   FIFTEENTH JUDICIAL CIRCUIT
COUNTY OF HORRY            )   CASE NO. 2003-~~GP-26-~~
                            )           GC - 75
                            )
CAROLYN HILLS AND VICTORIA   )
DOUGHERTY AS CO-GUARDIANS   )
AND CO-CONSERVATORS FOR     )
LILLIAN MCLURE, AND VICTORIA   )
DOUGHERTY AND MICHAEL J.     )          **COMPLAINT**
DOUGHERTY AS   CO-TRUSTEES OF )    (Jury Trial Demanded)
THE LILLIAN MCLURE IRREVOCABLE )
TRUST,                         )
         PLAINTIFFS,      )
                            )
vs.                           )
                            )
GEORGE T. SAMAHA, III,      )
                            )
        DEFENDANT.     )
_____)

      The Plaintiffs, above named, demanding trial by jury and complaining of the Defendant herein, allege and will show as follows:

      1.     Carolyn Hills is a citizen and resident of Horry County in the State of South Carolina and is the co-guardian and co-conservator for Lillian McLure.

      2.     Victoria Dougherty (hereinafter referred to as "V. Dougherty") is a citizen and resident of the State of New York and the co-guardian and co-conservator for Lillian McLure. Since September 17, 2003, V. Dougherty has been and is the successor co-Trustee of the Lillian J. McLure Irrevocable Trust dated July 16, 2001 (hereinafter referred to as the "Trust").

      3.     Michael J. Dougherty (hereinafter referred to as "M. Dougherty") is a citizen and resident of the State of Virginia. Since September 17, 2003, M. Dougherty has been

and is the successor co-Trustee of the Lillian J. McLure Irrevocable Trust dated July 16, 2001 (hereinafter referred to as the "Trust").

3.    Francis P. McLure (hereinafter referred to as "Decedent") was a citizen and resident of Horry County in the State of South Carolina at the time of his death.

4.    Lillian McLure (hereinafter referred to as "Widow") resides in an assisted living facility in the State of New York and is the primary beneficiary of the Trust and is the Widow of the Decedent.

5.    Upon information and belief, the Defendant, George T. Samaha, III (hereinafter referred to as "Samaha"), is a citizen and resident of Horry County in the State of South Carolina. At all times since its inception and until September 17, 2003, Samaha has been the trustee of the Trust.

## BACKGROUND FACTS

6.    Lillian McLure is the Widow of Decedent.

7.    Decedent was born on October 17, 1923.

8.    Widow was born on September 3, 1922.

9.    Widow and Decedent were married on July 29, 1950.

10.    Upon information and belief, Widow was raised as an orphan, possesses an eighth grade education, has never been employed outside of the home and has no more than an elementary understanding of financial affairs.

11.    During the fifty (50) year marriage between Widow and Decedent, Decedent handled all financial matters and important decisions and doted on Widow.

12.    Widow and Decedent did not have any children.

13.    Prior to August of 2000, Decedent was diagnosed with terminal cancer.

3

14.    In or about August of 2000, Samaha acted as the attorney for both Widow and Decedent.

15.    Upon information and belief, sometime in or around the summer of 2001, Samaha caused to be revoked an existing power of attorney for Widow and drafted a new Power of Attorney ("New POA") naming himself as attorney-in-fact for Widow.  Samaha failed to ascertain the competency of Widow to enter and appreciate the consequences and effects of entering into the New POA relationship.  At or around this time, Samaha knew or should have known that Widow was unable to manage her property and affairs and that she had property which would be wasted or dissipated without proper management.  Further, Samaha failed to advise Widow that she should seek independent advice as to the consequences and effect of the New POA and whether she should enter the relationship and appoint Samaha as attorney-in-fact.

16.    Upon information and belief, Samaha, at or near the same time he drafted the New POA, drafted the Trust for Widow wherein he appointed himself as Trustee.  Widow was the primary beneficiary of the Trust and her nieces and nephews (6 in number) were the remainder beneficiaries.  Samaha failed to ascertain the competency of Widow to enter and appreciate the consequences and effects of entering into the Trust relationship.  At or around this time, Samaha knew or should have known that Widow was unable to manage her property and affairs and that she had property which would be wasted or dissipated without proper management.  Further, Samaha failed to advise Widow that she should seek independent advice as to the consequences and effect of the Trust and whether she should enter the trust relationship and have Samaha serve as trustee.

17.    Under the alleged authority of the New POA, Samaha liquidated assets which were jointly held by Widow and Decedent.

18.    Samaha's liquidation of jointly held assets was unnecessary and imprudent and caused Widow and/or the Estate of Decedent to incur penalties, fees, assessments and/or surrender charges.

19.    Samaha's liquidation of the assets created an unnecessary tax liability of approximately $23,000.

20.    Upon information and belief, following the liquidation Samaha transferred the assets held jointly by Widow and Decedent into his own name.

21.    On or about July 16, 2001, Samaha, acting as attorney-in-fact under the New POA, transferred Widow's residence located at 4222 Bonaire Lane, Little River, South Carolina  (hereinafter referred to as "Primary Residence") to himself as Trustee of the Trust.  The deed for the transfer was rerecorded on August 24, 2001 to correct the Grantee's name and capacity and to clearly identify Samaha's status as Trustee of the Trust.

22.    In or about October 22, 2001, Samaha, as Trustee, contracted to sell Widow's Primary Residence (hereinafter referred to as "Contract") to Jo Anne L. Bostrup.

23.    In or about December 7, 2001, Samaha, as Trustee, executed a deed transferring the Primary Residence in accordance with the Contract.  The deed was recorded in Horry County on December 17, 2001.

24.    The proceeds from the sale of the Primary Residence, approximately $133,478.32, were deposited into an account at Carolina First, account number 8100751395.  Upon information and belief and at all times pertinent to this action,  the



account was held in the name of Lillian J. McLure Irrevocable Living Trust, George T. Samaha, III, Trustee.

25. Upon information and belief, on or about October 26, 2001 Samaha prepared for Widow's signature a document directing Samaha, as her "Power of Attorney", to make gifts to Victoria Valenti and Jill O'Kane in the aggregate amount of Seventy-five Thousand and No/100 ($75,000.00) Dollars. Samaha knew or should have known at this time that that Widow was unable to manage her property and affairs.

26. On December 21, 2001, Samaha, acting as Trustee, made gifts to Victoria Valenti and Jill O'Kane in the aggregate amount of Seventy-five Thousand and No/100 ($75,000.00) Dollars from the proceeds of the sale of the Primary Residence owned by the Trust. Such gifts were inappropriate and without authority and made by Samaha at a time when he knew or should have known that Widow was unable to manage her property and affairs. Further, such gifts were made from the Trust which did not authorize gifts, nor were the remainder beneficiaries consulted. Additionally, Samaha failed to take appropriate legal actions to make such gift assuming Widow was competent to request it.

27. Alternatively, to the extent that Widow was competent to request the gifts as set forth above, which is denied, Samaha lacked authority to use Trust funds to consummate such gifts. Samaha converted Trust funds for the benefit of O'Kane and Valenti to the detriment of Trust, Widow and the remainder beneficiaries.

28. With the proceeds of the liquidated assets from Decedent, Samaha, acting under the New POA, purchased a $300,000 annuity and a $100,000 annuity for Widow. The annuities were transferred by Samaha acting under the New POA to the Trust. The annuities, upon information and belief, do not provide Widow with any income until 2009.

06/04/04  FRI 14:59 FAX 202 662 2190        Ross. Dixon & Bell                    ☒002

Additionally, both annuities have an initial surrender charge of 9%, which decreases by 1% annually until maturity. By these actions, Samaha, acting under the New POA and/or Trustee, failed to exercise due care in making this investment and breached his fiduciary duties to Widow because the investment was not in the best interests of Widow, a substantial commission was charged as opposed to other investments, the surrender charge is substantial and an inappropriate investment in light of Widow's age, health and other resources.

29.    On March 12, 2002, the Probate Court held a hearing into matters concerning the Widow.

30.    Samaha testified before the Probate Court at that hearing that he charged Widow a contingency fee of approximately $115,000 for the liquidation and "marshalling" of the Widow's assets. Samaha testified that he paid that fee in his capacity under the New POA. At the conclusion of the March 12, 2002 hearing, the Probate Court ordered that the fee charged by Samaha be placed in a court monitored trust account pending further order of the Probate Court. Judge Creel, the Probate Court Judge further ordered in an Order dated March 19, 2002 (hereinafter referred to as "Order") that "Samaha is hereby enjoined from taking any further action under the Widow POA or Widow Trust or any action that would affect Decedent's assets or Widow's assets or held for their benefit."

31.    Subsequent to that Order, Samaha caused to be prepared the "Lillian J. McLure Irrevocable – All Account Itemized Categories Report 7/16/01 through 4/09/03" (hereinafter referred to as the "Report"). In the Report Samaha identifies a November 15, 2002 payment referenced as EFT, presumably an Electronic Funds Transfer, to George T. Samaha, III for legal fees in the amount of $159,785.12.    Such transfer was a clear



violation of the Order and, upon information and belief, appears to be in addition to the fees that Samaha testified he received at the March 11, 2002 hearing.

32.     Such fees, whether in addition to or separate, were, to the extent paid by Samaha acting as Trustee, a breach of Samaha's fiduciary duties to act as Trustee for the benefit of the beneficiaries of the Trust. Such payment of fees was also an impermissible conflict of interest for Samaha as Trustee to pay himself fees, whether it be the $115,000, the $159,785.12 or both.   Such payments were also a use of  Trust funds for non-Trust obligations and constituted a conversion of same.

## FOR A FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty)

33.     Plaintiffs reallege Paragraphs 1 through 32 as if set forth verbatim herein.

34.     Samaha served as Trustee for the Trust. Widow reposed special trust and confidence in Samaha. Samaha accepted Widow's trust and confidence.

35.     In his capacity as Trustee, Samaha owed fiduciary duties to Widow and the remainder beneficiaries in accordance with the common and statutory law of South Carolina.

36.     The Defendant breached his fiduciary duties to same by:

a)      approving the payment as Trustee of the Trust to himself as attorney for Widow of an unreasonable fee from Trust funds;

b)      selling Widow's primary residence for less than fair market value;

c)      failure to provide for an accounting of the proceeds from the sale of Widow's Primary Residence and other assets;

d)      the improper and imprudent investment of the proceeds of the liquidated assets;

e)    failing to account to the Special Administrator for his activities as Trustee for Widow and the remainder beneficiaries;

f)    failing to cooperate with and actually hindering The Special Administrator, Guardians and Conservators in the performance of their duties;

g)    by making the gifts and payments for legal fees referenced herein under the conditions set forth herein;

h)    otherwise acting in a manner against the best interests of the Widow and remainder beneficiaries.

37.    As a proximate result of these breaches, the Trust, and hence the beneficiaries thereof, have incurred a pecuniary loss.

38.    The Defendant's actions and omissions were negligent, grossly negligent, reckless, willful and wanton. That by reason of the acts and omissions of the Defendant as set forth above, the Plaintiffs are informed and believe that they are entitled to an award of actual and punitive damages, for the costs of this action, and for such other and further relief as this Court might deem just and proper.

**FOR A SECOND CAUSE OF ACTION**
(Negligence)

39.    The Plaintiffs reallege Paragraphs 1 through 38 as if set forth verbatim herein.

40.    Samaha was the Trustee for the Trust. Accordingly, Samaha had a duty to the Trust, and hence the beneficiaries thereof.

41.    Samaha breached his duty to the Trust, and hence the beneficiaries thereof, and failed to exercise reasonable care under the circumstances by:

a)    approving the payment as Trustee of the Trust to himself as attorney for

9


Widow of an unreasonable fee from Trust funds;

b)   selling Widow's primary residence for less than fair market value;

c)   failure to provide for an accounting of the proceeds from the sale of Widow's Primary Residence and other assets;

d)   the improper and imprudent investment of the proceeds of the liquidated assets;

e)   failing to account to the Special Administrator for his activities as Trustee for Widow and the remainder beneficiaries;

f)   failing to cooperate with and actually hindering The Special Administrator, Guardians and Conservators in the performance of their duties;

g)   by making the gifts and payments for legal fees referenced herein under the conditions set forth herein;

h)   otherwise acting in a manner against the best interests of the Widow and remainder beneficiaries.

42.   As the proximate cause of the Defendant's actions, the Trust, and hence the beneficiaries thereof, have suffered and have and are likely to continue to suffer damages.

43.   The Defendant's actions and omissions were negligent, grossly negligent, reckless, willful and wanton.

44.   That by reason of the acts and omissions of the Defendant as set forth above, the Plaintiffs are informed and believe that they are entitled to an award of actual and punitive damages, for the costs of this action, and for such other and further relief as this Court might deem just and proper.

## FOR A THIRD CAUSE OF ACTION
(Constructive Trust)

45.    The Plaintiffs reallege Paragraphs 1 through 44 above as if set forth verbatim herein.

46.    Through the activities as alleged throughout this Complaint, Samaha has obtained money that does not in equity and good conscience belong to him.  Said money has been obtained by Samaha through a breach of trust and/or breach of fiduciary duty and/or as otherwise set forth in this Complaint.

47.    As a result of Samaha's actions and omissions, the Trust, and hence the beneficiaries thereof, have suffered damages.

48.    Accordingly, Plaintiffs pray that the Court create a constructive trust by operation of law over the assets of Trust obtained by Samaha and return the corpus to the Trust.

## FOR A FOURTH CAUSE OF ACTION
(Conversion)

49.    The Plaintiffs reallege Paragraphs 1 through 48 above as if set forth verbatim herein.

50.    Upon information and belief, Samaha, as trustee, used funds of the Trust to pay himself for alleged obligations other than the Trust, being legal fees allegedly owed him by Widow.    Samaha also used Trust Funds to make gifts as set forth herein under the conditions set forth herein.

51.    As the proximate cause of the Defendant's actions, the Trust, and hence the beneficiaries thereof, have suffered and have and are likely to continue to suffer damages.

11

52.     The Defendant's actions and omissions were negligent, grossly negligent, reckless, willful and wanton.  Samaha is liable to the Trust, and hence the beneficiaries thereof, for the conversion of the Trust assets

53.     That by reason of the acts and omissions of the Defendant as set forth above, the Plaintiffs are informed and believe that they are entitled to an award of actual and punitive damages, for the costs of this action, and for such other and further relief as this Court might deem just and proper.

## PRAYER

WHEREFORE, Plaintiffs, having fully set out their Complaint, would pray unto this Honorable Court that this Court enter judgment awarding Plaintiffs damages to include, but not limited to, actual damages, punitive damages, attorney's fees and costs, pre-judgment interest, a constructive trust as set forth herein and any other relief that this Court deems just and proper.

Respectfully submitted,

McNAIR LAW FIRM, P.A.

Richard M. Smith, Esquire
George E. McDowell, Jr.
Post Office Drawer 418
Georgetown, S.C.  29442
(843) 546-6102

Attorneys for Plaintiffs

Georgetown, South Carolina
This 5 day of November, 2003.

12

Civil Action No.: 4:04-1782-27

# EXHIBIT D

STATE OF SOUTH CAROLINA                                                    PROBATE COURT

COUNTY OF HORRY

IN THE MATTER OF    FRANCIS G. MCLURE                CLERK OF THE

CASE NUMBER        2001 ES 2600820                   01 DEC -6  PM 2: 48

                                                    HORRY COUNTY

### PETITION FOR ADMINISTRATION UNDER PART 5

Petitioner:  Counsel for the Estate of Francis G. McLure

1.      Nature of interest of undersigned:  Counsel for the Estate of Francis G. McLure

2.      I hereby petition for Administration Under Part 5.
Check if applicable:
☐       The testacy of the decedent and the priority and qualification of a Personal Representative have not been previously adjudicated.  Attached is form #300PC, the petition required for formal testacy proceedings.
☐       I have met the notice requirements mandated by law for formal testacy proceedings.
☐       A Personal Representative has been previously appointed.
☑       Other:  Upon information and belief, certain and substantial funds of the Decedent have not been preserved but rather have dissipated without accounting or according to law.

Executed this ___4th___ day of ___December___ 2001.

                Signature: _____
                Name: George E. McDowell, Jr.; McNair Law Firm
                Address: 2411 Oak Street, Founders Center, Suite 206
                         Myrtle Beach, SC 29577
            Telephone(O): (843) 444-1107
                   (H): _____

### ORDER FOR HEARING

IT IS HEREBY ORDERED that a hearing on this matter be set for:

DATE:   MARCH 12, 2002

TIME:   2:30 P.M.

PLACE:  HORRY COUNTY PROBATE COURT COURTROOM

        Pursuant to SCPC Section 1-401, the petitioner is ordered to give notice of this hearing to all interested persons at least twenty (20) days prior to the hearing date.
        Upon receipt of a copy of this petition and order, the Personal Representative shall not exercise his/her power to distribute the estate pending the hearing in this matter.

Executed this __6th__ day of ___December___ 2001.

                _____
                The Honorable Diane Bufkin-Creel, Probate Judge

Civil Action No.:  4:04-1782-27

# EXHIBIT E

STATE OF SOUTH CAROLINA    )
                              )    IN THE PROBATE COURT
                              )    FIFTEENTH JUDICIAL CIRCUIT
COUNTY OF HORRY    )

IN THE MATTER OF:    ESTATE OF FRANCIS G. MCLURE

CASE NO:    2001-ES-26-0820

# THE HEARING HELD BEFORE THE
# HONORABLE DIANE BUFFKIN-CREEL

Tuesday, March 11, 2002
2:32 p.m. - 4:21 p.m.

The following is the hearing held before The Honorable Diane Buffkin-Creel, Probate Court in Horry County, South Carolina, on Tuesday, March 11, 2002.

**Prestige Court Reporting, Inc.**
Post Office Box 1550
Conway, South Carolina 29528
(843) 248-5252



THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO:  2001-ES-26-0820

Page No: 2

## APPEARANCES:

**FOR THE ESTATE:**

Richard Smith, Esquire
MCNAIR LAW FIRM, P.A.
121 Screven Street
Post Office Box 418
Georgetown, South Carolina 29442

George E. McDowell, Jr., Esquire
McNAIR LAW FIRM, P.A.
Founders Centre, Suite 206
2411 Oak Street
Post Office Box 336
Myrtle Beach, South Carolina 29578

**FOR ANN MCLURE:**

William H. Monckton, VI, Esquire
MONCKTON LAW FIRM, P.A.
1300 Professional Drive, Suite 102
Myrtle Beach, South Carolina 29577

**FOR LILLIAN MCLURE:**

George T. Samaha, III, Esquire
SAMAHA LAW FIRM
291-With Highway 90 East
Little River, South Carolina 29566

**COURT REPORTER:**

Karen L. Long
Verbatim Reporter

### *Prestige Court Reporting, Inc.*
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252



THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 3

## INDEX

EXAMINATION OF WITNESS:                                    PAGE

### D. CHARLES DEAL

Direct Examination by Mr. Smith.....................16

### GEORGE T. SAMAHA, III

Direct Examination by Mr. Smith.....................19
Cross Examination by Mr. Monckton...................69

### VICTORIA VALENTI

Direct Examination by Mr. Smith.....................76
Cross Examination by Mr. Monckton...................80
Examination by The Court...........................86

### ANN MCLURE

Direct Examination by Mr. Smith.....................91
Certificate of Court Reporter.....................120

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252



THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 5

| | | |
|---|---|---|
| 1 | THE COURT: | GOOD AFTERNOON, LADIES AND |
| 2 | | GENTLEMEN. BE SEATED, |
| 3 | | PLEASE. COURT IS IN |
| 4 | | SESSION. IT SEEMS I HAVE A |
| 5 | | LOT OF PEOPLE IN HERE |
| 6 | | TODAY. OUR LITTLE |
| 7 | | COURTROOM IS FULL. I |
| 8 | | ALWAYS LIKE TO HAVE THE |
| 9 | | NAMES OF ALL OF THOSE THAT |
| 10 | | ARE PRESENT. OF COURSE, I |
| 11 | | KNOW THE COUNSEL AT THE |
| 12 | | FRONT TABLE AND MR. SAMAHA |
| 13 | | AND MR. MONCKTON. WOULD |
| 14 | | THE REST OF YOU, STARTING |
| 15 | | WITH YOU, MS. MCLURE, |
| 16 | | PLEASE INTRODUCE YOURSELF? |
| 17 | MS. MCLURE: | ANN MCLURE. |
| 18 | THE COURT: | THANK YOU, MA'AM. NEXT? |
| 19 | MS. JARRETT: | IRENE JARRETT. |
| 20 | THE COURT: | OKAY, NEXT? |
| 21 | MR. LONG: | HOWARD LONG. |
| 22 | THE COURT: | THANK YOU. |
| 23 | MR. DEAL: | CHARLES DEAL, YOUR HONOR. |
| 24 | THE COURT: | IN THE BACK ROW, PLEASE, |
| 25 | | MA'AM? |

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252



THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 6

| 1 | MS. SMALL: | DONNA SMALL. |
| 2 | MS. VALENTI: | VICKIE VALENTI. |
| 3 | MS. DANIELS: | SHAWN DANIELS. |
| 4 | THE COURT: | THANK YOU.  EVERYONE HERE |
| 5 | | HAS BEEN ON THE LIST OF THE |
| 6 | | NAMES THAT WERE NOTICED OF |
| 7 | | THE HEARING TODAY, I DO |
| 8 | | BELIEVE.  WITH THAT SAID, |
| 9 | | COURT IS IN SESSION.  WE'RE |
| 10 | | HERE FOR A HEARING THIS |
| 11 | | AFTERNOON IN THE ESTATE OF |
| 12 | | FRANCIS MCLURE.  THAT FILE |
| 13 | | NUMBER IS 2001-ES-26-0820. |
| 14 | | THERE HAS BEEN A PETITION |
| 15 | | SUBMITTED TO THE COURT FOR |
| 16 | | AN APPOINTMENT OF A SPECIAL |
| 17 | | ADMINISTRATOR AND ALSO A |
| 18 | | PETITION FOR ADMINISTRATION |
| 19 | | UNDER PART FIVE.  MR. |
| 20 | | GEORGE MCDOWELL AND MR. |
| 21 | | RICHARD SMITH WITH MCNAIR |
| 22 | | LAW FIRM ARE THE ATTORNEYS |
| 23 | | FOR THE ESTATE.  MR. |
| 24 | | MONCKTON REPRESENTS MS. ANN |
| 25 | | MCLURE WHO HAS HAD A |

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO:  2001-ES-26-0820

Page No:  7

|    |    |    |
|----|----|----|
| 1 |  | LIMITED PR ABILITY IN THIS |
| 2 |  | ESTATE.  WITH THAT SAID, |
| 3 |  | MR. MCDOWELL, I'M GOING TO |
| 4 |  | ASK FOR AN OPENING |
| 5 |  | STATEMENT FOR THE COURT |
| 6 |  | FROM YOU, PLEASE, OR WOULD |
| 7 |  | YOU LIKE FOR MR. SMITH TO |
| 8 |  | GIVE THE OPENING STATEMENT? |
| 9 | MR. MCDOWELL: | I'LL ALLOW MR. SMITH. |
| 10 |  | THANK YOU, YOUR HONOR. |
| 11 | THE COURT: | THANK YOU, SIR.  MR. SMITH? |
| 12 | MR. SMITH: | THANK YOU, YOUR HONOR. |
| 13 |  | YOUR HONOR, WE'RE HERE |
| 14 |  | TODAY ON THE PETITION FOR A |
| 15 |  | PART FIVE ADMINISTRATION. |
| 16 |  | THE APPOINTMENT OF A |
| 17 |  | SPECIAL ADMINISTRATOR.  AS |
| 18 |  | THE COURT KNOWS, THESE ARE |
| 19 |  | VERY UNUSUAL.  THE SPECIAL |
| 20 |  | ADMINISTRATOR, PART FIVE IS |
| 21 |  | VERY STRENUOUS IN REMEDY; |
| 22 |  | HOWEVER, WE BELIEVE THAT |
| 23 |  | AFTER THE COURT HEARS THE |
| 24 |  | TESTIMONY TODAY WE WILL |
| 25 |  | FIND THAT THE ASSETS OF MR. |

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 8

1  MCLURE UPON HIS DEATH ARE

2  REALLY UNKNOWN. THEY ARE A

3  JUMBLE OF STOCKS, OF BONDS,

4  OF ANNUITIES AND PERSONAL

5  PROPERTY AND REAL PROPERTY

6  AND THAT SOMEHOW, SOMEWHERE

7  $130,000, APPROXIMATELY, OF

8  ASSETS THAT WERE HIS UPON

9  HIS PASSING HAVE BEEN

10  DISSIPATED. THEY'VE GONE TO

11  PERSONS WHO ARE DESIGNATED

12  AS BENEFICIARIES UNDER THE

13  WILL THAT WAS ACCEPTED BY

14  THE COURT FOR PROBATE AT

15  THE LAST HEARING. THERE'S

16  QUESTIONS REGARDING THE

17  PROPRIETY OF THOSE

18  TRANSFERS. WE BELIEVE THAT

19  WHAT NEEDS TO BE DONE TODAY

20  IS FOR THE COURT TO HEAR

21  THE TESTIMONY AND I BELIEVE

22  AT THE CONCLUSION OF THAT

23  TESTIMONY THERE WILL BE NO

24  QUESTION BUT THAT THE

25  ASSETS OF MR. MCLURE ARE

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 9

1  UNKNOWN, THAT WE KNOW THE
2  CATEGORIES AND WE KNOW
3  SOMETHING ABOUT THAT, BUT
4  WHAT WE NEED TO HAVE HAPPEN
5  HERE IS WHAT SHOULD HAPPEN
6  WHEN A PR GETS ACTIVELY
7  INVOLVED IN A CASE AND THAT
8  IS, STEP ONE, MARSHAL THE
9  ASSETS, DETERMINE WHAT THEY
10  ARE, GO THROUGH THE
11  INVENTORY, THE APPRAISAL,
12  THE PROPER NOTIFICATIONS TO
13  CREDITORS, ALL TO MAKE
14  SURE, BOTH THAT THE WIDOW
15  AND ANY BENEFICIARIES THAT
16  ARE ENTITLED TO THE FUNDS
17  GET THE FUNDS. WE WOULD
18  JUST LIKE TO PUT ON THE
19  TESTIMONY AND ESTABLISH,
20  YOUR HONOR, GENERALLY THAT
21  THERE ARE A VARIETY OF
22  ASSETS. NO ONE KNOWS
23  EXACTLY WHAT'S THERE. NO
24  ONE KNOWS WHAT WAS THERE
25  WHEN MR. MCLURE DIED. THIS

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 10

1    ESTATE IS IN CHAOS, AND WE

2    ALSO BELIEVE THAT SOMETHING

3    IMPROPER IS GOING ON WITH

4    THE PRIMARY BENEFICIARY

5    UNDER THE WILL, THAT BEING

6    MRS. LILLIAN MCLURE.   WE

7    WOULD PUT ON TESTIMONY THAT

8    WE HAVE TRIED TO GET HER

9    HERE FOR THIS HEARING, THAT

10   THE COURT REQUESTED THAT

11   SHE BE HERE AT THE LAST

12   HEARING, THAT SHE IS BEING

13   INTENTIONALLY SECRETED AWAY

14   FROM COURT AND BEING

15   ALLOWED TO APPEAR HERE; AND

16   ALSO THAT IN CONJUNCTION

17   WITH HER BEING HIDDEN AWAY

18   THAT LEGAL DOCUMENTS ARE

19   BEING DRAFTED, INCLUDING

20   POWERS OF ATTORNEY AND

21   TRUSTS THAT ARE EXTENSIVELY

22   ACTING IN HER BEST

23   INTEREST, BUT THAT THEY'RE

24   TAKING ASSETS THAT EXISTED

25   UPON THE DEATH OF MR.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO:  2001-ES-26-0820                                    Page No:  11

|   |   |
|---|---|
| 1 | MCLURE THAT MAY HAVE BEEN |
| 2 | OWNED BY MR. MCLURE, MAY |
| 3 | HAVE BEEN JOINT, WE DON'T |
| 4 | KNOW, AND THAT THOSE |
| 5 | ASSETS, UPON INFORMATION |
| 6 | AND BELIEF, HAVE BEEN |
| 7 | TRANSFERRED INTO A TRUST, |
| 8 | SOME OR ALL OF THEM.  THE |
| 9 | POINT OF ALL THIS IS, YOUR |
| 10 | HONOR, THIS ESTATE IS IN |
| 11 | CHAOS AND THIS ESTATE IS A |
| 12 | MESS AND IT NEEDS SOMEONE |
| 13 | TO GRAB CONTROL OF IT AND |
| 14 | STOP EVERYTHING UNTIL AN |
| 15 | ACCOUNTING. A PROPER |
| 16 | ACCOUNTING CAN BE MADE TO |
| 17 | THIS COURT AND THEN IF THE |
| 18 | ASSETS ARE SATISFIED TO THE |
| 19 | COURT AND DISTRIBUTED IN A |
| 20 | MANNER THAT THE COURT |
| 21 | APPROVES, SO BE IT.  THANK |
| 22 | YOU, YOUR HONOR. |
| 23 | THE COURT:    I'M ALSO GOING TO ASK FOR A |
| 24 | STATEMENT FROM YOU, MR. |
| 25 | MONCKTON. |

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 12

| | |
|---|---|
| 1 | MS. MONCKTON:    YES, MA'AM , YOUR HONOR. |
| 2 | MAY IT PLEASE THE COURT. |
| 3 | YOUR HONOR, I REPRESENT MS. |
| 4 | ANN MCLURE AND WE WOULD |
| 5 | JOIN IN THE PETITION OF THE |
| 6 | ESTATE.  WE BELIEVE THAT |
| 7 | THERE'S SOME ISSUES THAT |
| 8 | NEED TO BE RESOLVED.  WE |
| 9 | NEED AN INDEPENDENT THIRD |
| 10 | PARTY TO MARSHAL THE |
| 11 | ASSETS. DETERMINE WHAT IS |
| 12 | JOINT TENANT IN COMMON, |
| 13 | WHAT IS JOINT RIGHT OF |
| 14 | SURVIVORSHIP AND WHAT |
| 15 | POSSIBLY IS A PROBATE |
| 16 | ASSET.  RIGHT NOW, I AGREE |
| 17 | WITH MR. SMITH THAT WE'VE |
| 18 | GOT A SITUATION THAT WE DO |
| 19 | NOT KNOW WHAT THE ASSETS |
| 20 | ARE.  I DON'T BELIEVE |
| 21 | ANYTHING IS GOING TO BE |
| 22 | RESOLVED TODAY OTHER THAN |
| 23 | WE DON'T KNOW WHAT THE |
| 24 | ASSETS ARE, AND I WILL JOIN |
| 25 | WITH HIM AND I THINK WE |

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 13

1   NEED TO HAVE AN INDEPENDENT
2   PERSON APPOINTED IN THIS
3   MATTER.  I THINK WE NEED TO
4   DETERMINE EXACTLY WHAT IS
5   THE SITUATION WITH MS.
6   LILLIAN MCLURE, BECAUSE
7   THAT'S GOING TO DIRECTLY
8   AFFECT WHAT'S GOING ON HERE
9   TODAY.  YOUR HONOR ORDERED
10  HER TO BE HERE AT THE LAST
11  HEARING.  SHE IS NOT HERE
12  TODAY AND I BELIEVE
13  THERE'LL BE SOME TESTIMONY
14  FROM MR. SMITH AS TO WHAT'S
15  GOING ON WITH THAT
16  SITUATION.  ALSO, I DID
17  WANT TO BRING TO THE
18  COURT'S ATTENTION A CIVIL
19  LAWSUIT THAT HAS BEEN FILED
20  ON BEHALF OF MS. LILLIAN
21  MCLURE AGAINST MS. ANN
22  MCLURE.  THE DOCKET NUMBER
23  IS 2002-CP-26-.  IT APPEARS
24  TO BE 1321.  I BROUGHT THIS
25  TO YOUR ATTENTION THIS

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 14

|    |              |                                    |
|----|--------------|------------------------------------|
| 1  |              | AFTERNOON, YOUR HONOR.             |
| 2  |              | THIS WAS SERVED ON MY              |
| 3  |              | CLIENT TODAY.  IT'S MY             |
| 4  |              | UNDERSTANDING THE COURT            |
| 5  |              | WILL HAVE EXCLUSIVE                |
| 6  |              | JURISDICTION OVER THIS             |
| 7  |              | MATTER AND THAT ANY ACTION         |
| 8  |              | FILED IN COMMON PLEAS              |
| 9  |              | DIRECTLY AFFECTING THIS            |
| 10 |              | MATTER WOULD NOT BE                |
| 11 |              | APPROPRIATE AT THIS TIME           |
| 12 |              | AND I WOULD ASK THAT MR.           |
| 13 |              | SAMAHA, YOU INSTRUCT MR.           |
| 14 |              | SAMAHA TO DISMISS THIS             |
| 15 |              | LAWSUIT UNTIL THE PROBATE          |
| 16 |              | MATTER HAS BEEN RESOLVED.          |
| 17 |              | THANK YOU, YOUR HONOR.             |
| 18 | THE COURT:   | THANK YOU, SIR.  MR.               |
| 19 |              | SAMAHA, I'M ALSO GOING TO          |
| 20 |              | ASK FOR AN OPENING                 |
| 21 |              | STATEMENT FROM YOU, SIR.           |
| 22 |              | AS I UNDERSTAND, YOU WERE          |
| 23 |              | ACTING IN THE POWER OF, THE        |
| 24 |              | POA FOR MS. LILLIAN; IS            |
| 25 |              | THAT CORRECT?                      |



THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 15

| | | |
|---|---|---|
| 1 | MR. SAMAHA: | THAT IS CORRECT. |
| 2 | THE COURT: | DO YOU HAVE A STATEMENT FOR |
| 3 | | THE COURT, SIR, BEFORE WE |
| 4 | | GET INTO ALL OF THE OTHER |
| 5 | | HEARINGS AND THE TESTIMONY |
| 6 | | TODAY? |
| 7 | MR. SAMAHA: | NO, MA'AM. |
| 8 | THE COURT: | ALL RIGHT. THANK YOU. MR. |
| 9 | | SMITH, DO YOU HAVE |
| 10 | | WITNESSES --- |
| 11 | MR. SMITH: | YES, WE DO, YOUR HONOR. |
| 12 | THE COURT: | --- AND/OR TESTIMONY THAT |
| 13 | | THE COURT NOW NEEDS TO |
| 14 | | REVIEW? |
| 15 | MR. SMITH: | YES, WE DO, YOUR HONOR. |
| 16 | | WITH YOUR PERMISSION, I'D |
| 17 | | LIKE TO CALL MY FIRST |
| 18 | | WITNESS. |
| 19 | THE COURT: | THANK YOU, SIR. PLEASE DO. |
| 20 | MR. SMITH: | MR. DEAL, MR. CHARLES DEAL, |
| 21 | | YOUR HONOR. |
| 22 | THE COURT: | MR. DEAL, PLEASE COME |
| 23 | | FORWARD, AND IF YOU WOULD, |
| 24 | | WE'RE READY TO SWEAR YOU |
| 25 | | IN. |

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 16

|    |  |  |
|----|--|--|
| 1  | CHARLES DEAL, HAVING BEEN CALLED TO THE STAND AND | |
| 2  | DULY SWORN, TESTIFIED AS FOLLOWS. | |
| 3  | THE COURT: | FOR THE REPORTER, PLEASE |
| 4  | | GIVE HER YOUR NAME AND |
| 5  | | ADDRESS, AND IF YOU WOULD, |
| 6  | | SPELL YOUR NAME, MR. DEAL. |
| 7  | MR. DEAL: | MY LAST NAME IS DEAL, D-E- |
| 8  | | A-L.  FIRST NAME IS |
| 9  | | CHARLES, AND MY ADDRESS IS |
| 10 | | POST OFFICE BOX 1900, |
| 11 | | LITTLE RIVER, SOUTH |
| 12 | | CAROLINA 29566. |
| 13 | THE COURT: | THANK YOU, SIR.  HE'S |
| 14 | | PROPERLY SWORN, SIR. |
| 15 | MR. SMITH: | THANK YOU, YOUR HONOR. |

16                        DIRECT EXAMINATION

17  BY MR. SMITH:

18  Q:  Mr. Deal, can you give a very brief, and by very

19      brief, I mean real short history of your

20      professional employment?

21  A:  Yes, sir.  I'm a retired police officer from New

22      Jersey and I've been living in South Carolina the

23      last four years.  I own the American Process

24      Service & Investigations and I do process serving

25      and private investigations in South Carolina.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 17

1    licensed by the state.

2  Q:  In connection with the hearing today, were you

3       hired by the McNair Law Firm to effect service of

4       the Subpoena on Ms. Lillian McLure?

5  A:  Yes, sir, I was.

6  Q:  Did you attempt to serve that Subpoena?

7  A:  Yes, sir, I did.

8  Q:  Can you tell The Court what happened in your

9       efforts to serve the Subpoena?

10 A:  I went over to her residence on March 8th.  Her

11      residence was given to me as 4222 Bonaire Lane,

12      Little River, South Carolina.  I spoke to a

13      resident there by the name of Joanne Bostrup, B-

14      O-S-T-R-U-P.  She indicated she purchased the

15      property in December and she purchased it from an

16      attorney.  She didn't know the attorney's name

17      and she does not know Lillian McLure.  At that

18      point we conducted a skip search to see if we

19      could get another address on her and we got back.

20      I believe, eight addresses.  One of -- and all

21      the same, except for one, 291-C Highway 90 in

22      Little River, South Carolina.  I proceeded over

23      there and it was the law offices of Mr. George

24      Tommy -- I have a hard time pronouncing your

25      name. I apologize.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 18

1   Q:  Mr. Samaha?

2   A:  Samaha.  It was after five o'clock and no one was

3       at the office.  I then, the following day, which

4       was Saturday, I contacted Mr. Samaha at his, at

5       his home by phone and indicated my

6       representations and I was looking to serve a

7       Subpoena on Ms. McLure.  Mr. Samaha indicated

8       that he does represent Ms. McLure and that she

9       apparently had been, according to him, indicated

10      she had been abducted at one time by Ann McLure

11      just recently and that she was in hiding and that

12      he would not be producing her to come to court

13      today.  He indicated there is no estate to

14      probate in court today and would not, indicated

15      she would not be here today.

16  Q:  Did that end your efforts in trying to locate Ms.

17      McLure?

18  A:  Yes, sir, it did.

19  Q:  Answer any questions other counsel may have.

20  A:  Yes, sir.

21  THE COURT:           MR. MONCKTON?

22  MR. MONCKTON:        NO QUESTIONS, YOUR HONOR.

23  THE COURT:           MR. SAMAHA?

24  MR. SAMAHA:          NO QUESTIONS.

25  THE COURT:           THANK YOU.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                          Page No: 19

```
 1    MR. DEAL:                    THANK YOU, YOUR HONOR.
 2    MR. SMITH:                   YOUR HONOR, WE'D CALL MR.
 3                                 SAMAHA.
 4    THE COURT:                   THANK YOU.  MR. SAMAHA,
 5                                 PLEASE COME FORWARD AND BE
 6                                 SWORN IN.
 7    GEORGE T. SAMAHA, III, HAVING BEEN CALLED TO THE
 8    STAND AND DULY SWORN, TESTIFIED AS FOLLOWS:
 9    THE COURT:                   THANK YOU, SIR.  BE SEATED.
10                                 FOR THE REPORTER, PLEASE
11                                 GIVE HER YOUR NAME AND
12                                 ADDRESS, AND IF YOU WOULD,
13                                 SPELL YOUR NAME.
14    MR. SAMAHA:                  OKAY.  GEORGE T. SAMAHA,
15                                 III, S-A-M-A-H-A, 241 PARK
16                                 STREET, LITTLE RIVER 29566.
17                       DIRECT EXAMINATION
18    BY MR. SMITH:
19    Q:  Mr. Samaha, you're a licensed attorney in South
20        Carolina?
21    A:  That is correct.
22    Q:  How long have you been so licensed?
23    A:  Six years, seven years.
24    Q:  You represent Ms. Lillian McLure?
25    A:  That is correct.
```

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 20

1   Q:  How long have you had that representation?

2   A:  For nine months, I think.

3   Q:  What is the general nature of items you represent

4       her on?

5   A:  It's a general representation, particularly to

6       secure and marshal her assets and to locate

7       anything that belongs to her.

8  MR. SMITH:       YOUR HONOR, MAY I APPROACH

9                  THE WITNESS?

10  THE COURT:       YES.

11   Q:  Mr. Samaha, let me show you what has been marked

12       as Exhibit Number One for identification. Do you

13       recognize that document as a letter that was sent

14       to you by Mr. George McDowell from the McNair Law

15       Firm?

16   A:  Yes, I do.

17   Q:  In this letter, is it correct that Mr. McDowell

18       asked that you provide to him no later than

19       December 17th, 2001 a complete accounting of the

20       Estate of Francis G. McLure?

21   A:  That is correct.

22   Q:  Did you do that?

23   A:  No, sir.

24   Q:  That letter, so the record is clear, is December

25       4, 2001, correct?

```
 1   A:  That's correct.
 2   MR. SMITH:              YOUR HONOR, MOVE THE
 3                          ADMISSION OF EXHIBIT ONE.
 4   THE COURT:             ACCEPTED AND RECEIVED.
 5      EXHIBIT NUMBER ONE ADMITTED INTO EVIDENCE.
 6   Q:  Mr. Samaha, let me show you what has been marked
 7       as Exhibit Number Two.  Do you recognize Exhibit
 8       Number Two as a December 26th, 2001
 9       correspondence addressed to you from the McNair
10       Law Firm?
11   A:  Yes, sir.
12   Q:  Do you again recognize that again on December
13       26th, 2001 your having not provided the
14       accounting, then an additional written request
15       for an accounting was made?
16   A:  That is correct.
17   Q:  You did not comply with that accounting request
18       either?
19   A:  That is correct.
20   THE COURT:             MR. MONCKTON, YOU HAVE NO
21                          OBJECTION ---
22   MR. MONCKTON:          NO OBJECTION.
23   THE COURT:             --- TO THESE DOCUMENTS
24                          BEING INTRODUCED?
25   MR. MONCKTON:          I HAVE NO OBJECTION
```

1          WHATSOEVER, YOUR HONOR.

2  THE COURT:          THANK YOU, SIR.

3  EXHIBITS NUMBER TWO AND THREE ADMITTED INTO EVIDENCE.

4  Q:  Mr. Samaha, let me show you Exhibit Number Three,

5      a correspondence dated March 5, 2002 from the

6      McNair Law Firm directed to you.  Do you

7      recognize this as a third request for an

8      accounting?

9  A:  Yes.  It's a third request for an accounting.

10 Q:  Have you ever provided that complete accounting?

11 A:  I have, to the best of my ability.

12 Q:  Now, we'll talk about the best of your ability.

13     We'll get to that in a minute.  Let me get a

14     little history before we move forward.  Have you

15     ever drafted a Power of Attorney for Ms. Lillian

16     McLure?

17 A:  I have.

18 Q:  Have you done that more than once?

19 A:  Yes, I have.

20 Q:  How many times have you done that?

21 A:  I think twice.

22 Q:  When was the first occasion?

23 A:  I don't recall, but you should have a copy of it

24     in your file.  If you would show it to me, I can

25     confirm the date.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 23

Q:  I'll show you that in a minute. Do you believe it was around the summer of 2000?

A:  It could've been.

Q:  Now, where is Ms. McLure today?

A:  I can't tell you that.

Q:  What is her address today?

A:  I can't tell you that.

Q:  You don't know or are you refusing to tell me?

A:  I'm refusing to tell you, even if I did know, and at this point I'm not sure, but I can assure you if I knew, I would not tell you.

MR. SMITH:    YOUR HONOR, COULD YOU PLEASE INSTRUCT THE WITNESS TO ANSWER THE QUESTION?

THE COURT:    IS THERE SOME REASON YOU'RE REFUSING TO ANSWER THE QUESTION?

MR. SAMAHA:    I ANSWERED HIS QUESTION. I DON'T KNOW WHERE SHE IS TODAY, AND IF I DID ---

Q:  Do you know where she has been within the last week?

A:  No, sir.

Q:  Do you have any knowledge of her residence address?

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 24

1   A:   At this point today?  No, sir.

2   Q:   No, sir, let's talk about since -- you understand

3        Ms. McLure no longer lives at the Bonaire Avenue

4        address in Little River; is that correct?

5   A:   That's my understanding.

6   Q:   Do you know where she moved to?

7   A:   No, sir.

8   Q:   Do you have any knowledge of her whereabouts

9        since December 4th of 2001?

10  A:   I know that she is still a legal resident of

11       South Carolina.

12  Q:   Do you have any knowledge beyond the fact that

13       she lives somewhere in South Carolina?

14  A:   I think her official address is with a friend.

15       I'm not absolutely certain. ---

16  Q:   What is that?

17  A:   --- but I don't know that I have to tell you

18       that, ---

19  Q:   What is that friend's name?

20  A:   --- because that would be a breach of attorney-

21       client privilege, and I'm not about to do that

22       without her permission.

23  Q:   What is the friend's name that she resides with?

24  A:   I can't tell you that.

25  Q:   You can't tell me or you won't tell me?

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                        Page No: 25

```
1    A:  I won't tell you.
2    MR. SMITH:              YOUR HONOR ---
3    THE COURT:             LET'S FINISH TAKING THE
4                           TESTIMONY.  THERE IS
5                           DIFFERENT CODES HERE THAT
6                           CAN FORCE COMPLIANCE.  I
7                           WOULD PREFER THAT WE NOT
8                           HAVE TO FORCE COMPLIANCE,
9                           BUT PROCEED.
10   MR. SMITH:              OKAY.
11   THE COURT:              PROCEED ACCORDINGLY.
12   Q:  Were you aware that The Court requested at the
13       last hearing on this matter that Ms. McLure
14       appear at the hearing today?
15   A:  No, sir.
16   Q:  Do you know why Ms. McLure is not here today?
17   A:  Yes, sir.
18   Q:  Why is she not here?
19   A:  Because she doesn't want to be intimidated by
20       people like you and Ann McLure.
21   Q:  To your knowledge, has she ever met me?
22   A:  No, sir.
23   Q:  She hadn't had any communication with me?
24   A:  She has not.
25   Q:  So all she'd know about me is what you've told
```

1       her, correct?

2   A:  That's correct.

3   Q:  Do you have communications with her on a regular

4       basis?

5   A:  No, sir.

6   Q:  Do you have a phone number for her that you can

7       use when you need to contact her?

8   A:  I don't.

9   Q:  Do you have a mailing address that you mail

10      things to her?

11   A:  I don't mail things to her.

12   Q:  All the communication you have from her was

13      communication she initiates?

14   A:  She doesn't initiate.

15   Q:  Do you have any communications with her?

16   A:  Through one of her friends, yes.

17   Q:  Through an intermediary?

18   A:  That's correct.

19   Q:  Who's that intermediary?

20   A:  She's here today.

21   Q:  Who's that?

22   A:  Her name is Vickie Valenti. She's here.

23   Q:  Now, at some point in time did you prepare a

24      revocation of a Power of Attorney?

25   A:  I sure did.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 27

1  Q:  Let me finish the question.  Was there a Power of
2      Attorney that had been given for Ms. Lillian
3      McLure appointing Ms. Ann McLure as attorney-in-
4      fact?
5  A:  That's correct.
6  Q:  You prepared a revocation of that Power of
7      Attorney?
8  A:  That is correct.
9  Q:  When did you prepare that revocation?
10 A:  Look at your copy.  It's been over a year ago or
11     maybe -- no. I think it's less than a year ago,
12     perhaps last summer.
13 Q:  Why did you prepare the revocation?
14 A:  Because I went to the bank, to Ms. Lillian's bank
15     and got copies of checks of Lillian's personal
16     checking account and discovered that there were
17     funds missing from her account.  The checks were
18     all signed by Ann McLure.
19 Q:  Did you prepare a subsequent Power of Attorney
20     for Ms. Lillian McLure appointing anyone as
21     attorney-in-fact?
22 A:  Appointing me as attorney-in-fact.
23 Q:  Did you, as the attorney, prepare that document?
24 A:  I certainly did.
25 Q:  Did someone, to your knowledge, another attorney,

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 28

| | | |
|---|---|---|
| 1 | | independently review that attorney-in-fact, that |
| 2 | | Power of Attorney for Ms. McLure? |
| 3 | A: | I'm sure that we did not do that. |
| 4 | Q: | Who was the attorney-in-fact?  Yourself? |
| 5 | A: | That is correct. |
| 6 | Q: | Have you taken any actions under that Power of |
| 7 | | Attorney? |
| 8 | A: | I certainly have. |
| 9 | Q: | What actions have you taken? |
| 10 | A: | The same ones I've already told you, that I have |
| 11 | | marshaled all of her assets and I've put them in |
| 12 | | a safe place for her. |
| 13 | Q: | Where is that safe place? |
| 14 | A: | I'm not going to tell you that.  It's none of |
| 15 | | your business. |
| 16 | Q: | Is it a trust? |
| 17 | A: | It could be. |
| 18 | Q: | Is it? |

| | | |
|---|---|---|
| 19 | MR. SMITH: | YOUR HONOR, I BELIEVE WE'RE |
| 20 | | ENTITLED TO HAVE AN ANSWER |
| 21 | | TO THESE QUESTIONS. |
| 22 | MR. SAMAHA: | YOUR HONOR, IF I MAY OBJECT |
| 23 | | SINCE I'M NOT REPRESENTED |
| 24 | | BY COUNSEL.  I THOUGHT WHEN |
| 25 | | I CAME TODAY, YOUR HONOR, |

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 29

```
 1                          THAT WE'RE HERE ON THE
 2                          ESTATE FOR TWO REASONS.
 3                          THIS IS WHAT I RECEIVED
 4                          FROM THIS COURT.  IT SAYS,
 5                          "PETITION FOR
 6                          ADMINISTRATION UNDER PART
 7                          FIVE AND APPLICATION FOR
 8                          APPOINTMENT OF SPECIAL
 9                          ADMINISTRATOR."  I DON'T
10                          SEE WHERE WE'RE GOING WITH
11                          MY TESTIMONY ABOUT MS.
12                          LILLIAN THAT HAS ANYTHING
13                          TO DO WITH FRANCIS MCLURE.
14     MR. SMITH:           YOUR HONOR, IF I CAN ---
15     THE COURT:           GO AHEAD.
16     MR. SMITH:           YOUR HONOR, IF I CAN BE
17                          HEARD ON THAT.  WHAT WE'RE
18                          TRYING TO DO IS DETERMINE
19                          WHAT HAPPENED TO THE ASSETS
20                          OF MR. MCLURE UPON HIS
21                          DEATH AND THEY MAY WELL
22                          HAVE BEEN TAKEN BY MR.
23                          SAMAHA ACTING AS ATTORNEY-
24                          IN-FACT OR OTHERWISE AND
25                          TRANSFERRED SOMEWHERE.  A
```

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 30

|   |   |   |
|---|---|---|
| 1 | | PR WOULD NEED TO FIND THAT |
| 2 | | OUT AND THAT, I BELIEVE, IS |
| 3 | | A COMPLETELY LEGITIMATE |
| 4 | | QUESTION WHICH YOU SHOULD |
| 5 | | BE COMPELLED TO ANSWER. |
| 6 | MR. SAMAHA: | IF THAT TIME ARISES, YOUR |
| 7 | | HONOR, I HAVE NO TROUBLE |
| 8 | | WITH THAT.  I'VE ALREADY |
| 9 | | TOLD YOU IN CHAMBERS THAT I |
| 10 | | WILL FURNISH YOU WITH |
| 11 | | INFORMATION WHICH SHOULD |
| 12 | | SATISFY THE COURT THAT |
| 13 | | EVERYTHING MR. MCLURE OWNED |
| 14 | | AT THE TIME OF HIS DEATH |
| 15 | | EITHER PASSED JOINT TENANTS |
| 16 | | WITH RIGHTS OF SURVIVORSHIP |
| 17 | | OR WAS A CONTRACT, AN |
| 18 | | OPERATION OR A CONTRACT. |
| 19 | | ONCE THE MAN DIED ALL HE |
| 20 | | HAD LEFT WAS HIS VEHICLE |
| 21 | | WHICH ANN MCLURE TOOK. |
| 22 | MR. SMITH: | YOUR HONOR, THE TIME FOR |
| 23 | | MAKING THAT PRESENTATION IS |
| 24 | | TODAY. |
| 25 | THE COURT: | YES, SIR, IT IS.  PLEASE |

**Prestige Court Reporting, Inc.**

1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

1                               ANSWER THE QUESTION, MR.

2                               SAMAHA.

3     MR. SAMAHA:           WHAT IS YOUR QUESTION?

4     CONTINUATION BY MR. SMITH:

5     Q:  Yes, sir.  Did you take assets at the death of

6         Mr. McLure and acting pursuant to a Power of

7         Attorney which appointed you attorney-in-fact

8         transfer assets that were jointly or singularly

9         held by Mr. McLure at his death?

10    A:  Here's what I did:  From six or seven months

11        after Mr. McLure's death, I took assets that

12        belonged to Lillian McLure and transferred those

13        assets into a trust for her benefit.

14    Q:  Now, the assets that you're contending belonged

15        to Ms. Lillian McLure, were those assets that

16        before they became in your view into the

17        ownership of Mrs. Lillian McLure assets which, in

18        your view, were jointly owned by Mrs. McLure and

19        Mr. McLure?

20    A:  It was a joint tenancy, yes, sir, with rights to

21        survivorship.  That is correct.

22    Q:  Tell me if I'm correctly stating this, Mr.

23        Samaha.  Upon the death of Mr. McLure, some six

24        or seven months afterwards you marshaled the

25        assets that you believed were jointly owned by

```
 1        Mr. and Mrs. McLure and put those into a trust
 2        for Mrs. McLure?
 3    A:  Okay.  I did not believe that they were jointly
 4        held.  I knew for a fact that they were jointly
 5        held.  We need to get our verbs right, counsel.
 6    Q:  Who is the trustee of that trust?
 7    A:  I am the trustee.
 8    Q:  Who drew up that trust?
 9    A:  I drew the trust.
10    Q:  Who independently reviewed it as counsel for Mrs.
11        McLure?
12    A:  No one.
13    Q:  Do you receive a fee from that trust?
14    A:  No, sir.
15    Q:  Are you the sole trustee?
16    A:  I am the sole trustee.
17    Q:  Do you have a copy of that trust?
18    A:  I do not.
19    Q:  Do you have a copy of the assets that you
20        transferred into it?
21    A:  I've given that to you.  I take that back.
22        Everything you see and what I've already given
23        you is, it should be in the trust, if that's --
24        Is that what you're asking?
25    Q:  Yes.
```

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 33

1    A:   I think so.

2    Q:   Is the trust recorded anywhere?

3    A:   It is not.

4    Q:   Is there a reason it's not recorded?

5    A:   One does not normally record a living trust in

6         the Register of Deeds Office in Horry County.

7    Q:   How about the Power of Attorney that appointed

8         you attorney-in-fact, is that recorded?

9    A:   It's recorded, and you have a copy in your file.

10   Q:   Mr. Samaha, let me pass up to you Exhibit Number

11        Four.

12   THE COURT:              ANY OBJECTION, MR.

13                           MONCKTON?

14   MR. MONCKTON:           NO OBJECTION, YOUR HONOR.

15   THE COURT:              ACCEPTED AND RECEIVED.

16        EXHIBIT NUMBER FOUR ADMITTED INTO EVIDENCE.

17   Q:   Do you recognize Exhibit Number Four?

18   A:   Yes, sir.

19   Q:   What is it?

20   A:   To begin with, there is a cover letter which is

21        addressed to Richard Smith and I have attached an

22        exhibit to this which has the names, the account

23        numbers and the telephone numbers and the value

24        as of the time I first ascertained the value of

25        various securities held by Francis G. McLure and

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

1    his wife, Lillian J. McLure, and it says they're

2    all rights of survivorship, except for the life

3    insurance policies where Mrs. McLure was the sole

4    beneficiary.

5    Q:   Your basis for concluding that everything that is

6         attached to this list was joint tenants with

7         right of survivorship is based upon the documents

8         attached to Exhibit Four; is that correct?

9    A:   Not solely on those documents.  It's based upon

10        my correspondence with the various places which I

11        called to double check that this was, indeed,

12        joint tenants with rights of survivorship, and,

13        in fact, it was.

14   Q:   Have you brought that correspondence with you

15        today?

16   A:   I think that was done verbally at the time when I

17        made various requests for these monies.

18   Q:   When you made those requests, did you identify to

19        the person that you were talking to that you were

20        a Power of Attorney?

21   A:   That's correct.  They require, of course, the

22        usual identification, as you know.

23   Q:   Now, let's take a look at the materials that

24        you've prepared here.  Exhibit "A", I think, is

25        just a summary?

1  A:  That's correct.

2  Q:  Before we get into the paperwork attached to it,

3      let's take a look at number eight and that was

4      the residence located at 4222 Bonaire Lane,

5      correct?

6  A:  That's correct.

7  Q:  Was that the home that Mr. and Mrs. McLure owned

8      upon the death of Mr. McLure?

9  A:  That's correct.

10 Q:  To your knowledge, has that home been sold?

11 A:  It has.

12 Q:  Did you have any involvement in that sale?

13 A:  I sure did.

14 Q:  What involvement did you have?

15 A:  I was the attorney for the sale and I was, of

16     course, acting as her Power of Attorney for that

17     sale.

18 Q:  Did anybody independently review any of the

19     various and sundry legal documents associated

20     with the real estate closing on behalf of Mrs.

21     McLure except for you?

22 A:  I don't think so.

23 Q:  Now, let's look at the third page of your

24     summary.  It has a fax notation, page two in the

25     upper right-hand corner.  Do you have that?

1    MR. SMITH:                YOUR HONOR, MAY I APPROACH?

2    THE COURT:                CERTAINLY.

3    MR. SMITH:                YOUR HONOR, I'VE IDENTIFIED

4                              THE PAGE TO THE WITNESS.

5    Q:   Now, what is it that you're looking at there, Mr.

6         Samaha?

7    A:   It says a fixed annuity quarterly statement,

8         April 1st, 2001 to June the 31st, 2001.

9    Q:   Is it correct that this statement purports, as

10        you understand it acting as a Power of Attorney,

11        to identify assets in this account from the

12        period April 1 of 2000 to June 30, 2001?

13   A:   That's what the statement indicates, yes, sir.

14   Q:   When did Mr. McLure die?

15   A:   Let's see, January ---

16   Q:   January 3, 2001?

17   A:   That's correct.

18   Q:   Now, do you have any knowledge of what, if any

19        activity, took place with this account from

20        January 1, 2001 up through April 1, 2001?

21   A:   I don't have any knowledge in writing, but when I

22        checked with each one of these accounts, my first

23        question, of course, was, "Have there been any

24        withdrawals on these accounts," and the answer

25        each time was, "No." Now, in hindsight, I could

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

1    go back and get that in writing, which I intend

2    to do for The Court, as I've already told her.

3    Q:  What do you have to present today, Mr. Samaha, in

4        regard to that issue, any activity from the debt

5        - - -

6    A:  Just my testimony which is that there was, there

7        were no withdrawals on each one of these

8        accounts.

9    Q:  If you'll let me finish my question.  You're a

10       lawyer and you understand the concept of

11       evidence, correct?

12   A:  That's correct.

13   Q:  What you have to present today regarding the

14       account ending balance and debt and between that

15       time and any time you have an account statement

16       is what we call hearsay evidence, correct?

17   A:  I understand that.

18   Q:  All right.  Let's take a look at the next page.

19   A:  Okay.

20   Q:  Do you have that?  What is that, a John Hancock

21       annuity?

22   A:  Yes, sir.

23   Q:  And again, this is for the period April 1, 2000

24       to June 30, 2001, correct?

25   A:  That's correct.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 38

1  Q:  Where's the account statement for Post-June 30.

2      2001 to today, almost nine months later?

3  A:  I doubt there is one, because these were all

4      securities that we marshaled these assets and had

5      this money transferred into a trust.

6  Q:  When you say, "We marshaled the assets," do you

7      mean you liquidated the account?

8  A:  That is correct.

9  Q:  When did that liquidation take place?

10 A:  Over a period of months, beginning of the summer,

11     once I became Power of Attorney.

12 Q:  As we sit here today, do you have those documents

13     for review by The Court?

14 A:  What documents are those?

15 Q:  The documents showing the proceeds paid upon

16     liquidation of the various accounts?

17 A:  I don't follow you.  What document is it that

18     you're asking for.

19 Q:  Tell me if this is correct, Mr. Samaha.

20 A:  Okay.

21 Q:  Acting under your Power of Attorney, ---

22 A:  Uh-huh (affirmative response).

23 Q:  --- you have a variety of accounts here ---

24 A:  That's correct.

25 Q:  --- in Exhibit Four, correct?

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 39

1  A:  That's correct.

2  Q:  What you did, acting as the Power of Attorney, is

3      some time over a period of months in the summer

4      you liquidated these accounts ---

5  A:  That's correct.

6  Q:  --- that we see here in Exhibit Four, correct?

7  A:  That's correct.

8  Q:  When you mean liquidated, you mean you sold them

9      and in exchange got a check, correct?

10 A:  Correct.

11 Q:  You put that check into trust, correct?

12 A:  That's correct.

13 Q:  The question I have for you is, as we sit here

14     today, ---

15 A:  Uh-huh (affirmative response).

16 Q:  --- three o'clock on Tuesday, March 12th, do you

17     have any documentary evidence to show The Court

18     regarding to how much money you got when you sold

19     these things in Exhibit Four?

20 A:  It's very similar to this amount and I have

21     copies of those checks, of course, but I don't

22     have those ---

23 Q:  Do you have those here?

24 A:  No.

25 Q:  Okay.  So what we have is your testimony and

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                          Page No: 40

1    something similar to Exhibit Four, correct?

2  A:  That's correct.  That's correct.

3  Q:  Would that be true, if I went through every

4      document in Exhibit Four, your response would be

5      the same, you have no paper here today to tell us

6      what happened to those proceeds, correct?

7  A:  Other than this paper that you have showing the

8      amount that was transferred into the trust which

9      is roughly this amount of money.

10 Q:  When you say, "This paper," so we're clear,

11     you're talking about a document that is attached

12     to Exhibit Four ---

13 A:  Uh-huh (affirmative response).

14 Q:  --- as Exhibit "A", correct?

15 A:  That's correct.

16 Q:  Exhibit "A" is a document prepared by you, not by

17     any independent source; is that correct?

18 A:  (No response.)

19 Q:  Mr. Samaha, so we're clear and so the record is

20     clear, I'm holding in my hand Exhibit "A" ---

21 A:  Okay.  Exhibit "A" was taken from these documents

22     which you have copies of which I did not prepare.

23     I did not prepare these statements.

24 Q:  So Exhibit "A" is the summary of the amounts in

25     these documents, correct?

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 41

1    A:   That is correct.

2    Q:   And any evidence showing that they were sold, you

3         don't have today?

4    A:   That's correct.

5    Q:   Now, to your knowledge, does Exhibit "A" total

6         all the assets that Mr. McLure had upon his

7         death, excepting a motor vehicle?

8    A:   I think so.  It is listed, also, as Item Number

9         Seven.

10   Q:   Item Number Seven, okay.

11   A:   Uh-huh (affirmative response).

12   Q:   Now, how much did you get for the house?

13   A:   $134,000.

14   Q:   Have you filed a Certificate of Death with the

15        Register of Deeds?

16   A:   I have not.

17   Q:   Are you aware of the Statute 27-7-40 requiring

18        that to be done?

19   A:   I think we may have attached a copy of the Death

20        Certificate to the Deed.  If you have a copy of

21        that Deed, you could verify it.

22   Q:   Now, I don't see anything and tell me if I'm

23        reading Exhibit "A" correctly, was Mr. McLure in

24        the military during his life?

25   A:   I don't know.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 42

1   Q:   You don't know?

2   A:   Huh-uh (negative response).

3   Q:   Would it be fair to say that not knowing that,

4        you made no application to the Veteran's

5        Administration for any benefits that may have

6        been due him upon his death?

7   A:   That's correct.

8   Q:   Let me pass up to you exhibits marked Number Five

9        and Six, which excepting for the orange tags are

10       copies of the original documents.  I hold here,

11       Mr. Samaha, the originals of those documents

12       which are in bound books.  Have you ever seen

13       these before today?

14  A:   Huh-uh (negative response).

15  Q:   You have not?

16  A:   I have not.

17  Q:   So would it be fair to say that your knowledge of

18       whatever assets Mr. McLure had at his death was

19       derived by your going to the mailbox at Bonaire

20       Road and getting statements as they came in and

21       looking through them and making an assessment of

22       what was there?

23  A:   No.  It would not be fair to say that.

24  Q:   Okay.  Tell me what me what else you did.

25  A:   Well, first of all, I didn't go to the mailbox.

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 43

1       Ms. Lillian furnished me from her mailbox this

2       information that she received, and that's how I

3       got most of my information.

4  Q:  Did she mail it to you?

5  A:  I think one of her friends brought it or she

6       brought it.

7  Q:  Just so I'm clear, the way you received

8       information about the assets was from statements

9       that were mailed to Mrs. McLure and they were

10      somehow transmitted to you ---

11  A:  That's correct.

12  Q:  --- and then you totaled those up?

13  A:  That's correct.

14  Q:  So if there are assets that exist that were not

15      mailed, account statements were not mailed to

16      Mrs. McLure, you know nothing about those; is

17      that fair to say?

18  A:  If that were a possibility.

19  Q:  If that were a possibility?

20  A:  Uh-huh (affirmative response).

21  Q:  Well, have you looked -- take a minute and look

22      at these books and see if you see any assets in

23      there that you don't recognize as being on your

24      Exhibit "A".

25  A:  So far, I don't see the name of any asset that I

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                      Page No: 44

1    haven't listed.  Now, did you want me to take the
2    time and go through and match up all the account
3    numbers?
4    Q:  I'm just asking you if you'd look and see any
5        differences.
6    A:  All right.  In looking at this, I see the names
7        of everything so far that I had listed.
8    Q:  We'll come back to those, Mr. Samaha.  I just
9        want to keep one exhibit right now.
10   A:  Okay.
11   Q:  Let's go back to Number Four.  Do you have that
12       again?
13   A:  Okay.  I see it.
14   Q:  Looking at the first page after Exhibit "A", do
15       you have that?  Do you have it, Mr. Samaha?
16   A:  Is that John Hancock?
17   Q:  Blueprint Program.
18   A:  Okay.  I have it.
19   Q:  Is there anything on this statement, this Merrill
20       Lynch statement, that identifies this document as
21       having an account that is joint tenants with
22       right of survivorship?
23   A:  It doesn't say so on the paper.
24   Q:  Look at the next page.  Do you have that?
25   A:  Okay.  Is that John Hancock?

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 45

1    Q:  Yes, sir, John Hancock, and it has at the top,

2         "Fixed Annuity Quarterly Statement."

3    A:  Uh-huh (affirmative response).

4    Q:  Do you see that?

5    A:  Uh-huh (affirmative response).

6    Q:  Is there anything on this document that

7         identifies the account as being anything other

8         than in Mr. Frank G. McLure's name?

9    A:  No.  That is an annuity so there would have to be

10       someone that it would be paid to upon his death

11       and that was Ms. Lillian.

12    Q:  Have you brought those papers to court today to

13       identify who it was paid to?

14    A:  I don't think so.  All I have furnished you is

15       this, okay?

16    Q:  The reason all you furnished me is this is what

17       you have; is that right?

18    A:  I'm not sure, because I imagine I have some

19       information other than my verbal testimony.  If I

20       had the time to look, which I don't, because the

21       date of this, as you can see the 8th.  I could

22       probably furnish you this if it's required or

23       decided to do that.  There's no need in

24       questioning that.  If you want this information,

25       I can get it for you.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 46

1    Q:   Well, did you not understand the request of
2         December 4th in writing, which is reflected in
3         Exhibit ---
4    A:   I understood your question ---
5    Q:   Let me finish, Mr. Samaha, please.  Did you not
6         understand the December 4th, 2001 written request
7         to you for a full and complete accounting to be a
8         request to provide such information?
9    A:   No, sir, I didn't.
10   Q:   You don't understand what the term full and
11        complete accounting is?
12   A:   I understand the term, but I didn't understand it
13        to be a particular document you want, counsel,
14        but as I said, it's not difficult to produce it.
15   Q:   But in the three months since December 4th, 2001
16        and as we stand at this hearing today, you have
17        not produced it, true?
18   A:   That's true.
19   Q:   Let's look at the next page after John Hancock.
20   A:   Okay.
21   Q:   That's a quarterly statement, Hancock statement.
22        Do you have that?
23   A:   I think so.
24   Q:   Do you see on the left-hand side it does identify
25        Francis and Lillian McLure as joint tenants with

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 47

```
 1        right of survivorship?
 2   A:   Let's see.
 3   Q:   Do you see that, Mr. Samaha?
 4   A:   I see that.
 5   Q:   And again, this statement is from January 2, 2001
 6        to March 30, 2001, correct?
 7   A:   That's correct.
 8   Q:   After March 30, 2001, some time after that, you
 9        liquidated the account?
10   A:   That would be correct.
11   Q:   When you liquidated it, you don't know?
12   A:   No.  I don't have that date in my head, I'm
13        sorry.
14   Q:   Let's look at the next document.  It's the Nuveen
15        Distribution statement.  Do you have that?  Mr.
16        Samaha, let me show you right here.  I'm just
17        going through these in order, so it's the next
18        page.
19   MR. SMITH:                 MAY I APPROACH, YOUR HONOR?
20   THE COURT:                 CERTAINLY.
21   A:   Okay.  I have it.
22   Q:   Now, do you see there it identifies Mr. and Mrs.
23        McLure as joint tenants?
24   A:   Uh-huh (affirmative response).
25   Q:   Is there a difference in your mind as the
```

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 48

1     attorney acting on these accounts between a joint
2     tenancy and a joint tenancy with right of
3     survivorship?
4  A: There could be.  That's correct.
5  Q: What is that difference, as you understand it?
6  A: I just looked it up last week.
7  Q: Let me ask you this, do you understand that if a
8     asset is held as joint tenants as opposed to
9     joint tenants with right of survivorship that a
10    portion of that asset may be available to
11    creditors which would not be available if it was
12    joint ---
13 A: That's correct.  That's what the law says.
14 Q: So my question is complete on the record, I
15    would've finished it with, would not be available
16    to reach by creditors if it was a joint tenancy
17    with right of survivorship?
18 A: That's correct.
19 Q: Let's look at the next page, Mutual Fund
20    Confirmation from Nuveen dated July 16th, 2001.
21    Do you have that?
22 A: I have it.
23 Q: This appears to be an account statement of just
24    one date; is that correct, that being July 16th,
25    2001?



THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO:  2001-ES-26-0820                                        Page No: 49

1   A:  That's what it says.

2   Q:  It doesn't cover a transaction period, correct?

3   A:  That is correct.

4   Q:  What happened in this account before July 16th,

5       2001, you don't know; is that true?

6   A:  Probably not.  I'd have to go back and check my

7       records.

8   Q:  But as we're sitting here today, you can't tell

9       The Court what happened with this account up to

10      July 16th, 2001, correct?

11  A:  That may be correct.

12  Q:  Not to impugn anyone's integrity, but for all you

13      know, there could've been much larger assets

14      here, may have been dissipated and this is what

15      you have on July 16th?

16  A:  No, sir.  I wouldn't say that.

17  Q:  Well, how do you know what happened before July

18      16th?

19  A:  Because I asked when I called the places.  I've

20      already testified to that.

21  Q:  You don't have written confirmation of that, do

22      you?

23  A:  I'll have to check.  I don't think so, but that's

24      something I've offered to provide, if necessary.

25      You'll notice this account is also a joint

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 50

1        tenancy with rights to survivorship.  You didn't

2        read that into the record.

3    Q:  You'll have an opportunity, Mr. Samaha.  Let's

4        look at the next one, Presidential Life Insurance

5        Company.  Do you have that?

6    A:  I have that.

7    Q:  This is nothing more than a life insurance

8        policy?

9    A:  That's correct.

10   Q:  Payable to the widow?

11   A:  That's correct.

12   Q:  Did you file the death claim on that?

13   A:  That's correct.

14   Q:  All right.  Now, the next page is a SunAmerica

15       document.  Do you see that?

16   A:  I have it.

17   Q:  Is this a annuity contract?

18   A:  I have forgotten.  I'd have to check.

19   Q:  You don't know?

20   A:  I don't know at this point.  I think it was an

21       annuity and I think she was the beneficiary.

22   Q:  Do you see anywhere on here where it identifies

23       her as the beneficiary?

24   A:  I don't see it on the page you're referring to.

25   Q:  So the record is clear, we have two more pages.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                   Page No: 51

```
 1          - - -
 2    A:   Uh-huh (affirmative response).
 3    Q:   --- for a total of three pages that are identical
 4         in form, which appear to be analysis of contracts
 5         of annuities; is that fair to say?
 6    A:   That's correct.
 7    Q:   On none of these pages do we see Mrs. McLure, and
 8         that being Mrs. Lillian McLure, the widow,
 9         identified as the beneficiary, correct?
10    A:   But you do on the letters which are following.
11    Q:   Just answer my question.
12    A:   That is correct.
13    Q:   And again, looking at this account statement, we
14         see an account of activity for '94 and '95,
15         correct?
16    A:   That's correct.
17    Q:   What about activity for '96, 7, 8, 9, 2000, 2001?
18         Where is that account activity?
19    A:   Apparently, there wasn't any because it gives you
20         a value as of 6/29/2001.
21    Q:   There wasn't any, do you mean the funds were
22         earning no interest after '95?
23    A:   They are not indicated on this particular form.
24         It gives the value as of 6/29/2001.  Those are
25         deposit dates and they tell you how much was
```

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                      Page No: 52

1        deposited into the fund at what rate at that

2        time.

3    Q:  Then when we see under 6/29/2001, that's what

4        it's earned to date?

5    A:  That's correct.

6    Q:  After 6/29/2001, do you know what happened to the

7        funds?

8    A:  Eventually, they went into the trust. There's a

9        letter which you'll get to in a minute, which

10       will address part of that.

11   Q:  Did you make any inquiry as to whether or not

12       there had been any loans or withdrawals against

13       this annuity from '94 up to June 29, 2001?

14   A:  Yes. I asked the obvious questions, as I said

15       about each one.

16   Q:  Do you have any paper that was a response from

17       the contract, SunAmerican Company?

18   A:  I don't think so.

19   Q:  Now, you've been referencing repeatedly a letter.

20       Is that the letter that we see here on three

21       pages from the back?

22   A:  Actually, they're two letters ---

23   Q:  Let's talk about the August 1 letter. Is that

24       one of the letters?

25   A:  Okay. That's it.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 53

1    Q:   Is the August 1 letter and the letter after being
2         the July 30, 2001 letter, are those
3         correspondence from SunAmerica to you?
4    A:   That's correct.
5    Q:   Are they telling you how to collect on the
6         annuity contract?
7    A:   That is correct.
8    Q:   Did you take all these actions to collect on the
9         annuity contract ---
10   A:   I sure did.
11   Q:   --- under your Power of Attorney?
12   A:   That's correct.
13   Q:   Other than what we have here, Mr. Samaha, did you
14        make inquiry and conduct an accounting of any
15        other assets that Mr. McLure may have had upon
16        his death, other than what you have here in
17        Exhibit "A"?
18   A:   I couldn't find anything else.
19   Q:   Do you know if he owned any Horry County
20        Telephone Cooperative stock?
21   A:   You have a copy of that, this information you
22        just gave me.
23   Q:   Other than materials that were forwarded to you
24        by Mrs. McLure and that are reflected here in
25        Exhibit "A", what other search for assets did you

1    conduct?

2  A:  I did a usual asset hearing public records and I

3      went to various banks to see where accounts were,

4      but she knew that they only had their banking

5      accounts at one bank, so that was simple.

6  Q:  What about his stock accounts?  Other than

7      talking to Mrs. McLure or getting information,

8      what other search did you look for the assets?

9  A:  She gave me a name which I found in here.

10 Q:  Who was that?

11 A:  Let's see.  They have his name as Joseph Longo

12     who apparently was Mr. McLure's stockbroker.

13 Q:  Now, do you know that Mr. McLure used only one

14     stockbroker?

15 A:  I'm not sure, but Mr. Longo thought he was the

16     only one, and he sent me a list of what he was

17     aware of that Mr. McLure owned.

18 Q:  Did you ever find out if he owned any Horry

19     Telephone Cooperative stock?

20 A:  No.  This is the first I've heard of it.

21 Q:  Let me show you the certificate and ask you if

22     you recognize it, that it is a copy of Exhibit

23     Five?  Do you recognize that as a stock

24     certificate issued ---

25 A:  I recognize it as a stock certificate and I'm

1          aware that Horry Telephone issues these to people

2          when they have telephone service with them.

3     Q:   Now, you're aware that this was in the name of

4          Francis McLure as opposed to joint tenancy?

5     A:   I just saw it.

6     Q:   What have you done about liquidating that asset?

7     A:   Well, I didn't know about it until you just

8          showed it to me, so obviously I haven't done

9          anything.

10    Q:   Did you know Mr. McLure at all?

11    A:   Of course, I did.

12    Q:   Did you know he was a distinguished veteran?

13    A:   No, sir, I didn't.

14    Q:   Are you aware that distinguished veterans are

15         entitled to benefits from the military service?

16    A:   Yes, I am.

17    Q:   And you've done nothing to collect on such

18         benefits; is that correct?

19    A:   I didn't know he was a veteran.  His wife didn't

20         tell me.

21    Q:   So his wife didn't tell you about several years

22         of his life that he spent serving his country,

23         correct?

24    A:   That's correct.

25    Q:   Is it possible they're other things about Mr.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 56

1       McLure she didn't tell you?

2   A:  I'm sure that's possible, but now that you raise

3       the issue, I think I can find out if there are.

4   Q:  As we sit here today ---

5   A:  As we sit here today, I'm not aware that he was a

6       veteran, that he could've done something else.

7   Q:  Have you ever been in the military?

8   A:  I have not.

9   Q:  Did you know if Mr. McLure was what you would

10      call a meticulous note-keeper?

11  A:  That's what I was told.

12  Q:  Have you ever seen his handwriting?

13  A:  Yes.

14  Q:  Go ahead and open Exhibit Six.

15  MR. SMITH:              YOUR HONOR, I APOLOGIZE FOR

16                          NOT HAVING ADDITIONAL

17                          COPIES.  I'LL BE GLAD TO

18                          APPROACH YOU, THE COURT, SO

19                          YOU MAY SEE.  YOUR HONOR,

20                          MAY I APPROACH THE WITNESS

21                          AND DIRECT HIS ATTENTION?

22  THE COURT:              YES.

23  Q:  I have opened up to a page with some handwriting

24      on it.  The top says, "Francis George McLure;" do

25      you see that?

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

1    A:  I see it.

2    Q:  Do you recognize that handwriting as Mr.

3        McLure's?

4    A:  I don't.

5    Q:  It's written down here, "U.S. Navy, serial

6        number, Aviation Machinist Mate, First Class."

7    A:  Okay.  I see it.

8    Q:  --- "December 26th through December 5, 1946"?

9    A:  Uh-huh (affirmative response).

10    Q:  "Honorable discharge," you see that?

11    A:  I see it.

12    Q:  If Mrs. McLure had been here today she'd probably

13        know that her husband served in World War II;

14        would you agree?

15    A:  I would think so.

16    Q:  Now, where did Mr. McLure work?

17    A:  This says he worked at the Port Authority of New

18        York, which I think is correct.

19    Q:  What application have you made for any benefits

20        that he's entitled to under his union?

21    A:  Under what?

22    Q:  Under his union?

23    A:  He is already receiving all of his benefits, I

24        mean, she is receiving benefits she's entitled

25        to.  I think Ann McLure took care of that.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 58

1     because after his death, you've got to remember,

2     I wasn't part of this for about six months after

3     he died, but she gets a retirement check and she

4     gets Social Security, and as a result of his

5     employment, she gets supplemental Social

6     Security, certain other benefits that are all,

7     that were part of his retirement package.  That's

8     my understanding.

9  Q:  But so I'm clear, there's what we call a

10    survivor's pension, correct, and that's when one

11    person has worked, their spouse can get a portion

12    of their pension if the pension ---

13  A:  That's true.

14  Q:  --- is conserved in such a manner, true?

15  A:  That's true.

16  Q:  Mrs. Ann McLure here took care of getting that

17    for Ms. Lillian McLure, correct?

18  A:  She must have.  I'd have to take your testimony

19    on that.  I don't know.

20  Q:  You don't know that?

21  A:  I'm assuming she did, because she does get a

22    check.

23  Q:  Did you make any inquiry of the New York State

24    and local retirement system as to whether or not

25    Mr. Francis McLure was entitled to any death

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                        Page No: 59

1          benefits from his employer upon his death?

2    A:    Six months after the fact, no, sir, I did not.

3    Q:    Well, six months after the fact you didn't make

4          that inquiry, but tell me if I'm right, you made

5          all these other inquiries that you've testified

6          to that are reflected in Exhibit Four, correct?

7    A:    That's correct.

8    Q:    Was there a reason you didn't contact his

9          employer?

10   A:    No particular reason.

11   Q:    You just didn't do it?

12   A:    I just didn't do it.

13   Q:    Same reason you didn't contact the government,

14         correct?

15   A:    Who?

16   Q:    The government?

17   A:    I didn't ---

18   Q:    Veteran's Administration?

19   A:    I did not know that he was a veteran. I've

20         testified to that.

21   Q:    Who is CLW Investments? Do you know who they

22         are?

23   A:    Huh-uh (negative (response). I sure don't.

24   Q:    Do you know who Mr. McLure used as an attorney

25         before you?

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                      Page No: 60

1    A:   No, sir.
2    Q:   Do you know an attorney named Harold Grune, G-R-
3         U-N-E?
4    A:   No, sir.
5    Q:   Would it be fair to say, then, you haven't
6         contacted Mr. Grune?
7    A:   I don't know Mr. Grune.
8    Q:   Did Mr. McLure belong to AARP, American
9         Association of Retired People?
10   A:   I think so.
11   Q:   What contacts have you had with AARP regarding
12        any benefits Mr. McLure might ---
13   A:   I have not.
14   Q:   Is there a reason you haven't contacted them?
15   A:   I wasn't sure that he was a member of AARP.  I
16        would assume he would be because of his age.
17   Q:   What about Ms. Lillian McLure, do you know if she
18        belongs to AARP?
19   A:   I don't think so.
20   Q:   So is it fair to say you've made no inquiry?
21   A:   To whom?
22   Q:   AARP, to see if Mr. McLure or Ms. McLure ---
23   A:   That's correct.
24   Q:   --- has any benefits?  Do you know an attorney,
25        Charles Watson, here in Conway?

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 61

1   A:  I used to.

2   Q:  I understand he's passed on.  Have you contacted

3       his office about any assets or documents that

4       might pertain to Mr. McLure's estate?

5   A:  I had no idea that Mr. Watson ever had anything

6       to do with Mr. McLure, so there's no reason why I

7       would've contacted his office.

8   MR. SMITH:              MAY I APPROACH, YOUR HONOR?

9   THE COURT:              YES, CERTAINLY.

10  Q:  Let me show you a policy of life insurance.  I'll

11      direct your attention to it.  Mr. Samaha, let me

12      direct your attention in Exhibit Number Six to a

13      policy of life insurance issued by the United

14      States of America granted through National

15      Service Life Insurance, a policy of life

16      insurance, the insured being Francis McLure.  Do

17      you see that?

18  A:  I see it.

19  Q:  Until I put that in front of you today, were you

20      aware that existed?

21  A:  No, sir.

22  Q:  Would it be fair to say since you didn't know it

23      existed, you made no inquiry as to what, if any,

24      benefits may be available under that?

25  A:  That's correct.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 62

1  Q:  Did you discuss that subject matter with Mrs.
2      McLure, whether or not Mr. McLure had any
3      insurance through the Federal Government?
4  A:  I didn't ask her specifically Federal Government
5      When I talked with her, I asked her if she
6      thought I had missed anything, and to the best of
7      her knowledge, she said no.  I don't think he
8      involved her very much in his financial affairs.
9      When these records disappeared, we had nothing
10     else to go on, because they were stolen from his
11     home.
12 Q:  What inquiry did you make of Mr. Monckton here to
13     provide you records?
14 A:  I'm not sure if I've asked Mr. Monckton to return
15     those records.  I may have.  He would have to
16     testify to that.
17 Q:  I'm asking you right now ---
18 A:  I'm telling you, I don't recall right now what I
19     have requested from him.  I have, in this
20     lawsuit, requested stuff through a request for
21     production of documents.  So yes, I have
22     requested through the lawsuit and he has a copy
23     of them.
24 Q:  So I'm clear, when you say you have requested
25     through this lawsuit, what you're talking about

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

**THE HEARING IN THE MATTER OF FRANCIS G. MCLURE**
CASE NO: 2001-ES-26-0820                                    Page No: 63

1    is a lawsuit that you literally served on this

2    lady sitting here today, Ms. Ann McLure, correct?

3  A:  That's right.  No, I didn't serve it on her.

4  Q:  You had that served?

5  A:  My process server did, correct.  That's correct.

6  Q:  That is a civil action that you've requested some

7    documents, but in order to comply with the

8    request of Mr. McDowell for an accounting, did

9    you ask Ms. McLure for any documents, Ms. Ann

10   McLure sitting right here?

11 A:  I couldn't ask her for documents.  I don't

12   represent her.  She's represented by counsel.

13 Q:  And you don't recall ever asking her counsel for

14   any records, true?

15 A:  I thought we had written him a letter, which I

16   don't have today.  I don't recall asking for

17   certain things.  Perhaps I didn't, but I would've

18   asked for three things in particular.

19 Q:  What would those have been?

20 A:  Mr. McLure's ashes, Mr. McLure's van and the

21   records which she took from his home.

22 Q:  Getting back here to, again, Exhibit Number Six,

23   I want to direct your attention to a policy of

24   insurance, Prudential Insurance Company of

25   America.  Do you see that?

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 64

```
 1   A:  Uh-huh (affirmative response).
 2   Q:  Do you see a policy number on that?  Do you see a
 3       104?  If I could direct your ---
 4   A:  I see a certificate number; is that what you're
 5       asking for?
 6   Q:  Yes, sir.  On your Exhibit "A", do you know if
 7       that policy of insurance is one of the policies
 8       of insurance referenced here in Exhibit "A"?
 9   A:  It's not listed on Exhibit "A"?
10   Q:  Pardon me?
11   A:  It is not listed on my Exhibit "A".
12   Q:  Would it be fair to say, until I presented that
13       to you today you had no knowledge that that
14       policy of insurance existed?
15   A:  That's correct.  That's correct.
16   Q:  Let me direct your attention to another policy of
17       insurance, group number 10493.
18   A:  Is it here?
19   Q:  Yes, sir.
20   A:  Now, the one which we were just looking at listed
21       his wife as the beneficiary; is that correct?
22   Q:  I'm just asking questions, Mr. Samaha.
23   A:  Okay.  It did.  I'll make that statement, then.
24   Q:  Let me change the question and ask you another
25       one.  Let me pass you a document here.  So the
```

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 65

1     record will be clear, it has a large stamp number

2     in the upper right corner.  It's part of Exhibit

3     Six and it has for VA use, number 21367 in big

4     bold print.  Do you see that?

5  A: I see it.

6  Q: Do you see down at the bottom there's a reference

7     to a strong box?

8  A: Uh-huh (affirmative response).

9  Q: Did you open any strong boxes that Mr. McLure may

10    have had?

11 A: I could not find any.

12 Q: Could not find any?

13 A: That's correct.

14 Q: How about safe deposit boxes?

15 A: I could not find any.

16 Q: But you see someone has written on Mr. McLure's

17    personal record ---

18 (HEARING INTERRUPTED BY CELL PHONE.)

19 THE COURT:              I'M GOING TO MAKE LIKE I

20                         DIDN'T HEAR THAT.

21 MR. SMITH:              THANK YOU, YOUR HONOR.

22 Q: You see on ---

23 A: I see someone has penciled in and printed, it

24    says, "See policy in strong box."

25 Q: To your knowledge, there may be a strong box,

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 66

1       there may not be, you simply don't know?

2   A:  That's correct.

3   Q:  Do you have a policy of insurance from Prudential

4       with policy number 10493 on your summary?

5   A:  I don't.  It's not on here.

6   Q:  Were you aware that Mr. McLure had such a policy

7       for $10,000 payable through the Port Authority,

8       group life insurance?

9   A:  I haven't. I don't see a copy of it here and I

10      was not aware of it.  If you have it, I'll be

11      glad to look at it and see if I recognize it.

12      Okay.  This is handwritten and I guess this is

13      his handwriting; it matches the rest of it, and

14      it states, "Prudential Insurance Company,

15      $11,000."  It does not tell who the beneficiary

16      is.

17  Q:  Does not, and as someone acting in the best

18      interest of Mrs. Lillian McLure, you would want

19      to run that down and find out where ---

20  A:  That is correct.

21  Q:  You've not done that?

22  A:  I haven't had it to do it with.

23  Q:  Are you familiar with the form that is called a

24      Inventory and Appraisement?

25  A:  I am.

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                      Page No: 67

```
 1   Q:  Are you aware that that is a form that is filled
 2       out by a personal representative and by someone
 3       acting pro se and they fill that out, and the
 4       purpose of that is to identify to the world what
 5       assets this person had so if creditors want to
 6       file a claim, they can do so, and also to make
 7       sure that it's fair in treatment of the decedent
 8       and his assets; is that true?
 9   A:  That's correct.
10   Q:  Are you aware that that form requires that
11       whether an asset is singularly or jointly owned
12       that it be identified?
13   A:  That's correct.  I have a copy of the form in my
14       file.
15   Q:  Have you done that?
16   A:  Have I done what?
17   Q:  Marshal the assets in order to prepare an
18       inventory and appraisement?
19   A:  No, I have not.
20   MR. SMITH:              YOUR HONOR, IF I COULD HAVE
21                           ONE MINUTE.
22   THE COURT:              THANK YOU, SIR, YOU MAY.
23   Q:  Other than Ms. Lillian McLure, are there any
24       other beneficiaries of the trust that you
25       established for her?
```

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 68

1    A:  Yes, there are.

2    Q:  Who are they?

3    A:  Her nieces and nephews.

4    Q:  Are any of those people, people to whom Mrs. Ann

5        McLure wrote checks on the account of Ms. Lillian

6        McLure using the Power of Attorney?

7    A:  No, sir.

8    Q:  Are there any remainderments in the trust?

9    A:  No, sir.

10   Q:  What is the distribution at death?

11   A:  Upon the death of Mrs. McLure, it goes, share and

12       share alike to the six nieces and nephews.

13   Q:  Who appraised Mrs. McLure's home for sale?

14   A:  I have the appraisal.  I don't remember who

15       appraised it, but the appraisal was the exact

16       appraisal which the county assessor put on it.

17   Q:  Just so I'm clear, Mr. Samaha, let me finish up

18       here, other than what I've put in here as

19       exhibits, there are no other documents

20       establishing the nature of the accounts that

21       you've identified in Exhibit "A" or any other

22       accounts that may exist for Mr. McLure or Lillian

23       McLure that have, are available for production to

24       The Court today; is that true?

25   A:  Not to my knowledge.

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 69

1    Q:  That's all I have.  Thank you.

2    THE COURT:                    DO YOU HAVE ANY QUESTIONS

3                                  FOR THIS WITNESS, MR.

4                                  MONCKTON?

5    MR. MONCKTON:                 JUST A COUPLE, YOUR HONOR.

6                        CROSS EXAMINATION

7    BY MR. MONCKTON:

8    Q:  Mr. Samaha, why did you prepare a Power of

9        Attorney for Ms. Lillian McLure and make you as

10       attorney-in-fact?

11   A:  As I've already testified, when we discovered

12       that Ann McLure had written checks on Ms.

13       Lillian's personal checking account in excess of

14       $130,000, it was brought to my attention by Ms.

15       Lillian, then we decided, actually Ms. Lillian

16       decided that that needed to stop, and so, the

17       best way to stop it was to renounce the Power of

18       Attorney that she had given to Ann McLure and put

19       me in that position and then, of course, change

20       the signature card on the checking account, which

21       we did.

22   Q:  Can we agree that you could've just renounced Ms.

23       Ann McLure as the Power of Attorney, attorney-in-

24       law, and acted in her own behalf?

25   A:  She could have, but she wanted me to help her.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 70

1    because she was not knowledgeable about a lot of

2    financial affairs and she needed some help with

3    that.  Her husband had always done everything for

4    her, as I previously testified.

5    Q:  Mr. Samaha, is it your opinion that Ms. Lillian

6        McLure is competent to execute these documents?

7    A:  She certainly is.

8    Q:  What do you base that on?

9    A:  Because I know her personally.  I know her

10       friends who also have spent considerable years

11       with her and she's spent time in our home.  So

12       we're very familiar with Mrs. McLure.

13   Q:  She spent time in your home?

14   A:  That's correct.

15   Q:  The trust that you talked about earlier, ---

16   A:  Uh-huh (affirmative response).

17   Q:  --- those assets, are those with a bank or where

18       are they?

19   A:  They're invested in annuities with a bank.

20   Q:  Which bank?

21   A:  Carolina First.

22   Q:  The house proceeds, are they also with Carolina

23       First?

24   A:  That's correct.

25   Q:  Are all of the assets you liquidated in trust at

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 71

1      Carolina First?
2   A:  Essentially, everything is there.
3   Q:  What is not there?
4   A:  Like her fees, her cost.  We had to pay for the
5       -- well, there were no liquidation fees, so I
6       would say everything is in the trust.
7   Q:  So everything that you've marshaled, you've
8       liquidated by POA and placed into a trust with
9       Carolina First?
10  A:  That's correct.
11  Q:  What kind of fees did you charge?
12  A:  I charged a contingency fee.
13  Q:  I want to understand this correctly.
14  A:  Okay.
15  Q:  You, acting as trustee of these assets, filed a
16      contingency fee agreement with yourself?  How did
17      ---
18  A:  No.  I didn't do that.  She first retained me
19      before we knew a lot about anything.  When we
20      first began, she signed a representation
21      agreement with me.
22  Q:  Do you have a copy?
23  A:  No.
24  Q:  What does that representation -- Is it hourly?
25  A:  I just told you it was a contingency.

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 72

1  Q: Contingent on what?

2  A: Contingent upon the recovery that I would make

3     for her, whatever assets of hers that I could

4     marshal.

5  Q: How much of a contingency?

6  A: It was one-fourth.

7  Q: So if I understand this correctly, you obtained a

8     fee of one-quarter of the assets you marshaled?

9  A: That is correct.

10 Q: What is your best guess on the total number of

11    assets, the total amount of assets you marshaled?

12 A: About 450 to $500,000.

13 Q: Your fee was approximately $115,000?

14 A: That's correct.

15 Q: Have you paid yourself $115,000?

16 A: Have I?  Yes.  I just told you ---

17 Q: You, acting as ---

18 A: I'm misunderstanding your question.

19 Q: You're the trustee?

20 A: That is correct.

21 Q: Who signed the check to George T. Samaha?

22 A: Who signed the check to me?

23 Q: Yes, sir.

24 A: For my fee?

25 Q: Yes, sir.

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 73

1   A:   I would sign the check, but that was before we

2        put any money in the trust.  First, we got the

3        assets, got the trust, got the trust officer to

4        find out the best way to put the assets in the

5        trust, but prior to depositing the money into the

6        trust, I would state a fee.

7   Q:   So you marshaled the assets into your trust

8        account of approximately $450,000?

9   A:   No, into her checking account, her account at the

10       bank.

11  Q:   Her account at the bank?

12  A:   That's correct.

13  Q:   Then as POA you wrote a check from the checking

14       account ---

15  A:   That's correct.

16  Q:   --- to yourself ---

17  A:   To pay my ---

18  Q:   --- for approximately $115,000?

19  A:   To pay my fee.  That's correct.

20  MR. MONCKTON:          YOUR HONOR, I HAVE NO

21                         FURTHER QUESTIONS.

22  MR. SMITH:             YOUR HONOR, I HAVE A FEW

23                         QUESTIONS ON THIS THING.

24                      RE-DIRECT

25  BY MR. SMITH:

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                          Page No: 74

1   Q:  Mr. Samaha, what is a PR entitled to as a fee?

2   A:  A personal representative?

3   Q:  Yes, sir.  Is it five percent, max?

4   A:  It was five percent the last time I checked.

5   Q:  I want to understand what you did to earn this

6       $100,000.  You picked up the phone, you called a

7       few people and said, "Is this a joint account,"

8       and if the answer was yes, you sent them what you

9       needed to get them to send you the money.

10  A:  It was not that simple.

11  Q:  How many hours did you put in to earn this excess

12      of $100,000?

13  A:  A considerable number of hours.

14  Q:  How many?

15  A:  I'll go back and check my records and tell you

16      ---

17  Q:  What's your best estimate?

18  A:  I don't know.

19  Q:  Mr. Samaha, isn't this true, that the reason you

20      are objecting to the probate of this estate is

21      because the probate would make you pay that

22      hundred and some thousand dollars back and that a

23      reasonable fee in this situation from marshaling

24      the assets of this woman would be five percent as

25      a maximum?

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 75

1    A:  I don't think so.

2    MR. SMITH:                   I HAVE NOTHING ELSE, YOUR
3                                 HONOR.  I MOVE THE
4                                 INTRODUCTION OF ALL THE
5                                 EXHIBITS I'VE USED.

6    MR. MONCKTON:               NO OBJECTION TO HIS
7                                EXHIBITS, YOUR HONOR.

8    THE COURT:                  ACCEPTED AND RECEIVED.
9    EXHIBITS NUMBER FIVE AND SIX ADMITTED INTO EVIDENCE.

10   THE COURT:                  NO OTHER QUESTIONS.  YOU'RE
11                               EXCUSED.  ANY OTHER
12                               WITNESSES AND/OR TESTIMONY,
13                               SIR?

14   MR. SMITH:                  YES, YOUR HONOR, ONE BRIEF
15                               WITNESS.  WE CALL MS.
16                               VALENTI TO THE STAND.
17                               VICKIE VALENTI.

18   THE COURT:                  MS. VALENTI?  PLEASE COME
19                               FORWARD, MS. VALENTI.

20   VICTORIA A. VALENTI, HAVING BEEN CALLED TO THE STAND
21   AND DULY SWORN, TESTIFIED AS FOLLOWS:

22   THE COURT:                  THANK YOU.  BE SEATED.  FOR
23                               THE REPORTER, IF YOU WOULD.
24                               SPELL YOUR NAME AND GIVE
25                               HER YOUR ADDRESS.

***Prestige Court Reporting, Inc.***
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 76

```
 1   MS. VALENTI:            OKAY.  VICTORIA A. VALENTI.

 2                           V AS IN VICTORY, A-L-E-N-T-

 3                           I.  I LIVE AT 4255 HIGHWAY

 4                           1008, LITTLE RIVER, SOUTH

 5                           CAROLINA 29566.

 6                   DIRECT EXAMINATION

 7   BY MR. SMITH:

 8   Q:  Ms. Valenti, are you any kin to Lillian McLure?

 9   A:  No, I am not.

10   Q:  Do you know her?

11   A:  Yes, I do.

12   Q:  How long have you known her?

13   A:  Approximately four years.

14   Q:  How did you come to know her?

15   A:  She was a neighbor.

16   Q:  Did you know her husband, Francis?

17   A:  Yes, I did.

18   Q:  Do you know where Mrs. McLure is today?

19   A:  No, I do not.

20   Q:  When was the last time you had any knowledge of

21       her whereabouts?

22   A:  Two weeks ago.

23   Q:  Where was she then?

24   A:  At my residence.

25   Q:  Does she live here from time to time?
```

1  A: Yes, she does.

2  Q: Where is she living now, if you know?  Does she

3     have any other permanent address, let me ask you

4     that?

5  A: Not a permanent; when she visits.

6  Q: Where did she visit from?  Where do you

7     understand her to be visiting from?

8  A: From South Carolina.

9  Q: Well, I mean, when she comes to you, she's

10    visiting, correct?

11 A: No.

12 Q: She lives ---

13 A: Well, she, she visits here and then she visits

14    her sister and, and different people.

15 Q: Is it your understanding of Ms. McLure's living

16    situation that she doesn't have a permanent

17    residence, but visits from family member to

18    family member?

19 A: Her permanent residence is with me, but she does

20    visit with her sister.

21 Q: How did that come to be that her permanent

22    residence is with you?

23 A: Well, she wasn't staying at her home, okay, we

24    decided to sell it.  She was by herself an awful

25    lot.  After Frank died, it was my understanding

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 78

1        and Lillian's that she was to go north and, and

2        would visit.  She wanted to go see her sister.  I

3        made that happen, with the help of some friends.

4    Q:  Did she pay you anything for staying with you?

5    A:  No.

6    Q:  Did she help out a little with the bills, the

7        groceries, anything like that?

8    A:  Oh, she may give you two or five dollars.

9        That's, that's a lot of money to Lil.

10   Q:  So a few dollars means a lot to her, doesn't it?

11   A:  Sure, it does.

12   Q:  She's living on a fixed income?

13   A:  Yes.

14   Q:  She gets her husband's pension check, Social

15       Security and whatever income she has?

16   A:  Whatever she gets.  I'm not familiar with what

17       she gets, sir.

18   Q:  To the best of your knowledge, does she have a

19       spare $100,000 to throw around?

20   A:  I would say she does, but you'd never know it by

21       knowing Ms. Lillian.

22   Q:  She pretty frugal at the time?

23   A:  No.  What do you mean, frugal by she holds on to

24       it?

25   Q:  Yes.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 79

1  A:  Yes.  Yes, she does.
2  Q:  Were you aware that her attendance at this
3      hearing had been requested?
4  A:  No, I was not.
5  Q:  Would you have a way to contact her if her
6      attendance was required at another hearing?
7  A:  Probably.
8  Q:  Would you be willing to do that, if instructed to
9      do so by The Court or through another process?
10  A:  I prefer that she does not come.
11  Q:  I understand you prefer, but I'm asking if you'd
12      do that?
13  A:  I don't know.
14  Q:  Why do you prefer she don't come?
15  A:  Because I know how Ms. Lil feels about what's
16      going on.  She is very hurt.  She gets very
17      nervous.  It's, it's hard -- if you would see Ms.
18      Lillian, you'd understand what I'm saying.  She's
19      a very fragile woman who cannot believe this is
20      happening to her, that this money has
21      disappeared, and I have tried to explain to her
22      where it went.  She can't believe that -- she
23      would only be upset and I don't want to see
24      Lillian hurt again, I mean, these people can say
25      I don't, I don't care about it, but I sincerely

1      do.

2  Q:  Tell me if you agree with this. The best thing

3      that could happen would be for somebody to find

4      out where all the money went and if it's been

5      wronged, get it back to Ms. Lillian; is that fair

6      to say?

7  A:  Yes.

8  Q:  Would you like The Court to do that if it can do

9      that?

10  A:  I think it has --- I, I think so, yes.

11  Q:  All right. That's all I have, Ms. Valenti. Hold

12      on one second. How does Ms. McLure get around?

13      Do you drive her or does she drive herself? How

14      does that work?

15  A:  Well, I don't drive now. My neighbor takes us.

16  Q:  Thank you.

17  A:  Uh-huh (affirmative response).

18  THE COURT:         MR. MONCKTON?

19           CROSS EXAMINATION

20  BY MR. MONCKTON:

21  Q:  Just a couple of questions. You said you don't

22      where she is?

23  A:  Not today, no, sir.

24  Q:  Who was the last person that came and picked her

25      up from your house?

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 81

1   A:   Who was the last person that came?

2   Q:   You said she doesn't drive.

3   A:   My husband.  No.

4   Q:   Your husband?

5   A:   Uh-huh (affirmative response).

6   Q:   Where did he take her?

7   A:   The airport.

8   Q:   He took her to the airport?

9   A:   Uh-huh (affirmative response).

10  Q:   Where was she going?

11  A:   I really don't want to tell you.

12  Q:   Ma'am, where was she going?

13  A:   To visit her sister.

14  Q:   Where is her sister?

15  A:   Upstate.

16  Q:   Upstate where?  What state?

17  A:   Do I have to ---

18  Q:   Ma'am, this is not a game.  Please answer the

19       question.

20  A:   And I don't want it to be a game.  The people

21       that took her money, they started this all, all

22       right?  I'm looking out for Lillian and I, and I

23       am afraid that if I tell you where she's at these

24       people will go and get her again and drag her

25       around like they did the last time.

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

4:04-cv-01782-RBH    Date Filed 11/02/04    Entry Number 2    Page 140 of 226

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                    Page No: 82

| | |
|---|---|
| 1 | THE COURT:                NO, MA'AM.  I CAN TELL YOU |
| 2 | THEY'RE NOT TO DRAG HER |
| 3 | AROUND ANY MORE.  THOSE |
| 4 | DAYS ARE OVER.  THOSE DAYS |
| 5 | ARE OVER, SO PLEASE |
| 6 | COOPERATE WITH HIM. |
| 7 | A:  She is in New York right now. |
| 8 | THE COURT:                OKAY. |
| 9 | Q:  When did she leave? |
| 10 | A:  It must've been around Christmas, I believe. |
| 11 | Q:  She's been in New York since Christmas? |
| 12 | A:  Off and on, yes. |
| 13 | Q:  When's the last time she was at your house? |
| 14 | A:  Two weeks.  I believe it was about two weeks ago, |
| 15 | three weeks ago, maybe. |
| 16 | Q:  Did anybody instruct her to go to New York? |
| 17 | A:  Instruct her?  No.  She was asked. |
| 18 | Q:  By who? |
| 19 | A:  Me. |
| 20 | Q:  Did anybody ask you to have her go to New York? |
| 21 | A:  We, Lillian and I talked about it for a long |
| 22 | time. |
| 23 | Q:  Did anybody ask you to tell her to go to New |
| 24 | York? |
| 25 | A:  I don't believe so. |

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                              Page No: 83

1   Q:  Did you know this court hearing was coming in?

2   A:  I didn't know it was today.  I didn't know -- I

3       don't keep tabs on what exactly is going on, you

4       know, I know that, that Ms. Ann McLure was coming

5       down, I didn't know when.  I didn't know when the

6       hearing was.  I was asked this morning if I

7       wanted to come and I said, "Yes."

8   Q:  Are you aware of the Will that this court has

9       held to be valid in this case?  Are you aware

10      that there is a Will that this court has held to

11      be valid in this case?

12  A:  I don't know what Will there was.  I know that

13      Frank did have Mr. Samaha come to the house last

14      year and make a Will.  I do not know what that

15      Will contained.

16  Q:  Do you understand this whole process is to find

17      out exactly what assets Ms. McLure has so she can

18      rightfully be paid her assets?  Have you

19      understood that today?

20  A:  I, I believe so and I believe that it is for, to

21      see what certain individuals got like Ms. McLure,

22      Ann McLure.

23  Q:  Do you understand that the process these

24      attorneys here are trying to do is to make sure

25      all the assets, everything Ms. Lillian is

1    entitled to, she gets?

2  A:  Yes, sir, and I believe that's what Mr. Samaha

3      was trying to do, but we did not have the files

4      at the house.

5  Q:  Were you aware that Mr. Samaha charged Lillian

6      $125,000?

7  A:  No. I never asked him that.

8  Q:  Today is the first time you've heard that?

9  A:  Yes.

10 Q:  Do you think Ms. Lillian McLure is competent to

11     handle her own finances?

12 A:  I think, with some help. She, she needs help

13     doing that stuff, I mean, she, she's almost 80

14     years old, so ---

15 Q:  So your answer would be, she can't handle her own

16     personal affairs or ---

17 A:  Not completely, no. Not completely.

18 Q:  That's all I need to know.

19                    RE-DIRECT

20 BY MR. SMITH:

21 Q:  Very briefly, Ms. Valenti.

22 A:  Uh-huh (affirmative response).

23 Q:  So you knew Frank McLure what, about two, three

24     years before he passed away?

25 A:  I guess it'd be three years, because I'd take him

1      back and forth for cancer treatments, take care

2      when he called.  Like Christmas day he called my

3      house many times to come help him.  He would get

4      belligerent, would fall down and couldn't get up.

5   Q: Did he ever talk to you about being in the

6      military?

7   A: Yes.  Yes.

8   Q: So knowing him just as a neighbor, you knew that?

9   A: I knew that.

10   Q: You knew he was from upstate ---

11   A: Only because we were going through his, his

12      things out in the garage.  I came across his Navy

13      uniform.

14   Q: Let me show you a Will.  We'll mark it as Exhibit

15      Seven.

16      EXHIBIT NUMBER SEVEN MARKED FOR IDENTIFICATION.

17   Q: --- and direct your attention to the top of page

18      two.  You see a list of people there saying,

19      "Give this one this much money and this one this

20      much money?"

21   A: Uh-huh (affirmative response).

22   Q: If that's what Frank McLure wanted to do in his

23      Will, do you know of any reason Ms. Lillian would

24      disagree with that?

25   A: No.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 86

1  Q:  That's all I have.

2                    RE-CROSS

3  BY MR. MONCKTON:

4  Q:  Just one other question.  Would you know that the

5      money that's allegedly missing out of the estate

6      paid those persons?  Had you ever been told that?

7  A:  Yes.

8  Q:  No further questions.

9  THE COURT:                  I HAVE A COUPLE OF

10                             QUESTIONS.

11                    EXAMINATION

12 BY THE COURT:

13 Q:  Now, I've seen Ms. Lillian.  She's been in the

14     courtroom ---

15 A:  Uh-huh (affirmative response).

16 Q:  --- and in the administrative division.

17 A:  Uh-huh (affirmative response).

18 Q:  And I met Ms. Lillian and I could realize that

19     she would've been distraught being here, but she

20     appeared to me, and you said the word fragile,

21     did you?

22 A:  Uh-huh (affirmative response).    Yes, I did.

23 Q:  What is her health condition today?

24 A:  Her health condition?  She ---

25 Q:  I know you're not a doctor, but ---

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 87

| | |
|---|---|
| 1 | A: No. |
| 2 | Q: --- what would you say of her health? |
| 3 | A: Physically, her knee, she has arthritis, I |
| 4 | believe, in her left knee. She is on Procromat. |
| 5 | A liquid, I don't know what the liquid, it's a |
| 6 | vitamin type thing. And there's another. I'm |
| 7 | trying to think of what the name of that is. She |
| 8 | takes a white pill once a month. Besides that, |
| 9 | physically, Lillian is fine, you know, she has |
| 10 | osteoporosis. She walks every day, a couple of |
| 11 | times a day, even when it is cold out. She gets |
| 12 | up, takes care of herself, takes an hour to get |
| 13 | ready for bed, put her hair in pin curlers and |
| 14 | everything, but besides that, she's perfectly |
| 15 | fine. |
| 16 | Q: Okay, mentally? |
| 17 | A: Mentally, she is what I would call, I guess, a |
| 18 | learned -- Frank always did everything for Ms. |
| 19 | Lillian, so I, I have been told and what I have |
| 20 | seen. He didn't let her do a whole lot and he |
| 21 | catered to her, was very good to her, so she was |
| 22 | never taught -- it's a, it's a learned disability |
| 23 | is how I call it. She is very intelligent in, in |
| 24 | things like music and dance, but when it -- and |
| 25 | the same with me, when it comes to insurances or |

```
1    these proceedings, she wouldn't be the smartest,
2    just like I'm not, and you would have to, you
3    have to repeat things to Lillian over and over
4    and she will repeat them back to you and ask you
5    questions and you just told her, you know. And
6    she has always been sheltered all her life is
7    basically what I, is what I want to say, you
8    know, looked out after. That's why I was so
9    concerned when Frank died, that she was left at
10   that house by herself. Rini would come and take
11   her to church on Sunday, take her out to eat, you
12   know, things like that. Besides that, you know,
13   that was a couple of hours during the week and
14   then she was by herself, so she'd come over to my
15   house and she ate, and I did it because I wanted
16   to do it, okay. She didn't pay me to do it. I
17   just looked out after her and, you know, just
18   like Rini did, you know, Ann come down, I don't
19   know how many times after Frank died, which
20   wasn't many, but she left her at the house by
21   herself all the time and all she kept telling me
22   is she wanted to see her sister, "I want to see
23   my sister, I want to see my sister," and there
24   was no movement going toward, she was going to
25   see her sister. When I would take Frank, when,
```

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                              Page No: 89

1    when I would take Frank to the cancer treatments

2    some, I would reassure her, and the nurses down

3    there can tell you or anybody else, that when

4    she, when Frank died, and I said this in front of

5    Frank, she would go see her sister, but nobody

6    was doing that and that was, that's all.

7  Q:  You said she needs help.  Are you telling me

8      again in your opinion that she is experiencing

9      some senility?

10 A:  I don't, she's in her 80s, she's, she's, she's

11     smart when she wants to be.  As far as being

12     deaf, she can hear when she wants to hear and be

13     completely deaf another time, you know, there's

14     certain things that she grasps and certain things

15     that she doesn't.

16 Q:  Okay.

17 THE COURT:          DO EITHER OF YOU GENTLEMEN

18                     HAVE ANY OTHER QUESTIONS?

19 MR. SMITH:          VERY BRIEF FOLLOW-UP.

20                   RE-DIRECT

21 BY MR. SMITH:

22 Q:  Would you say that her abilities are not as

23     sophisticated as one would need to manage stocks

24     and bonds and annuities and contracts and keep

25     track of loosing stock and of rising stock and

```
 1        all that ---
 2    A:  Right, because I couldn't do it.  She couldn't do
 3        it.
 4    Q:  She surely couldn't do it?
 5    A:  No.
 6    THE COURT:            THAT'S ALL I HAVE.  ANY
 7                         OTHER QUESTIONS?
 8    MR. MONCKTON:        NO QUESTIONS.
 9    THE COURT:           YOU'RE EXCUSED, MA'AM.
10                         THANK YOU.  ANY OTHER
11                         WITNESSES AND/OR TESTIMONY,
12                         SIR?
13    MR. SMITH:           NOTHING FURTHER, YOUR
14                         HONOR.  I'D LIKE TO MAKE A
15                         BRIEF CLOSING STATEMENT.
16                         IF I COULD HAVE ONE MINUTE,
17                         I MAY HAVE ONE VERY, ONE
18                         BRIEF WITNESS.  (MOTIONS TO
19                         MS. MCLURE.)
20    THE COURT:           MS. MCLURE, PLEASE COME
21                         FORWARD AND BE SWORN IN.
22    ANN MCLURE, HAVING BEEN CALLED TO THE STAND AND DULY
23    SWORN, TESTIFIED AS FOLLOWS:
24    THE COURT:           FOR THE REPORTER, PLEASE
25                         GIVE HER YOUR NAME AND
```

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 91

```
 1                              ADDRESS, AND IF YOU WOULD,
 2                              SPELL YOUR NAME.
 3    MS. MCLURE:               ANN MCLURE, M-C-L-U-R-E,
 4                              1604 RARITAN, R-A-R-I-T-A-
 5                              N, AVENUE, MANVILLE, M-A-N-
 6                              V-I-L-L-E, NEW JERSEY
 7                              08835.
 8    MR. SMITH:                YOUR HONOR, MAY I APPROACH?
 9    THE COURT:                YES, SIR.
10    MR. SMITH:                THANK YOU.
11                 DIRECT EXAMINATION
12    BY MR. SMITH:
13    Q:   Ms. McLure, let me show you what has been marked
14         as Exhibits Five and Six, and excluding the
15         orange tags that have been put on them to assist
16         us in court here today, have you seen those
17         documents before?
18    A:   Yes, sir.
19    Q:   When is the first time you saw them?
20    A:   Just before Frank passed away.
21    Q:   How did they come into your sight?  How did you
22         see ----
23    A:   He had given me two notebooks to keep because he
24         was afraid somebody else would come in and take
25         them.
```

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 92

1   Q: Are those the notebooks I hold here in my hand?

2   A: Yes, they are.

3   Q: Exhibit Five and Exhibit Six are copies of those

4      notebooks, correct?

5   A: Yes.

6   Q: After Frank passed on, what did you do with those

7      notebooks?

8   A: I brought them to Gem.

9   Q: So the record's clear, you're talking about Mr.

10     McDowell sitting here to the left of me?

11  A: Yes.

12  Q: Had you taken them to anyone else before that?

13  A: No.

14  Q: How about the Will, did you take any Wills to

15     anyone of Mr. McLure?

16  A: No.

17  Q: All right.  That's all I have.  Thank you, Ms.

18     McLure?

19  THE COURT:              ANY QUESTIONS, SIR?

20  MR. MONCKTON:           NO QUESTIONS, YOUR HONOR.

21                          THANK YOU.

22  THE COURT:              THANK YOU.  YOU'RE EXCUSED.

23                          THANK YOU, MS. MCLURE.  ANY

24                          OTHER WITNESSES?

25  MR. SMITH:              NOTHING FURTHER, YOUR

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 93

| | | |
|---|---|---|
| 1 | | HONOR. |
| 2 | THE COURT: | MR. MONCKTON, DO YOU HAVE |
| 3 | | ANY WITNESSES? |
| 4 | MR. MONCKTON: | I DON'T HAVE ANY WITNESSES, |
| 5 | | YOUR HONOR, BUT AT THE |
| 6 | | APPROPRIATE TIME, LIKE TO |
| 7 | | MAKE A STATEMENT. |
| 8 | THE COURT: | DO YOU HAVE ANY STATEMENTS |
| 9 | | AND/OR ANY WITNESSES AT |
| 10 | | THIS TIME? |
| 11 | MR. SAMAHA: | NO, MA'AM. |
| 12 | THE COURT: | COULD I HAVE A STATEMENT? |
| 13 | MR. SMITH: | YES, YOUR HONOR.  I THINK |
| 14 | | WE HAVE SEEN TODAY |
| 15 | | SOMETHING THAT SURPRISES |
| 16 | | EVEN ME.  I THINK WE KNOW |
| 17 | | WHY THERE'S BEEN A REASON |
| 18 | | TO DELAY PROBATING THIS |
| 19 | | WILL, WELL, A 100,000 |
| 20 | | REASONS TO KNOW WHY THIS |
| 21 | | WILL HAS BEEN SO FOUGHT TO |
| 22 | | BE PROBATED AND WHY MRS. |
| 23 | | MCLURE IS NOT HERE TODAY |
| 24 | | AND WHY SHE'S BEING KEPT |
| 25 | | AWAY FROM US.  THERE IS |

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 94

```
 1              GROSS IMPROPRIETY GOING ON
 2        HERE, YOUR HONOR. AND I
 3        WOULD REQUEST THAT THIS
 4        COURT ORDER A CONSTRUCTIVE
 5        TRUST ON THE FEE THAT OVER
 6        $100,000 THAT MR. SAMAHA
 7        HAS TAKEN FROM THIS ESTATE.
 8        I MOVE BACK TO THE PART ON
 9        THE PART FIVE. I DON'T
10        THINK IT COULD BE ANY
11        CLEARER. WE HAVE, I USE
12        THE WORD ACCOUNTING ONLY IN
13        THE MOST COMMON THINGS, NOT
14        BY ANY MEANS A PROFESSIONAL
15        ACCOUNTING BY MR. SAMAHA.
16        AND ALL HE CAN TELL US IS,
17        "WELL, HERE'S WHAT WE HAVE
18        AT A GIVEN POINT IN TIME."
19        HE KNEW NOTHING ABOUT THIS
20        MAN. HE DIDN'T DELVE INTO
21        IT. HE DIDN'T KNOW HE WAS
22        A VETERAN, DIDN'T KNOW HE
23        HAD VETERAN'S BENEFITS,
24        OTHER POLICIES OF
25        INSURANCE, STOCK ACCOUNTS.
```

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 95

1    HE DIDN'T KNOW ANYTHING
2    EXCEPT A WOMAN, WHO BY
3    TESTIMONY OF HER NEIGHBOR
4    WHO APPEARS TO BE A SWEET,
5    LOVING WOMAN, HAS SAID,
6    "SHE NEEDS A LITTLE HELP,"
7    AND THAT'S WHERE MR. SAMAHA
8    IS GETTING HIS INFORMATION
9    TO FEATHER HIS OWN NEST.
10   WE NEED A PART FIVE
11   ADMINISTRATION HERE AS SOON
12   AS POSSIBLE BECAUSE I'VE
13   NEVER SEEN A CASE THAT MORE
14   CRIES OUT FOR THIS.
15   THERE'S SOMETHING CROOKED
16   GOING ON HERE, JUDGE, AND
17   YOU NEED TO GRAB CONTROL OF
18   IT.   YOU NEED TO PUT
19   SOMEBODY IN CHARGE OF IT.
20   THEY NEED TO ROUST OUT
21   EVERY SINGLE THING THAT WAS
22   THERE WHEN MR. MCLURE WAS
23   ALIVE AND THEY NEED TO NOT
24   BE ALLOWED TO DO A THING
25   WITH IT UNTIL THEY COME TO

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                              Page No: 96

| | |
|---|---|
| 1 | YOU AND GET THAT APPROVAL. |
| 2 | THAT'S WHAT HAS GOT TO |
| 3 | HAPPEN.  IF THERE'S |
| 4 | ANYTHING, IT'S AN ABSOLUTE |
| 5 | INJUSTICE.  THANK YOU, YOUR |
| 6 | HONOR. |
| 7 | THE COURT:        MR. MONCKTON? |
| 8 | MR. MONCKTON:     YES, MA'AM, YOUR HONOR.  I |
| 9 | WOULD JOIN IN THE FACT THAT |
| 10 | I THINK WE NEED TO HAVE THE |
| 11 | PART FIVE ADMINISTRATION. |
| 12 | I WOULD ALSO JOIN IN THE |
| 13 | FACT THAT I THINK WE NEED A |
| 14 | CONSTRUCTIVE TRUST PLACED |
| 15 | ON THESE PROCEEDS AND THE |
| 16 | BASIS OF THAT, IF ANY OF |
| 17 | THOSE ATTORNEY FEES COULD |
| 18 | BE ASCERTAINABLE AS PROBATE |
| 19 | ASSETS, THEN THEY WOULD GO |
| 20 | INTO THE DISBURSEMENT MY |
| 21 | CLIENT, ANN MCLURE, HAS |
| 22 | ALREADY MADE.  MY CLIENT |
| 23 | READILY ADMITTED THAT IF |
| 24 | SHE'S MADE ANY |
| 25 | DISBURSEMENTS |

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                              Page No: 97

1    INAPPROPRIATELY, THEN SHE

2    WILL TURN THOSE BACK INTO

3    THE PROBATE COURT, BUT

4    THOSE DISBURSEMENTS ARE ALL

5    BASED ON WHAT IS OR IS NOT

6    A PROBATE ASSET.  THIS

7    HEARING WAS SCHEDULED A

8    LONG TIME AGO FOR THE SOLE

9    PURPOSE OF FINDING OUT WHAT

10   IS WHAT.  I RECEIVED

11   REQUESTS FROM MR. SMITH

12   REGARDING DOCUMENTS AND I

13   INFORMED MR. SMITH THAT ALL

14   THE DOCUMENTS THAT I HAD

15   WERE GIVEN TO MR. MCDOWELL

16   BEFORE MS. MCLURE EVEN CAME

17   TO SEE ME AND I'VE COMPLIED

18   WITH MR. SMITH AND WE

19   TALKED ON THE PHONE A

20   COUPLE OF TIMES ABOUT OUR

21   CONCERNS IN THIS MATTER.  I

22   THINK WE NEED TO TAKE A

23   STEP FURTHER AND LOOK AT --

24   THERE ARE POWER OF

25   ATTORNEYS DRAFTED HERE.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 98

1   THEY'RE COMPETENCY ISSUES

2   HERE.  THERE IS ASSETS THAT

3   ARE BEING SOLD AND

4   DISBURSED OF AND MR. SAMAHA

5   TESTIFIED THAT HE SOLD THE

6   HOUSE BASED ON THE TAX

7   APPRAISAL.  WELL, I KNOW IN

8   HORRY COUNTY THAT THE TAX

9   APPRAISAL IS NOT A FAIR

10  MARKET APPRAISAL.  THERE

11  MIGHT HAVE BEEN SOME

12  PROBLEMS THERE AND ALL THIS

13  INCLUDES PROBATE PROFITABLE

14  ASSETS.  WE DON'T KNOW, AND

15  I THINK IT BRINGS ME TO MY

16  NEXT POINT.  MY CLIENT WAS

17  JUST SERVED WITH A LAWSUIT

18  TODAY IN COMMON PLEAS AND I

19  BELIEVE THIS LAWSUIT IS

20  COMPLETELY INAPPROPRIATE AT

21  THIS TIME, BECAUSE WE'RE

22  DEALING WITH PROBATE ASSETS

23  AND DISBURSEMENTS AND I

24  THINK THIS COURT NEEDS TO

25  ORDER MR. SAMAHA TO DISMISS

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 99

1    IT PURSUANT TO 40J AND IF
2    HE WANTS TO BRING IT AT AN
3    APPROPRIATE TIME AFTER THIS
4    COURT'S HAD AN OPPORTUNITY
5    TO DETERMINE WHAT ASSETS WE
6    HAVE, WHAT CAN BE DISBURSED
7    AND WHAT CANNOT BE
8    DISBURSED, THEN I'D LIKE TO
9    HAVE THAT ORDER, BUT I
10   THINK WE NEED TO GET
11   LILLIAN MCLURE, HAVE A
12   GUARDIAN APPOINTED FOR HER
13   FOR A CONSERVATOR OF THE
14   ASSETS, BECAUSE IT GOES
15   BEYOND MY BELIEF THAT
16   SOMEBODY DRAFTS A POWER OF
17   ATTORNEY, MAKE THEMSELVES A
18   TRUSTEE, THEN SIGNS A FEE
19   AGREEMENT AS THE POWER OF
20   ATTORNEY AND DISBURSES
21   $125,000 FOR MAKING SOME
22   PHONE CALLS.  I DOUBT IF
23   THIS COURT WOULD ORDER A
24   SUMMARY OF HOURS BILLED IN
25   THIS CASE.  THERE IS NONE.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 100

1   BECAUSE IT'S A CONTINGENCY
2   AGREEMENT, AND IF SHE'S
3   INCOMPETENT, THIS IS AN
4   EXAMPLE OF SOMEBODY TAKING
5   ADVANTAGE OVER SOMEBODY WHO
6   IS SOMEBODY, AN ELDERLY
7   PERSON THAT CAN'T TAKE
8   CONTROL OF THEIR AFFAIRS
9   AND SHE'S BEING TAKEN
10  ADVANTAGE OF AND THIS COURT
11  NEEDS TO JUMP IN
12  IMMEDIATELY, STOP
13  EVERYTHING, PLACE ALL
14  ASSETS IN A TRUST UNTIL WE
15  CAN FIND OUT WHAT'S GOING
16  ON, BECAUSE THIS THING, AND
17  I TALKED TO MR. SMITH AND
18  MR. MCDOWELL ABOUT IT, IT
19  COULD'VE BEEN RESOLVED IN
20  ABOUT 30 DAYS IF EVERYBODY
21  CAME TO THE TABLE AND
22  BROUGHT THE DOCUMENTS
23  NEEDED TO FIND OUT WHAT WAS
24  WHAT, AND HONESTLY, THAT
25  HAS NOT HAPPENED.  YOU SENT

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                              Page No: 101

| | | |
|---|---|---|
| 1 | | THE NOTICES ON THIS |
| 2 | | HEARING, YOUR HONOR, |
| 3 | | DECEMBER 5TH, 2001 AND WE |
| 4 | | ARE NO CLOSER TO BEING AT A |
| 5 | | FINISH LINE THAN WE WERE |
| 6 | | THEN, OTHER THAN WE KNOW |
| 7 | | WE'VE GOT BIGGER PROBLEMS. |
| 8 | THE COURT: | DO YOU WANT TO SAY |
| 9 | | SOMETHING? |
| 10 | MR. SAMAHA: | YES, MA'AM.  YOUR HONOR, |
| 11 | | PERHAPS I DON'T FEEL LIKE |
| 12 | | THESE OTHER COUNSELS, YOUR |
| 13 | | HONOR, BUT I DO HAVE A FEW |
| 14 | | THINGS TO SAY FOR THE |
| 15 | | RECORD.  I CAN CORRECT SOME |
| 16 | | MISTAKES THAT I'VE HEARD |
| 17 | | SOME PEOPLE MAKE HERE |
| 18 | | TODAY.  FIRST OF ALL, THERE |
| 19 | | WAS AN INDEPENDENT |
| 20 | | APPRAISAL DONE ON THE HOME |
| 21 | | WHICH WAS SOLD, AND MY |
| 22 | | TESTIMONY WAS THAT IT WAS |
| 23 | | THE SAME AMOUNT, THE |
| 24 | | APPRAISAL WHICH WAS DONE, |
| 25 | | WHICH THE COUNTY APPRAISAL |



THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 102

1    WAS JUST IS A LITTLE

2    UNUSUAL. NORMALLY, THE

3    COUNTY APPRAISAL IS LOWER

4    THAN A BONA FIDE

5    APPRAISAL, BUT THAT

6    APPRAISAL WAS ALMOST DOLLAR

7    FOR DOLLAR AND I BELIEVE IT

8    WAS $134,000 WHICH IS WHAT

9    HER HOME SOLD FOR. THE

10   SECOND THING IS, MS.

11   LILLIAN HERSELF, PRIOR TO

12   MY BECOMING POWER OF

13   ATTORNEY, SIGNED A

14   REPRESENTATION AGREEMENT

15   HERSELF. I DID NOT SIGN A

16   REPRESENTATION AGREEMENT

17   FOR HER AS HER POWER OF

18   ATTORNEY. I THINK THE

19   RECORD NEEDS TO CLEARLY

20   REFLECT THAT. THE REASON

21   THAT WE WERE FIRST BROUGHT

22   INTO THIS ENTIRE ISSUE WAS

23   THE FACT, AS I TESTIFIED

24   BEFORE, THAT ANN MCLURE WHO

25   IS APPARENTLY TODAY

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 103

1  ATTEMPTING TO GET OFF SCOTT

2  FREE WITH WHAT SHE HAS DONE

3  WAS THE PERSON WHO WITHOUT

4  ANY REAL AUTHORITY HELPED

5  HERSELF TO OVER $130,000 OF

6  MS. LILLIAN'S PERSONAL

7  FUNDS ON HER PERSONAL

8  CHECKING ACCOUNT AND

9  THEREIN LIES THE PROBLEM.

10  WHAT I HAVE DONE TO THE

11  BEST OF MY ABILITY, I DID

12  NOT HAVE ALL THE RECORDS.

13  NO ONE PROVIDED THEM. I'VE

14  WORKED WITHIN THE

15  PARAMETERS THAT I HAD AND

16  MARSHALED THE ASSETS THAT I

17  COULD FIND. IT IS TRUE,

18  THAT WAS DONE ON A

19  CONTINGENCY BASIS. AT THE

20  TIME I ENTERED INTO THE

21  AGREEMENT WITH HER, I HAD

22  NO IDEA WHAT MR. MCLURE HAD

23  OR WHAT I WOULD FIND. BUT I

24  CAN TRUTHFULLY SAY TODAY,

25  HAD I NOT INTERVENED MS.

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                      Page No: 104

|    |               |                                          |
|----|---------------|------------------------------------------|
| 1  |               | LILLIAN WOULD NOT HAVE A                  |
| 2  |               | PENNY, BECAUSE ANN MCLURE                 |
| 3  |               | WOULD'VE CONTINUOUSLY                     |
| 4  |               | FIGURED OUT HOW TO GET TO                 |
| 5  |               | THE INVESTMENT WHICH TOOK                 |
| 6  |               | MORE TIME TO GET, OF                      |
| 7  |               | COURSE, THAN JUST WRITING A               |
| 8  |               | CHECK ON A CHECKING                       |
| 9  |               | ACCOUNT.  SO MY POINT IS,                 |
| 10 |               | WHAT IS LEFT TODAY TO MS.                 |
| 11 |               | LILLIAN IS FAR MORE THAN                  |
| 12 |               | SHE WOULD'VE HAD, HAD I NOT               |
| 13 |               | INTERVENED AT THE TIME THAT               |
| 14 |               | I DID AND I'M GLAD THAT I                 |
| 15 |               | DID AND I WOULD DO IT AGAIN               |
| 16 |               | TO HELP HER.                              |
| 17 | MR. SMITH:    | YOUR HONOR, I WOULD JUST                  |
| 18 |               | POINT OUT TO THE COURT THAT               |
| 19 |               | WHAT HAS BEEN DONE BY MR.                 |
| 20 |               | SAMAHA IS NOTHING OTHER                   |
| 21 |               | THAN WHAT A PR WOULD HAVE                 |
| 22 |               | DONE FOR A HECK OF A LOT                  |
| 23 |               | LESS.  AND THEN                           |
| 24 |               | SECONDARILY, ALL THE                      |
| 25 |               | EVIDENCE, I DON'T KNOW MS.                |

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO:  2001-ES-26-0820

Page No:  105

| | |
|---|---|
| 1 | ANN MCLURE FROM ADAM.  I'VE |
| 2 | NEVER MET HER IN MY LIFE. |
| 3 | ALL THE EVIDENCE ABOUT HER |
| 4 | IS, THE STATEMENTS ABOUT |
| 5 | HER, WE'VE GOT TO GO -- |
| 6 | THIS IS A COURT OF LAW. |
| 7 | THERE'S NOT A SHRED OF |
| 8 | EVIDENCE TO SUPPORT ANY OF |
| 9 | THOSE STATEMENTS.  THERE'S |
| 10 | BEEN NO TESTIMONY.  I'M THE |
| 11 | ONLY ONE PUT TESTIMONY ON |
| 12 | TODAY AND ANYTHING ABOUT |
| 13 | MS. ANN MCLURE IS |
| 14 | COMPLETELY INAPPROPRIATE TO |
| 15 | EVEN BE CONSIDERED BECAUSE |
| 16 | THERE'S ZERO EVIDENCE TO |
| 17 | SUPPORT IT.  THANK YOU, |
| 18 | MA'AM. |
| 19 | MR. SAMAHA:            YOUR HONOR, IF I MAY.  IF |
| 20 | YOU WILL CHECK YOUR FILE, |
| 21 | YOUR HONOR, FROM LAST FALL |
| 22 | YOU HAD AS EVIDENCE |
| 23 | PREVIOUSLY ENTERED WITH |
| 24 | THIS COURT COPIES OF THE |
| 25 | FRONT AND THE BACK OF ALL |

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 106

| | | |
|---|---|---|
| 1 | | THE CHECKS WHICH ANN MCLURE |
| 2 | | WROTE. |
| 3 | THE COURT: | THAT'S CORRECT.  THEY ARE |
| 4 | | IN THE FILE.  DOES ANYONE |
| 5 | | ELSE HAVE ANYTHING TO SAY |
| 6 | | TO THE COURT? |
| 7 | MR. MONCKTON: | NO, MA'AM, YOUR HONOR. |
| 8 | THE COURT: | WELL, THIS COURT IS ANGRY, |
| 9 | | OKAY?  DO YOU HAVE |
| 10 | | ANYTHING?  HAVE YOU |
| 11 | | FINISHED YOUR CLOSING |
| 12 | | STATEMENT? |
| 13 | MR. SMITH: | YES, YOUR HONOR. |
| 14 | THE COURT: | HAVE YOU FINISHED YOURS? |
| 15 | | HAVE YOU FINISHED YOURS? |
| 16 | | DO YOU HAVE ANYTHING TO |
| 17 | | SAY, MR. MCDOWELL? |
| 18 | MR. MCDOWELL: | YOUR HONOR, WHEN I RECEIVED |
| 19 | | THOSE TWO ORIGINAL WILLS |
| 20 | | LAST YEAR AND HEARD THE |
| 21 | | STORY I HEARD, I |
| 22 | | ABSOLUTELY, FOR THE LIFE OF |
| 23 | | ME, COULD NOT BELIEVE THE |
| 24 | | FACTS.  PRIOR TO EVEN |
| 25 | | HAVING A HEARING, I CALLED |

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 107

```
1       YOU.  I SAID, "I THINK
2       THERE'S A PROBLEM.  I WANT
3       TO HAVE A MEETING IN
4       CHAMBERS" BEFORE WE EVEN
5       HAD A HEARING, BECAUSE I
6       SAID, "THIS SOUNDS BAD AND
7       I DON'T WANT IT TO GET OUT
8       OF CONTROL."  THAT'S WHY I
9       SAT DOWN WITH YOU IN JULY
10      OF LAST YEAR, AND AS AN
11      OFFICER OF THE COURT AS I'M
12      REQUIRED TO DO BY LAW, I
13      GAVE YOU THE WILL.  AT THAT
14      POINT, I SAID, "I'M DONE.
15      I'M OUT."  AND YOU SAID,
16      "NO, SIR, YOU'RE STUCK,
17      YOU'RE IN IT."  SO I
18      COULDN'T GET OUT EVEN IF I
19      WANTED TO.  I DID WHAT THE
20      LAW REQUIRES ME TO DO AND
21      I'M GLAD THAT I STAYED
22      BECAUSE WE'RE FINALLY
23      GETTING TO THE MEAT OF THE
24      MATTER TODAY AND I'M GLAD
25      THAT I CAME TO YOU.  I'M
```

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 108

| | |
|---|---|
| 1 | GLAD THAT YOU'VE TAKEN |
| 2 | CONTROL OF THIS BECAUSE |
| 3 | THERE ARE VICTIMS IN THIS |
| 4 | FILE AND THE BIGGEST VICTIM |
| 5 | OF ALL IS LILLIAN MCLURE. |
| 6 | SHE'S NOT MY CLIENT, BUT I |
| 7 | FEEL PROUD TO SAY THAT WE |
| 8 | ARE EFFECTUATING SOMETHING |
| 9 | TO PROTECT HER THAT HASN'T |
| 10 | BEEN DONE SINCE MR. FRANK |
| 11 | MCLURE DIED.  FRANK MCLURE |
| 12 | WOULD'VE NEVER AGREED TO |
| 13 | PAY ANYBODY 25 PERCENT. |
| 14 | THAT'S WHY THE WILL SAYS, |
| 15 | "REASONABLE COMPENSATION." |
| 16 | FRANK MCLURE PROTECTED HER |
| 17 | HER ENTIRE LIFE AND FRANK |
| 18 | MCLURE IS NOT HERE TODAY |
| 19 | AND THAT'S WHY SHE'S BEEN |
| 20 | TAKEN ADVANTAGE OF AND I'M |
| 21 | GLAD THAT YOU'RE HERE TO |
| 22 | TAKE CARE OF HER SINCE NO |
| 23 | ONE ELSE HAS. |
| 24 | THE COURT:    YES, SIR, AND I'M GOING TO |
| 25 | DO THAT. |

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 109

| | |
|---|---|
| 1 | MR. MCDOWELL: THANK YOU, YOUR HONOR. |
| 2 | THE COURT: AND YOU'RE ABSOLUTELY |
| 3 | RIGHT. I DID TELL YOU, "NO, |
| 4 | SIR, YOU ARE NOT RELIEVED." |
| 5 | YOU BROUGHT BOTH OF THE |
| 6 | WILLS IN HERE AND YOU WOULD |
| 7 | BE A PART OF IT AND YOU |
| 8 | STILL ARE. THIS COURT'S |
| 9 | ANGRY. I'M ANGRY, LADIES |
| 10 | AND GENTLEMEN AND I'M GOING |
| 11 | TO LOOK AT EVERY ONE OF |
| 12 | YOU. I AM ANGRY. THIS IS |
| 13 | ONE OF TWO OF THE ABSOLUTE |
| 14 | WORSE CASES THAT I HAVE HAD |
| 15 | IN THIS COURTROOM IN ALMOST |
| 16 | FOUR YEARS. LET ME TELL |
| 17 | YOU WHAT I'M GOING TO DO. |
| 18 | GET PREPARED TO WRITE, MR. |
| 19 | SMITH. WHAT I'M GOING TO |
| 20 | DO IS, I AM GOING TO PLACE |
| 21 | THIS UNDER A PART FIVE |
| 22 | ADMINISTRATION. I'M TAKING |
| 23 | CONTROL. IT'S COMING |
| 24 | THROUGH ME, OKAY? I'M |
| 25 | GOING TO HAVE THE STRICTEST |

*Prestige Court Reporting, Inc.*
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 110

1     ADHERENCE TO ALL OF THE
2     RULES AND REGULATIONS.  I'M
3     GOING TO APPOINT A SPECIAL
4     ADMINISTRATOR TO TAKE
5     CHARGE.  THAT SPECIAL
6     ADMINISTRATOR, I CHECKED MY
7     ROSTER PRIOR TO ENTERING
8     COURT TODAY BECAUSE OF THE
9     REQUEST OF A SPECIAL
10    ADMINISTRATOR AND BEING
11    AWARE THAT THIS, THERE IS A
12    PROBLEM.  I'M APPOINTING,
13    IF SHE WILL ACCEPT AND
14    RECEIVE THE APPOINTMENT,
15    MS. CAROLYN HILLS TO SERVE
16    AS THE SPECIAL
17    ADMINISTRATOR.  I AM GOING
18    TO MAKE INCLUSIVE IN THIS
19    ORDER, I WANT AN ABSOLUTE,
20    ABSOLUTE EVERYTHING, IF I
21    HAVE TO SIGN SUBPOENAS TO
22    GATHER ALL INFORMATION SIX
23    MONTHS PRIOR TO MR.
24    MCLURE'S DEATH.  I WANT TO
25    KNOW WHAT'S BEEN TAKING

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 111

1    PLACE.  I THINK THEY'VE

2    BOTH BEEN VULNERABLE,

3    ABSOLUTELY.  I THINK THEY

4    WERE BOTH VULNERABLE.  LET

5    ME READ SOMETHING TO YOU

6    HERE.  I CONSIDER WHERE WE

7    ARE AN ESTATE HEARING

8    TODAY.  WE HAVE SEVERAL

9    ISSUES THAT WE'RE DEALING

10   WITH HERE TODAY AND PROBATE

11   COURT HAS ABSOLUTE

12   JURISDICTION OVER EACH OF

13   THE PROCEEDINGS THAT I'M

14   GOING TO COMBINE.  I'M

15   HAVING A PROTECTIVE

16   PROCEEDING AS FAR AS THE

17   ASSETS OF MR. AND MRS.

18   MCLURE ARE CONCERNED AND

19   HAVE BEEN, AND AGAIN, SIX

20   MONTHS PRIOR TO THE DEATH

21   AND I'LL BE GLAD TO SIGN

22   SUBPOENAS TO GET ALL OF

23   THAT IN PLACE.  WE HAVE

24   ABSOLUTE JURISDICTION OVER

25   ANY PROTECTIVE PROCEEDING

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 112

1  AND/OR GUARDIANSHIP

2  PROCEEDING. IT IS EVIDENT

3  TO THE COURT THAT MS.

4  LILLIAN IS IN NEED OF A

5  PROTECTIVE ELEMENT. IN

6  ADDITION TO THAT, I HAVE

7  SEVERAL PAGES HERE WHICH I

8  HAVE MARKED. THE

9  APPOINTMENT OF AN ATTORNEY-

10 IN-FACT UNDER THIS SECTION

11 DOES NOT PREVENT A PERSON

12 OR HIS REPRESENTATIVE FROM

13 APPLYING TO THE COURT AND

14 HAVING A GUARDIAN OR A

15 CONSERVATOR APPOINTED. I'M

16 APPOINTING A GUARDIAN AD

17 LITEM ALSO. I'LL HAVE TO

18 CHECK MY ROSTER AND SEE WHO

19 THAT GUARDIAN AD LITEM

20 SHALL BE, BUT IT WILL BE A

21 COURT APPOINTMENT, NOT ONE

22 THAT SOMEONE REQUESTS. WE

23 HAVE ONE OTHER THING HERE,

24 JURISDICTION. THE PROBATE

25 COURT HAS CONCURRENT

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 113

1   JURISDICTION WITH THE
2   CIRCUIT COURTS OF THIS
3   STATE OVER ALL SUBJECT
4   MATTER RELATED TO THE
5   CREATION EXERCISE AND
6   TERMINATION OF POWERS OF
7   ATTORNEYS GOVERNED BY THE
8   PROVISIONS OF THIS PART
9   INCLUDING THE APPROVAL OF
10  THE SALE OF REAL AND
11  PERSONAL PROPERTY BY
12  ATTORNEY-IN-FACT.  I WANT
13  EVERYTHING MARSHALED.  I
14  WANT COPIES OF THE SALE OF
15  THE REAL ESTATE.  I WANT
16  COPIES OF EVERYTHING AND
17  THE ORIGINAL PAPERS OF HOW
18  IT WAS CREATED, A BANK
19  ACCOUNT, A CHECKING
20  ACCOUNT, A SAVINGS ACCOUNT,
21  AN ANNUITY AND IF I'VE
22  MISSED ANYTHING, YOU
23  GENTLEMEN PLEASE MAKE IT
24  INCLUSIVE, BECAUSE I WANT
25  IT ABSOLUTE, AND I WANT IT

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 114

1    IN MY OFFICE NOT LATER THAN
2    30 DAYS OR SOMEBODY'S GOING
3    TO JAIL.  NOW, BE IT MS.
4    ANN MCLURE THAT'S SITTING
5    BACK THERE, IF SHE RELEASED
6    SOME MONIES, I WANT
7    ACCOUNTINGS THERE, TOO.  I
8    WANT ACCOUNTINGS FROM
9    EVERYBODY THAT'S HAD
10   ANYTHING TO DO WITH
11   ANYTHING OR ANYBODY, AND
12   I'M HAVING PEOPLE TELL ME
13   THAT EVERYBODY WANTS TO
14   PROTECT.  THE LADY DOESN'T
15   EVEN HAVE A HOME ANY MORE.
16   NOW, THAT IS UNPARDONABLE,
17   AND WE WERE IN SUCH FEAR OF
18   COMING TO THIS COURT TODAY
19   TO BE PROTECTED, WE WERE
20   GOING TO TAKE OFF TO
21   ANOTHER STATE?  I'M GOING
22   TO ALSO APPOINT A VISITOR
23   AND AN EXAMINER, BOTH BEING
24   PHYSICIANS, AND THERE WAS
25   SOMEONE ALONG THE LINES OF

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 115

| | | |
|---|---|---|
| 1 | | PATSY ALEXANDER OR TE ANNE |
| 2 | | OEHLER TO BE VISITORS, AND |
| 3 | | THE EXAMINER IS TO GIVE ME |
| 4 | | AN ABSOLUTE DETERMINATION |
| 5 | | AS TO THEIR OPINION AS THE |
| 6 | | MENTAL AND THE PHYSICAL |
| 7 | | HEALTH OF MS. MCLURE. |
| 8 | | LADIES AND GENTLEMEN, IF |
| 9 | | I'VE MISSED ANYTHING AS I |
| 10 | | REVIEW THAT ORDER, I'LL BE |
| 11 | | HAPPY TO MAKE ANY |
| 12 | | ADJUSTMENTS.  YES, SIR. |
| 13 | MR. MCDOWELL: | YOUR HONOR, I WOULD REQUEST |
| 14 | | OR ASK THAT YOU CONSIDER |
| 15 | | THAT WE TERMINATE THE |
| 16 | | ATTORNEY-IN-FACT THAT HAS |
| 17 | | BEEN GIVEN BY MS. MCLURE. |
| 18 | THE COURT: | IT'S FROZEN. |
| 19 | MR. MCDOWELL: | OKAY.  WHEN YOU PUT |
| 20 | | SOMETHING OF RECORD IN THE |
| 21 | | REGISTER OF DEEDS --- |
| 22 | THE COURT: | IT'S FROZEN AS OF THIS |
| 23 | | MINUTE.  ANYTHING THAT SHE |
| 24 | | NEEDS, I'LL HAVE MS. HILLS |
| 25 | | TO PETITION THE COURT AND I |

**Prestige Court Reporting, Inc.**
1301 Third Avenue
Conway, South Carolina 29526
(843) 248-5252

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                     Page No: 116

|     |             |                                      |
|-----|-------------|--------------------------------------|
| 1   |             | WILL SIGN AN ORDER THAT SHE          |
| 2   |             | CAN HAVE. MS. LILLIAN CAN            |
| 3   |             | HAVE ANYTHING MS. LILLIAN            |
| 4   |             | NEEDS.  IT'S HER MONEY.              |
| 5   |             | IT'S HER ASSETS.  WHATEVER           |
| 6   |             | SHE NEEDS FOR HER PERSONAL           |
| 7   |             | ENJOYMENT. SHE CAN HAVE IT.          |
| 8   |             | AND IF I HAVE TO PUT IT              |
| 9   |             | UNDER A COURT ORDER AND SHE          |
| 10  |             | GETS A MONTHLY INCOME CHECK          |
| 11  |             | TO TAKE CARE OF HER NEEDS.           |
| 12  |             | THEN SO BE IT.  YES, SIR.            |
| 13  |             | WE DO THAT UNDER OUR                 |
| 14  |             | CONSERVATOR DIVISION.                |
| 15  | MR. SMITH:  | YOUR HONOR, VERY BRIEFLY.            |
| 16  |             | I'D REQUEST THAT THAT                |
| 17  |             | $125,000 BE PAID INTO COURT          |
| 18  |             | IN AN ESCROW UNTIL WE                |
| 19  |             | DETERMINE WHERE THAT SHOULD          |
| 20  |             | GO.  ONCE THAT MONEY'S               |
| 21  |             | GONE, WE CAN'T GET OUR               |
| 22  |             | HANDS BACK ON IT.  I THINK           |
| 23  |             | THOSE ATTORNEY FEES, IF YOU          |
| 24  |             | WANT TO CALL THEM THAT,              |
| 25  |             | SHOULD BE BROUGHT BACK               |

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO:  2001-ES-26-0820                                Page No:  117

| | |
|---|---|
| 1 | UNDER THE JURISDICTION OF |
| 2 | THE COURT.  IF MR. SAMAHA |
| 3 | IS ULTIMATELY ENTITLED TO |
| 4 | THEM --- |
| 5 | THE COURT:          I'M GOING TO FREEZE THOSE. |
| 6 | $125,000. |
| 7 | MR. SMITH:          THANK YOU, YOUR HONOR. |
| 8 | THE COURT:          I'M GOING TO FREEZE THEM. |
| 9 | PLEASE HOLD THOSE IN |
| 10 | ABEYANCE, MR. SAMAHA.  I'M |
| 11 | NOT EVEN GOING TO ADDRESS |
| 12 | THAT.  I'LL WAIT AND SEE |
| 13 | WHAT THE DETERMINATION OF |
| 14 | THE SPECIAL ADMINISTRATOR |
| 15 | IS ON THAT, BUT HOLD THOSE |
| 16 | FUNDS IN ABEYANCE.  MS. |
| 17 | MCLURE NEEDS TO ALSO HOLD |
| 18 | ANY FUNDS IN ABEYANCE TO |
| 19 | REPLACE ANY MONEY THAT |
| 20 | MIGHT HAVE BEEN |
| 21 | INAPPROPRIATELY DISBURSED. |
| 22 | MR. MONCKTON:        YOUR HONOR, WE'VE ALREADY |
| 23 | TAKEN PRECAUTIONS TO START |
| 24 | THAT AND I JUST ALSO WANTED |
| 25 | TO ADDRESS, IF WE CAN MAKE |

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                    Page No: 118

| | | |
|---|---|---|
| 1 | | A PART OF THE ORDER THIS |
| 2 | | CIVIL LAWSUIT. |
| 3 | THE COURT: | IT IS, AND IF YOU WILL |
| 4 | | INCLUDE CODE NUMBER 62-5- |
| 5 | | 101, 102, 501 AND 503, I |
| 6 | | THINK YOU WILL FIND THE |
| 7 | | CODE IS THERE THAT GIVES ME |
| 8 | | THE ABILITY TO HAVE THAT |
| 9 | | REMANDED BACK TO PROBATE |
| 10 | | COURT. |
| 11 | MR. SMITH: | YOUR HONOR, ONE LAST THING. |
| 12 | | THE ATTORNEY AMOUNT WAS |
| 13 | | PAID FOUR OR FIVE MONTHS |
| 14 | | AGO. I WOULD REQUEST THAT |
| 15 | | THE COURT IN ITS ORDER |
| 16 | | DEMAND PROOF THAT FUNDS ARE |
| 17 | | ON DEPOSIT IN APPROPRIATE |
| 18 | | PROTECTION AND THAT THAT |
| 19 | | ACCOUNT HAS BEEN |
| 20 | | RESTRICTED, BECAUSE I DON'T |
| 21 | | KNOW IF THERE'S 125 THERE |
| 22 | | TODAY. |
| 23 | THE COURT: | WELL, I HEAR THAT WE HAD |
| 24 | | FROM 400 TO $500,000? |
| 25 | MR. SMITH: | YES, SIR. |

THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820

Page No: 119

| | | |
|---|---|---|
| 1 | THE COURT: | WHEN I SAID FROZEN, I MEAN |
| 2 | | EVERYTHING IS FROZEN, |
| 3 | | CHECKING, SAVINGS, ANY |
| 4 | | POWERS OF ATTORNEY. |
| 5 | | ANYTHING THAT WOULD TAKE |
| 6 | | PLACE FOR FRANCIS MCLURE OR |
| 7 | | LILLIAN MCLURE WILL ONLY BE |
| 8 | | APPROVED THROUGH THE COURT. |
| 9 | | EVERYTHING IS FROZEN, NO |
| 10 | | MORE MONEY SPENT, OKAY? |
| 11 | MR. SMITH: | THANK YOU, YOUR HONOR. |
| 12 | THE COURT: | OKAY.  COURT IS DISMISSED. |
| 13 | | (The hearing concluded at 4:21 p.m.) |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |



THE HEARING IN THE MATTER OF FRANCIS G. MCLURE
CASE NO: 2001-ES-26-0820                                        Page No: 120

# CERTIFICATE

This is to certify that the foregoing transcript of the hearing held before Honorable Diane Buffkin-Creel, consisting of **One hundred twenty-one (121)** pages is a true and correct transcript of the testimony given at said hearing. The hearing was reported by method of stenomask with backup.

I further certify that I am neither employed by nor related to any of the parties in this matter nor their counsel; nor do I have any interest, financial or otherwise, in the outcome of the same.

IN WITNESS WHEREOF I have hereunto set my hand and seal this **13th** day of **March, 2002.**

_____

Karen L. Long, Court Reporter
Notary in and for the State of
South Carolina
My Commission Expires: 10-2-10

Civil Action No.:  4:04-1782-27

# EXHIBIT F

STATE OF SOUTH CAROLINA ) IN THE PROBATE COURT
                        ) FIFTEENTH JUDICIAL CIRCUIT
COUNTY OF HORRY         )

IN THE MATTER OF:        ESTATE OF FRANCIS G. MCLURE

CASE NO:                 2001-ES-26-0820

## ORDER

This Matter is before the Court upon the Petition of George E. McDowell, Jr., counsel for the Estate of Francis G. McLure on a Petition for Part 5 Administration and for the appointment of a Special Administrator. Proper notice to all parties and interested persons has been provided and notice thereof is on file. The matter was called for hearing before the undersigned on Tuesday, March 12, 2002 at 2:30 p.m.[1] Present for the Estate: Richard M. Smith and George E. McDowell, Jr., for Ann McLure: William H. Monckton, VI, and for Lillian McLure: George T. Samaha, III.

Because of matters raised during the course of the Hearing, this Court is taking, as set forth below, further protective and other actions for Lillian McLure, the decedent's widow, the Estate of Frank G. McLure and its assets and powers of attorney and trusts which relate thereto.

## BACKGROUND[2]

Frank G. McLure (hereinafter referred to as "Decedent") was the husband of Lillian McLure (hereinafter referred to as "Widow") at the time of his death on January 3, 2001. At the August 27, 2001 hearing attorney George E. McDowell, Jr. (hereinafter referred to as "McDowell")

---

[1] The Court incorporates by reference the record of the proceedings from the August 27, 2001 hearing and subsequent Order dated September 17, 2001.

CERTIFIED TO BE A TRUE COPY OF THE RECORDS OF THIS OFFICE.
_Annie Mitjotto_
JUDGE OF PROBATE, HORRY COUNTY

1

presented to this Court two wills drafted by attorney George T. Samaha, III. (hereinafter referred to as "Samaha") and requested the Court determine which of the two wills, if any, was the final Last Will and Testament of the Decedent and to admit such will into probate. The Court determined that the will dated October 13, 2000 is the Last Will and Testament of the Decedent (hereinafter referred to as "Will"). That Will has been admitted to probate.

Thereafter, McDowell and his law partner Richard M. Smith (hereinafter referred to as "Smith") of the McNair Law Firm, P.A. made numerous requests in writing to Samaha and William H. Monckton, VI. (hereinafter referred to as "Monckton") for an accounting, see Exhibits 1, 2 and 3. Monckton provided such information as was in his client's possession, that being Exhibits 5 and 6. On March 8, 2002 Samaha provided some financial information to Smith, that being Exhibit 4.

At the March 12, 2002 hearing the Court heard live testimony from the following witnesses: Charles Deal, Samaha, Victoria Valenti and Ann McLure.

The Court finds as follows:

1.  Decedent died on January 3, 2001 survived by Widow.

2.  Decedent's will was drafted by Samaha.

3.  Prior to Decedent's death Samaha drafted a power of attorney for Decedent and for Widow (Widow's POA is hereinafter referred to as "McLure POA") appointing Ann McLure (hereinafter referred to as "McLure") as their attorney-in-fact.

4.  After Decedent's death, McLure, using the McLure POA and stating that she was acting on Samaha's advice, paid approximately $130,000.00 of bequests from Decedent's Will. The payments were drawn on Widow's and Decedent's joint checking account.

---

[2]  This Court's Order set forth its Findings of Fact and Conclusions of Law. No labels are dispositive of this categorization. To the extent that any Finding of Fact is more properly denominated a Conclusion of Law it is such.

5.    After Decedent's death, Samaha drafted a POA for Widow (hereinafter referred to as "Widow POA") wherein he was appointed as attorney-in-fact.

6.    After Decedent's death, Samaha drafted a trust for Widow (hereinafter referred to as "Widow Trust") wherein he appointed himself sole trustee.

7.    Widow received no independent legal advice for the Widow POA or for the Widow Trust.

8.    Samaha, acting as attorney-in-fact under the Widow POA, liquidated all assets known by him in which Widow had any rights. The assets include those identified on the attached Exhibit 4 and her personal residence.

9.    Samaha, acting under the Widow POA, liquidated the personal residence of Decedent and Widow. Widow received no independent legal advice for this sale. The sale's price equalled the tax assessed value from the county appraiser.

10.    Samaha, acting under the Widow POA, liquidated the assets shown on Exhibit 4 and allegedly placed the proceeds into Widow Trust.

11.    Samaha, acting under the Widow POA, allegedly placed the proceeds from the sale of the personal residence into Carolina First Bank.

12.    There is no evidence, other than Samaha's testimony, to support the whereabouts of the assets identified on Exhibit 4 or the proceeds from the sale of the personal residence. Samaha's testimony on this subject matter is self serving and vague and as such further inquiry to definitively determine the nature, extent and location of these assets is required.

13.    A full and complete accounting is required.

---

Likewise, to the extent that any Conclusion of Law is more properly denominated a Finding of Fact, it is such.

3

14. Samaha, acting under the Widow POA or as trustee under the Widow Trust, executed a check paying himself at least $115,000.00 for "marshalling" the assets identified on Exhibit 4, (hereinafter referred to as "Marshalling Charge").

15. Samaha may have attempted to hide this Marshalling Charge from the Court and the estate's attorneys by submitting a markedly incomplete and untimely accounting which did not include the Marshalling Charge and by giving evasive testimony regarding the assets of the Widow Trust.

16. The accounting prepared by Samaha, identified as Exhibit 4, is not current and has substantial gaps of time where no information is provided.

17. A review of Exhibits 5 and 6 identifies additional assets which may be assets of Decedent, but were not included on Samaha's accounting identified as Exhibit 4.

18. The Marshalling Charge is exorbitant and bears no rational relationship to services rendered. Samaha apparently has abused the powers granted to him under the Widow POA and Widow Trust.

19. The Court has grave concerns regarding Widow's failure to appear at the hearing dated March 12, 2002.

20. At the August 27, 2001 hearing the Court requested Samaha bring Widow to the next hearing held by the Court on this matter. Ample notice was provided to Samaha of the March 12, 2002 hearing in order for Samaha to make arrangements for Widow's appearance. Widow was intentionally placed beyond the subpoena power of the Court by Samaha or those acting in concert with Samaha.

21. Samaha's testimony regarding Widow's failure to appear, the safety of the estate's assets and Widow's assets, and Widow's mental and physical state are not credible.

4

22. Widow is for all intent and purpose homeless and her residence depends on the kindness of relatives and neighbors.

23. Widow has always led a sheltered life and Decedent always handled financial affairs for the family. Decedent died without issue and Widow was his only heir.

24. Widow is incapable of independently managing her financial affairs.

25. Widow was born on or about September 3, 1922 and is an incapacitated person as that term is defined in S. C. Ann. § 62-5-101(1) due to her advanced age, lack of sophistication in handling financial affairs, evidence that she has been a victim of overreaching by Samaha and possibly others after Decedent's death, and the lack of evidence that Widow has conducted any financial affairs on her own since decedent's death.

26. No person appears to have the authority to act on behalf of Widow.

27. Since Decedent's death, at least $245,000.00 has been removed from assets of Widow or Decedent's estate without proper justification. An emergency exists for Widow in that her financial affairs are in disarray, she is without a permanent residence and she is susceptible to financial victimization.

28. Widow requires an immediate appointment of a temporary guardian.

29. Widow requires an examination by a visitor as defined in S. C. Code Ann. § 62-5-308. The visitor shall be a licensed examiner capable of assessing mental and physical health. An additional examination by a physician capable of assessing mental and physical health is also required. These examinations are to be performed in South Carolina.

IT IS THEREFORE ORDERED:

1. This estate shall hereafter be administered under Part 5 of the Probate Code as set forth in S. C. Code Ann. § 62-3-501 et. seq.

5

2.    Carolyn R. Hills of Hills & Hills, P.C. is hereby appointed as Special Administrator and temporary guardian for protective proceedings.  A bond shall be posted in accordance with S. C. Code Ann. § 62-3-604.

3.    Samaha is hereby enjoined from taking any further action under the Widow POA or the Widow Trust or any action that would affect Decedent's assets or Widow's assets or held for their benefit.  The Special Administrator shall promptly provide a copy of this Order to Carolina First Bank in Myrtle Beach, South Carolina where Widow's Trust account exists. Samaha shall upon receipt of this Order advise the Special Administrator where the Widow's Trust account is set up and the name of the account representative for the Widow Trust at Carolina First Bank.

4.    On or before March 25, 2002, Samaha shall pay the greater of $115,000.00 or the Marshalling Charge to the Special Administrator in certified funds without the use of the funds from the Decedent's estate or Widow's assets.  The Special Administrator shall immediately deposit the payment in an interest bearing account at Branch Banking & Trust at 21st Ave in Myrtle Beach, South Carolina attention Edwin Hoff, City Executive.

5.    McLure shall take no further action under the McLure POA or take any other actions affecting the Decedent's estate or Widow's estate.

6.    On or before March 25, 2002, McLure shall repay the greater of $130,000.00 or the total amount paid by McLure under the McLure POA to the Special Administrator in certified funds.  The Special Administrator shall immediately deposit the payment in an interest bearing account at Branch Banking & Trust at 21st Ave in Myrtle Beach, South Carolina attention Edwin Hoff, City Executive.

6

7.      On or before April 12, 2002, Samaha shall provide to the Special Administrator an accounting sworn to under oath detailing each and every financial transaction, regardless of the capacity such action was taken (i.e. trustee or attorney-in-fact), taken for or on behalf of Decedent, Widow, Decedent's Estate, Widow's Trust or for the benefit of any of these for the period commencing July 3, 2000 through the date of the present.    Copies of each and every document shall be provided to the Special Administrator. It is the intention of the Court to determine and for this accounting to provide the information necessary to ascertain the whereabouts of involving every asset owned by Decedent and Widow six months prior to Decedent's death through the present.

8.      On or before April 12, 2002, McLure shall provide to the Special Administrator an accounting sworn to under oath detailing each and every financial transaction taken for or on behalf of Decedent, Widow, Decedent's Estate, Widow Trust or for the benefit of any of these for the period commencing July 3, 2000 through the date of the present.    Copies of each and every document shall be provided to the Special Administrator. It is the intention of the Court to determine and for this accounting to provide the information necessary to ascertain the whereabouts of involving every asset owned by Decedent and Widow six months prior to Decedent's death through the present.

9.      Carolyn Hills shall serve as a temporary guardian under S. C. Code Ann. § 62-5-310 until such time as it appoints a replacement guardian. A hearing to review the appointment shall be held on April 18, 2002 at 9:00 a.m. which is within 30 days after this appointment. Samaha shall ensure that Widow attends this hearing in person.

7

10.    TeAnne Oehler is appointed as a visitor as that term is defined in S. C. Code Ann. § 62-5-308 and shall examine Widow to determine if she continues to be an incapacitated person.

11.    Widow's personal physician is appointed as the examiner and shall also examine Widow to determine if she continues to be an incapacitated person and submit a report in writing to the Court prior to the hearing set for April 18, 2002 at 9:00 a.m.

12.    William Parnell Diggs is hereby appointed the Guardian ad Litem and attorney on behalf of Widow for the purpose of protective proceedings scheduled April 18, 2002 at 9:00 a.m.

13.    All proceedings in Civil Action 2002-CP-26-1321 captioned Lillian McLure v. Ann McLure presently pending in the 15th Judicial Circuit, Horry County, South Carolina are stayed pending further order of this Court.

14.    A copy of this Order shall be submitted to the Commission on Lawyer Conduct, P. O. Box 12159, Columbia, South Carolina 29211 attention Disciplinary Counsel, Henry B. Richardson, Jr.

IT IS SO ORDERED THIS 19 DAY OF MARCH, 2002 AT CONWAY, SOUTH CAROLINA.

HONORABLE DIANE BUFFKIN-CREEL
JUDGE OF PROBATE

Dbc   3-19-02
Faxed Copy to stand
for Original - Until
Original Filed in Court
and Judge Creel's return.

8

Civil Action No.:  4:04-1782-27

# EXHIBIT G

# QUOTATION FOR
# LAWYERS PROFESSIONAL LIABILITY INSURANCE

FIRM NAME: GEORGE T. SAMAHA, III
DATE OF QUOTATION: 3/22/2002
INSURANCE COMPANY: CNA Insurance Company

CIRCLE APPROPRIATE PREMIUM AMOUNT FOR DESIRED COVERAGE:

| LIMIT OF LIABILITY | DEDUCTIBLE | CLAIM EXPENSE INSIDE LIMITS | CLAIM EXPENSE OUTSIDE LIMITS |
|---|---|---|---|
| $1,000,000/$1,000,000 | $5000 | $4566.00 | $4982.00 |

NUMBER OF ATTORNEYS: 1
FIRM RETROACTIVE DATE: 4/5/1996
INDIVIDUAL RETROACTIVE DATE: 4/5/1996
TITLE AGENCY AS ADDITIONAL INSURED: Waterway Title Agency, Inc.

CONDITIONS/ADDITIONAL INFORMATION: Quotation is subject to receipt of original   (2)
signed/dated application, completing the attached Claim Supplement for the Ernie Young, Dorothy Strong
and Doris Ferrell matters and completing the attached Title Insurance Agency Supplement.

VALID UNTIL: 4/5/2002

CLAIM EXPENSE INSIDE THE LIMIT OF LIABILITY - Claim Expenses shall be part of the Limit of
Liability.

CLAIM EXPENSE OUTSIDE THE LIMIT OF LIABILITY - Claim Expenses shall apply in addition to
the Limit of Liability.

RECEIVED
APR 3 2002
THE GENERAL AGENCY

I/We hereby warrant that the information contained in our original application (and attachments, if any) for
this coverage is unchanged since completion and that I/we are not aware of any claim or circumstances
which might be expected to be the basis of a claim which has not been previously disclosed to my/our
current carrier. Please bind coverage as instructed above.

Signature _George T. Samaha III_   Date _3-28-02_   Total Premium _4566.00_

Disclaimer: Premium quotation and actual premium on policy may vary slightly due to rounding differences.

The General Agency, P. O. Drawer 30459, Charleston, SC 29417-0459 1-800-922-5036 Fax - 843-763-1632

Civil Action No.:  4:04-1782-27

# EXHIBIT H

# Westlaw.

210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

Page 1

**H**
Briefs and Other Related Documents

NOTICE: THIS IS AN UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA7 Rule 53 for
rules regarding the citation of unpublished
opinions.)

United States Court of Appeals, Seventh Circuit.

John O. WORTH d/b/a Worth Law Offices,
Plaintiff-Appellant,
v.
TAMARACK AMERICAN, DIVISION OF
GREAT AMERICAN INSURANCE CO., and
American
National Fire Insurance Company, a subsidiary of
Great American Insurance Co.,
Defendants-Appellees.

**No. 99-2037.**

Argued Jan. 4, 2000.
Decided Jan. 26, 2000.

Appeal from the United States District Court for
the Southern District of Indiana, Indianapolis
Division. No. 97 C 1757. Sarah Evans Barker,
Judge.

Before Hon. JOEL M. FLAUM, Hon. FRANK H.
EASTERBROOK, Hon. DANIEL A. MANION,
Circuit Judges.

ORDER

**\*\*1** John Worth informed his insurers that he was
being sued by a former client for legal malpractice
and sought to have his insurer defend him. The

malpractice suit arose out of the dismissal of his
client's lawsuit due to Worth's failure to effect
service of process as required by Fed.R.Civ.P.4(d).
Worth's insurers declined to defend him, citing a
clause in the policy which absolved it of
responsibility for claims arising from conduct which
occurred prior to the initiation of the policy and for
which Worth had a reasonable basis to believe that
he had breached a professional duty. So Worth
initiated this suit under Indiana law seeking a
declaratory judgment that American National and
Tamarack American were obliged to defend him
and seeking damages for the defendants' bad faith
denial of his claim. The parties cross-moved for
summary judgment. In their motion, the defendants
demonstrated that Worth had failed to create a
genuine issue as to whether Worth had a reasonable
basis to believe that he committed malpractice or
whether the defendants failed to investigate his
claim. In a thorough opinion the district court
granted the defendants' motion for summary
judgment and denied Worth's motion. Because there
is little to add to the analysis, we affirm for the
reasons stated in the district court's decision which
is attached to this order. AFFIRMED.

*ENTRY GRANTING DEFENDANTS' MOTIONS*
*FOR SUMMARY JUDGMENT AND DENYING*
*PLAINTIFF'S*
*MOTION FOR SUMMARY JUDGMENT*

BARKER, Chief J.

Plaintiff, John O. Worth ("Worth"), brings this bad
faith and declaratory judgment action against his
insurer, American National Fire Insurance
Company ("American National"), and against the
processors of his claim, Tamarack American
("Tamarack"). Worth alleges that defendants acted
in bad faith in denying his claim and he seeks a
declaration that the professional liability insurance
policy he purchased from American National
obligates defendants to defend and indemnify him
in an underlying legal malpractice action brought
against him by a former client. All parties, plaintiff

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

Page 2

and defendants, move for summary judgment. For the reasons discussed, defendants' motions for summary judgment are *GRANTED* and plaintiff's motion for summary judgment is *DENIED*.

### Relevant Background

John O. Worth practices law in Rush County, Indiana. In the late 1980's, Larry Clock ("Clock"), a farmer, retained Worth to advise him on his struggling farming business. Over the course of the next several years, Worth represented Clock in three different actions: Mr. Clock's divorce from his wife, a lawsuit against the United States alleging improprieties in the administration of the Agricultural Stabilization and Conservation Service program ("ASCS"), and a Chapter 7 bankruptcy filing. *See* Pl.'s Br. Summ. J. at 1-2.

On August 5, 1991, three days before the running of the statute of limitations, Worth filed the ASCS suit on Clock's behalf in the Southern District of Indiana (coincidentally in this very court), pursuant to the Federal Tort Claims Act. While reviewing Clock's business records in 1989, Worth discovered a potential claim against the Department of Agriculture. *See* Worth Dep. at 12, 14-15. The claim rested on the theory that the Farmer's Home Administration ("FMHA") and the Blackford County ASCS did not permit Clock to sell stored grain at an optimal time to maximize profits. *See* Tamarack's Br. Summ. J. at 6; Worth Dep. at 12. Worth surmised that the possible recovery from the ASCS suit could be used to offset the amount Clock owed to the FMHA. *See* Worth Dep. at 12, 14-15.

\*\*2 On August 30, 1991, an Indiana state court apparently issued a decree finalizing the Worth divorce, specifying that any recovery from the ASCS claim would be divided equally between Mr. Worth and his ex-wife. *See* Pl.'s Br. Summ. J. at 1-2.

On November 21, 1991, this Court ordered Worth to show cause, on or before December 5, 1991 (December 3, 1991 represented the 120th day after the August 5, 1991 filing of the complaint), why the ASCS action should not be dismissed for failure to perfect service on the defendant, the United States of America, pursuant to Federal Rules of Civil Procedure 4(d), 4(j) and 41(b). [FN1] On

December 10, 1991, Worth filed a motion for an extension of time until December 21, 1991 to respond to the Court's Order, claiming that he had not received our order until December 9, 1991. Nonetheless, on December 11, 1991, we granted Worth's motion for an extension.

> FN1. In 1991-92, Federal Rule of Civil Procedure 4(d) required the following actions to effect service upon the United States:
> [A plaintiff must effect service of process] [u]pon the United States, by delivering a copy of the summons and of the complaint to the United States attorney for the district in which the action is brought or to an assistant United States attorney or clerical employee designated by the United States attorney in a writing filed with the clerk of the court and by sending a copy of the summons and of the complaint by registered or certified mail to the Attorney General of the United States at Washington, District of Columbia, and in any action attacking the validity of an order of an officer or agency of the United States not made a party, by also sending a copy of the summons and of the complaint by registered or certified mail to such officer or agency. Additionally, in 1991-92, Federal Rule of Civil Procedure 4(j) provided, in relevant part, that:
> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant....

On December 30, 1991, nine days after Worth neglected to comply with his self-imposed deadline to respond to our Order to Show Cause why the case should not be dismissed, and 27 days after the deadline to effect service of process upon the defendant as required by Rule 4, Worth filed his response. He claimed that he had forwarded a copy of the complaint and summons to an assistant United States attorney in the Southern District of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

Page 3

Indiana, and that he had forwarded a certified copy of the pleadings to the Attorney General of the United States in Washington, D.C.; (we would learn subsequently that Worth forwarded these pleadings on December 27 and December 31, 1991 respectively). *See* Worth's Dec. 30, 1991 Response to Order to Show Cause; Worth's April 21, 1992 Response Def.'s Mot. Dismiss.

On February 25, 1992, the government filed a motion to dismiss Clock's ASCS complaint, contending that Worth failed to effect service of the complaint and summons in the manner required by Federal Rule of Civil Procedure 4(d). Namely, the government contended that Rule 4 mandated that Worth serve process upon both the United States attorney, or his/her official designee, and the Attorney General of the United States within 120 days after filing the complaint. In other words, December 3, 1991 represented Worth's last day to serve process upon the required persons before mandatory dismissal of Clock's claim, absent a showing by Worth of "good cause" excusing his failure to comply with Rule 4 requirements. The government also asserted that since the statute of limitations had run on Clock's ASCS complaint, a Rule 4 dismissal for failure to effect service of process would completely bar any future filing of the ASCS action. [FN2]

> FN2. The parties do not dispute that under the Federal Tort Claims Act, 28 U.S.C. 2401(b), the statute of limitations on Clock's ASCS claim ran on August 8, 1991, six months after the United States Department of Agriculture mailed its February 8, 1991 denial of Clock's claim. Indeed, the Department's denial expressly advised Worth of the six month statute of limitations: "You are advised of your client's right to file suit in an appropriate United States district court within six months of the date of the mailing of this letter if he is dissatisfied with the results of this determination." Gov't Feb. 25, 1991 Br. Support Mot. Dismiss (Attachment B).

Despite the looming dismissal of his client's complaint, Worth remained silent in responding to the government's motion to dismiss for well over 30

days. On April 8, 1992, this Court ordered Worth to show cause before April 23, 1992 why the government's unopposed motion to dismiss should not be granted. On April 21, 1992, Clock filed a two-page response, claiming (without supporting evidence) that he had perfected service upon "Gary Hobbs," an individual who Worth claimed was both an ASCS employee and an agent of the United States. [FN3] Worth also claimed that his tardy mailing of the ASCS complaint to the Attorney General of the United States and to an Assistant United States Attorney in this District constituted proper service of process and that, in any event, the United States somehow had actual notice of the action within the 120 day period despite the lack of formal service. Worth never provided any reason for his failure to serve process upon the appropriate individuals within the required 120 day time period, nor did he attempt to offer a "good cause" explanation for his inaction.

> FN3. The only service of process filed in the ASCS action was sent to the State ASCS Office in Indianapolis, Indiana in August, 1991. Contrary to Worth's dubious representation that he believed that he served Gary Hobbs sometime after filing the ASCS complaint on August 5, 1991, Gary Hobbs had resigned from his position as Blackford County's Director of ASCS over a year and one-half earlier. *See* Def.'s May 6, 1991 Reply to Pl.'s Response to Def.'s Mot. Dismiss. In any event, service of process upon either the ASCS office or Gary Hobbs would have failed to satisfy the requirements of Rule 4.

**3 On June 26, 1992, we issued an Entry dismissing the ASCS complaint with prejudice, finding Worth's response to the government's motion to dismiss "entirely unavailing, both on the facts and the law." Court's June 26, 1992 Entry at 2. We noted that a suit brought against the United States under the Federal Tort Claims Act requires compliance with Rule 4, which mandates delivery of a copy of the summons and complaint to the U.S. Attorney for the district in which the action is brought (or the designated employee of that office) and the sending of the same pleadings to the Attorney General of the United States at

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

Washington D.C. We found Worth's purported service of process upon Gary Hobbs a completely insufficient attempt to comply with Rule 4, terming it "suspicious" in light of Hobbs' resignation from ASCS well over a year before Worth filed the ASCS complaint, and finding that Worth failed to serve the United States even assuming he had succeeded in serving Gary Hobbs. *Id.* at 3.

We further held that Worth's failure to serve the United States by December 3, 1991 mandated dismissal of the ASCS action absent a showing that the delay was based on good cause, remarking that "plaintiff's counsel has offered no explanation or excuse for his failure to meet that deadline, not to mention his failure to make a showing of 'good 'cause." ' *Id.* at 4. We concluded that although a dismissal prompted by failure to comply with Rule 4(j) is generally a dismissal without prejudice, we dismissed the ASCS action with prejudice since the six-month statute of limitations had passed since the date the Department of Agriculture mailed notice of final denial of Clock's claim (February 8, 1991), thereby foreclosing any future filing of the ASCS action after our dismissal.

On May 18, 1992, almost a month after Worth finally responded to the government's motion to dismiss the ASCS action, Worth filed a Chapter 7 bankruptcy petition on behalf of his client, Larry Clock. Worth listed the ASCS suit as an asset of the bankruptcy estate, as we had not ruled on the fully briefed motion to dismiss by that date. As mentioned, on June 26, 1992, we dismissed the ASCS complaint and mailed a copy of our entry to Worth, which he apparently received. *See* Worth Dep. at 22, 15. On September 28, 1992, Clock received a Chapter 7 bankruptcy discharge.

On March 6, 1997, more than four years after dismissal of the ASCS action, and after Clock filed a complaint with the Indiana Supreme Court Disciplinary Commission, Clock brought a malpractice and fraud action against Worth. *See* Tamarack's Ex. 13 (Clock V. Compl.). Clock alleged that Worth's negligence in failing to serve process upon the United States in the ASCS action resulted in its dismissal. He also alleged that Worth defrauded him by intentionally concealing the fact that the ASCS action had been dismissed.

Specifically, Clock claimed that Worth never informed him of the dismissal despite numerous personal meetings related to his bankruptcy, that Worth failed to disclose the dismissal during telephone conversations, that Worth avoided returning his telephone calls as late as September 1995, and that Clock wrote letters to Worth after the 1992 dismissal confirming that Clock still believed the case was active. *See* Tamarack's Ex. 13 (Clock V. Compl.), Exs. 19, 20. Clock maintained that he learned of Worth's alleged negligence for the first time on July 9, 1996, when he sought legal counsel from Cohen & Malad and retained a copy of the court docket reflecting the dismissal.

**4 Defendants received notice of the malpractice action on March 18, 1997. [FN4] On March 26, 1997, Tamarack sent Worth a letter, in which it denied coverage, refused to defend the action, detailed the basis for its decision, and reserved the right to file a declaratory judgment action. *See* Tamarack's Ex. 17.

> FN4. We employ the term "defendants" merely for simplicity, as both defendants have adopted the same legal position in this case. We fully recognize that defendant American National and defendant Tamarack are distinct entities, and that Worth failed to sue American National, the true insurer in this case, until the latter stages of this litigation. We also note that while Worth claims that both defendants have a duty to defend and indemnify him, Tamarack merely served as American National's claims processor and has never issued an insurance policy to Worth other than on behalf of American National. We need not continually distinguish between the two defendants, however, in light of our ruling that American National, through its claims processor Tamarack, properly refused to defend Worth in the underlying malpractice action and that Tamarack acted reasonably and in good faith in performing its duties. Moreover, Worth cites no evidence that the defendants ever attempted to conceal or manipulate their relationship, much less that they did so to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

Page 5

his detriment.

Worth comes before us now seeking a declaratory judgment that the "claims made" professional liability insurance policy he purchased from American National in 1995 obligates defendants to defend and indemnify him in Clock's legal malpractice action. Worth alleges that the policy had effective dates of July 31, 1995 through July 31, 1997, and that Clock's 1996 malpractice claim therefore falls within policy coverage. Worth also demands compensatory and punitive damages for defendants' alleged failure to exercise reasonable skill and diligence in investigating and defending the malpractice action, contending that defendants have acted in bad faith and breached their implied covenant of good faith and fair dealing by refusing to defend the malpractice action.

American National and Tamarack rejoin that coverage under the policy extends to claims based on events that occurred prior to its effective date, but only where, prior to the policy coverage, Worth had no reasonable basis either to believe that he had breached a professional duty as a result of any prior act, error or omission, or to foresee that a claim would be made against him based upon such prior act, error or omission. The defendants contend that the undisputed evidence reveals that Worth had a reasonable basis to believe before the July 31, 1995 policy inception that his failure to perfect service upon the United States in the ASCS action constituted a breach of professional duty to Clock. Defendants also contend that they conducted a reasonable investigation before denying coverage and that they have acted in good faith during the course of that determination. [FN5] We now turn to the merits of these contentions.

> FN5. Defendants also claim that Worth's insurance policy unambiguously excludes coverage for Clock's allegations that (1) Worth intentionally and willfully concealed the ASCS dismissal from Clock, and (2) punitive damages are warranted in the malpractice action. *See* Tamarack's Br. Summ. J. at 23-24. Worth does not dispute or even acknowledge defendants' coverage position on these aspects of Clock's malpractice claim, choosing instead only to

address the negligence aspects of Clock's malpractice allegations. Upon review of the insurance policy and defendants' pleadings, we agree that they have no duty to defend or indemnify Worth for any of Clock's claims pertaining to punitive damages or intentional or willful conduct, and we accordingly *GRANT* defendants' motions for summary judgment in those respects.

Discussion
*A. Summary Judgment Standards and Applicable Indiana Insurance Law*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) . A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v.. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992) ; *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). Yet, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but also required. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989).

**\*\*5** As a federal court sitting in diversity, we must evaluate Indiana law as it pertains to this dispute. *See Colip v. Clare,* 26 F .3d 712, 714 (7th Cir.1994)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

Page 6

. Under Indiana law, a contract for insurance is subject to the same rules of interpretation as are other contracts. *See USA Life One Ins. Co. v. Nuckolls,* 682 N.E.2d 534, 537-38 (Ind.1997). The interpretation is "primarily a question of law for the court, even if the policy contains an ambiguity needing resolution." *Id.* (quoting *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992)). The insured is required to prove that her claims fall within the coverage provision of her policy, but the insurer bears the burden of proving specific exclusions or limitations to policy coverage. *See Erie Ins. Group. v. Sear Corp.,* 102 F.3d 889, 892 (7th Cir.1996) (applying Indiana law). The insurer's duty to defend, which is broader than its duty to indemnify, is determined by the nature of the claim in the underlying complaint, not its merits. *See Ticor Title Ins. Co. v. FFCA/IIP 1988 Prop. Co.,* 898 F.Supp. 633, 638 (N.D.Ind.1995) (applying Indiana law). An insurer must defend an action even if only a small portion of the conduct alleged in the complaint falls within the scope of the insurance policy. *See Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.,* 43 F.3d 1119, 1122 (7th Cir.1994).

If the insurance policy is clear and unambiguous, then it should be given its plain and ordinary meaning. *See Nuckolls,* 682 N .E.2d at 537-38. When an insurance company has failed to clearly exclude that which the insured attempted to protect against, a court must construe any ambiguous contract to further the policy's basic purpose of indemnity. *Id.* Yet, when the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurance company can properly refuse to defend. *See Wayne Township Bd. of Sch. Comm'rs v. Indiana Ins. Co.,* 650 N.E.2d 1205, 1208 (Ind.Ct.App.1995).

### B. Policy Coverage

The parties do not dispute that if Worth had a reasonable basis to believe, prior to policy coverage, that he had breached a professional duty as a result of an undisclosed act, error, or omission that occurred before the effective date of policy coverage, the defendants properly have refused to defend Clock's malpractice action. (Worth never

notified defendants of the prior ASCS dismissal when purchasing policy coverage.) Therefore, the parties form battle lines over whether Worth had a reasonable basis to believe, prior to policy coverage, that the ASCS dismissal constituted a breach of professional duty owed to his client. We harbor no reluctance in concluding that Worth had a reasonable basis to believe, at or before the time the policy became effective, that he breached a professional duty to Clock when he failed both to comply with Federal Rule of Civil Procedure 4(d) & (j) and to offer a good faith excuse for doing so, resulting in our dismissal of the ASCS action with prejudice.

**\*\*6** The American National "claims made" insurance policy purchased by Worth provides coverage for damages resulting from "claims first made against [Worth] during the policy period and reported to the company during the policy period [July 31, 1995 through July 31, 1997]." *See* Tamarack's Ex. 1. The parties do not dispute that Larry Clock filed his March 6, 1996 malpractice claim for the first time within the policy period and that Worth reported the claim to defendants in timely fashion. The coverage section of the policy, however, adds an important caveat, denying coverage for acts, errors or omissions that occurred prior to the policy period unless Worth had "no reasonable basis to believe that [he] had breached a professional duty or to foresee that a claim would be made against [him]." *Id.* [FN6]

> FN6. The relevant portion of the coverage provision reads:
> II. COVERAGE
> A. Professional Liability and Claims Made Clause: This policy shall pay on behalf of each insured all sums in excess of the deductible amount ... which the Insured shall become legally obligated to pay as damages as a result of CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD
> ....
> PROVIDED ALWAYS THAT such act, error or omission or personal injury happens:

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

Page 7

1. during the policy period; or
2. prior to the policy period, provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by the Company to the named Insured and continuously renewed and maintained in effect to the inception of this policy period:
(a) the Insured did not give notice to any prior insurer of any such act, error or omission; and
(b) the Insured had no reasonable basis to believe that the Insured had breached a professional duty or to foresee that a claim would be made against the Insured; and
(c) there is no prior policy or policies which provide insurance for such liability or claim, ...
Tamarack's Ex. 1.

The parties agree that we should assess the reasonableness of Worth's belief under an objective standard, asking whether a reasonable attorney in Worth's position would have believed he had breached a professional duty to Clock before the effective date of policy coverage. *See* Pl.'s Response to Def.'s Mot. and Br. Support Summ. J. at 3-4; Tamarack's Br. Summ. J. at 19-23; *Mt. Airy Ins. Co. v. Thomas,* 954 F.Supp. 1073, 1074-79 (W.D.Penn.1997), *aff'd,* 149 F.3d 1165 (1998); *Coregis Ins. Co. v. Camico Mut. Ins. Co.,* 959 F.Supp. 1213, 1222 (C.D.Cal.1997); *International Ins. Co. v. Peabody Int'l Corp.,* 747 F.Supp. 477, 483-84 (N.D.Ill.1990).

Worth contends that the defendants did not adequately investigate the circumstances prompting dismissal of the ASCS action. He asserts without citation to any evidence in the record that a proper investigation would have revealed three key facts establishing that Worth did not have a reasonable basis to believe that he had breached a professional duty to Clock. *See* Pl.'s Br. Summ. J. at 13-14.

First, Worth claims that he "committed no negligence" since he believes he was absolved from pursuing the ASCS action upon his filing of Clock's Chapter 7 bankruptcy petition in May, 1992. *Id.* In effect, he argues that he filed the ASCS action to protect a speculative claim and to forestall creditors

until the filing of the bankruptcy petition, and that after the bankruptcy filing, "the pursuit of the ASCS claim was in the hands of the Trustee." *Id.* Second, Worth disputes the merits of the underlying malpractice claim, contending that Clock could not prove damages from the ASCS dismissal since any potential recovery on the action would have benefitted only the bankruptcy creditors, not Clock. Thus, "[i]f anyone was injured by the actions of Worth, it was the creditors and/or the trustee." *Id.* Third, even if he committed malpractice, Worth reiterates that any damages flowing from the breach would have been discharged in bankruptcy or pursued to the benefit of the creditors (again suggesting that Clock could not prove that he was damaged by Worth's alleged negligence). *Id.*

**7 We find Worth's contentions seriously wanting in a number of respects, only a few of which we need develop for purposes of summary judgment. At the outset, we are convinced as a matter of law that Worth breached a professional duty to his client by failing to comply with Federal Rule of Civil Procedure 4(d) & (j). While we express no opinion on the merits of Clock's underlying malpractice claim, the first two elements of a legal malpractice claim under Indiana law provide guidance on whether Worth breached a professional duty. In Indiana, a plaintiff-client bringing a malpractice action must show (1) employment of an attorney (duty), (2) failure by the attorney to exercise ordinary skill and knowledge (breach), (3) proximate cause (causation), and (4) loss to the plaintiff (damages). *See Fricke v. Gray,* 705 N.E.2d 1027, 1033 (Ind.Ct.App.1999); *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338, 344 (Ind.1991).

In assessing policy coverage in this case, elements three and four (causation and damages), arguably the more difficult hurdles to negotiate in a malpractice action, [FN7] are beside the point in determining whether a reasonable attorney in Worth's position had a reasonable basis to believe that he/she had breached a professional duty to Larry Clock. As for the first element, it is undisputed that Worth represented Clock in the ASCS action and that the attorney-client relationship continued well past the dismissal. The parties never suggest or cite any evidence that Clock either requested termination of the ASCS

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

Page 8

proceeding or otherwise relieved Worth of his duty to pursue that litigation.

> FN7. To prove causation and the extent of the any alleged injury, the plaintiff-client must demonstrate that the outcome of the underlying litigation would have been more favorable but for the attorney's negligence. *See Picadilly,* 582 N.E.2d at 344. This proof typically requires a "trial within a trial," with the measure of damages being the value of the claim lost. *Id.; Schneider v. Wilson,* 521 N.E.2d 1341, 1343 (Ind.Ct.App.1988). A determination of whether Clock has succeeded in establishing a prima facie case of legal malpractice is not essential to our resolution of this case, and we accordingly refrain from stepping into the province of the Indiana trial court responsible for adjudicating Clock's malpractice claim.

As for the second element, we are immediately struck with the force by which the undisputed facts demonstrate that Worth failed to exercise ordinary skill and knowledge in complying with Federal Rule of Civil Procedure 4(d) & (j). One of the most fundamental duties an attorney owes to his or her client is loosening the litigation from its moorings and effectuating proper service of process. [FN8] Often, as in a case such as this, the attorney need only extend an arm, select the appropriate federal or state rules book (which we would hope is nearby), and familiarize himself or herself with the applicable service requirements. *See Baker v. Dorfman,* No. 978 CIV. 7512(DLC), 1998 WL 642762 (S.D.N.Y. Sept. 17, 1998) (finding that attorney's failure to conduct the minimal investigation necessary to determine the relevant statutory limitations for filing a client's claims, and to file those claims in a timely manner, constitutes "negligence as a matter of law"). Where an attorney is uncomfortable with or unsure about service of process for a particular defendant, we would imagine that such discomfort would compel an attorney exercising ordinary skill and intelligence to be more diligent in getting it right, especially if the statute of limitations has run and that initiative represents the client's only opportunity to recover on the claim. *See, e.g., Fricke v. Gray,* 705 N.E.2d

1027, 1033 (Ind.Ct.App.1999) (attorneys who failed to file client's lawsuit within the statute of limitations committed "negligence," although the jury properly determined that the attorney was not liable for malpractice since the client failed to prove causation).

> FN8. New York's highest state court effectively captured the importance of an attorney's duty to serve process in a timely and accurate manner:
> [T]he duty at issue here--that owed by an attorney to his or her client to exercise care in the service of process--fits squarely and neatly within the category of obligations the law regards as "nondelegable." Manifestly, when an individual retains an attorney to commence an action, timely and accurate service of process is an integral part of the task that the attorney undertakes. Furthermore, proper service of process is a particularly critical component of a lawyer's over-all responsibility for commencing a client's lawsuit, since a mistake or oversight in this area can deprive the client of his or her day in court regardless of how meritorious the client's claim might be.
> *Kleeman v. Rheingold,* 614 N.E.2d 712, 598 N.Y.S.2d 149, 154 (N.Y.1993).

**\*\*8** Remarkably, Worth has not attempted, never mind succeeded, in ever explaining his gross failure to serve the United States within the 120 day deadline of filing the ASCS action, as mandated by Rule 4(j). Indeed, we afforded Worth extraordinary leeway during the brief life-span of the ASCS litigation to explain his failure to comply with Rule 4 and avoid dismissal: (1) we notified Worth by written entry on November 21, 1991 that he had until December 3, 1991 to effect service before the Rule 4 deadline would pass, (2) we tolerated Worth's excuse that he did not receive our written entry until December 9, 1991 and granted his request for an extension of time until December 21, 1991 to respond to our order to show cause why the case should not be dismissed, (3) we overlooked his failure to meet his own December 21 deadline to respond to our show cause order and still considered his delinquent response, and (4) we took

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

great pains (despite Worth's recurrent shortcomings in addressing the issue) to avoid granting the government's February 25, 1992 unopposed motion to dismiss the ASCS action for failure to perfect service, and instead entered an order on April 8, 1992 urging Worth to respond by April 22, 1992 and show cause why the case should not be dismissed.

In an odd reversal of roles, we found ourselves pleading with Worth to provide us with some basis to resuscitate his client's faltering claim. If our prodding of Worth did not impress upon him the stakes at risk, he undoubtedly knew that the statute of limitations had run mere days after he filed the ASCS complaint (he does not deny as much), as the Department of Agriculture's February 8, 1991 denial letter expressly notified him that he had only six months in which to file a federal lawsuit. Despite our carrot and stick approach, Worth has failed to this day to provide any reason or good cause excuse for his failure to comply with the dictates of Rule 4. It is a mind-numbing exercise in fathoming how a reasonable attorney could read our June 26, 1992 dismissal of the ASCS action, which we wrote in unequivocal language, and not be on notice that his failure to comply with a straightforward federal rule of civil procedure constituted a breach of a professional duty to his/her client. *See, e.g., Fricke,* 705 N.E.2d at 1033; *Basinger v. Sullivan,* 540 N.E.2d 91 (Ind.Ct.App.1989) (identifying attorney malpractice where attorney allowed limitation period to lapse on client's potential lawsuit, but finding that clients were themselves barred from recovery by a statute of limitations); *Baker,* 1998 WL 642762 at *3-4 (finding that an attorney's failure to serve a timely notice of client's claim, his failure to seek leave to serve a late notice of a client's claim, and his failure to file his client's complaint within the applicable statute of limitations constituted negligence); *Home Indem. Co. v. Toombs,* 910 F.Supp. 1569, 1574 (N.D.Ga.1995) (holding that an attorney who entered an appearance in an existing action, voluntarily dismissed that action, and subsequently refiled it after the statute of limitations had run possessed a reasonable basis to believe that he had breached a professional duty as a matter of law); *Stanski v. Ezersky,* 210 A.D.2d 186, 621 N.Y.S.2d 18, 19 (N .Y.App. Div.1994)(finding negligence as

a matter of law where attorney failed to effect proper service in client's action and statute of limitations subsequently barred further action).

**\*\*9** Our conclusion is not altered by the "three items" that Worth claims the defendants would have discovered if they had investigated the underlying malpractice complaint more thoroughly. Pl.'s Br. Summ. J. at 13. Worth's first "item," that Clock had no reasonable basis to believe he had breached a professional duty because there "was no need to pursue the district court case" upon filing the bankruptcy petition, is a red herring, and a wounded one at that. *Id.*

Worth filed Clock's Chapter 7 petition on May 18, 1992, months *after* the December 3, 1991 service of process deadline and well after the briefing on the government's motion to dismiss for failure to perfect service had closed. In fact, in Worth's April 21, 1992 two-page response to the government's motion to dismiss, which he filed only after we ordered him to show cause why we should not grant the government's unopposed motion, Worth never mentioned any bankruptcy preparations or how those efforts would excuse his failure to pursue the ASCS litigation. On the contrary, Worth had a duty to deliver the ASCS litigation to the bankruptcy trustee intact, and the mere fact that he actually filed a bankruptcy petition does not allow him to turn a blind eye to the damage done to his client's case prior to that filing. [FN9]

> FN9. We also note in passing that we disagree with Worth's suggestion that filing a Chapter 7 petition necessarily relieves attorneys of all responsibility for pre-bankruptcy litigation filed by the bankrupt/debtor. Unlike situations where the debtor is the defendant in litigation, the automatic stay provision of the bankruptcy code does not freeze litigation where the debtor is the plaintiff. *See Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n,* 892 F.2d 575, 577 (7th Cir.1989) ("For in any event the automatic stay is inapplicable to suits by the bankrupt ('debtor,' as he is now called.")). Moreover, even though a lawsuit may be an asset of the bankruptcy estate, a bankruptcy trustee may abandon

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the litigation, leaving the debtor/plaintiff to continue the fight outside the purview of the bankruptcy action. *See Bittel v. Yamato Int'l Corp.,* 70 F.3d 1271 (table), No. 94-1396, 1995 WL 699672 (6th Cir. Nov. 27, 1995) (discussing abandonment and explaining that bankruptcy debtor may bring suit if the trustee has abandoned his interest in the cause of action).

While we did not issue our opinion dismissing the ASCS action until June 26, 1992, a month after the bankruptcy filing, the basis of our decision clearly rested on Worth's activity (or lack thereof) between the filing of the ASCS action on August 5, 1991 and the service of process deadline on December 3, 1991. Regardless of the filing of the bankruptcy petition, Worth's own failure to perfect service of process, coupled with our entry dismissing the ASCS lawsuit as a result of Worth's omission, would have given a reasonable attorney in Worth's position a "reasonable basis to believe" that he or she had breached a professional duty to his or her client.

Worth's final two "items" that he claims trigger the defendants' duty to defend in this case relate to causation and damages, two elements of the tort of legal malpractice that are beyond our narrow inquiry here concerning the breach of a professional duty. While Worth may be correct that any recovery from the ASCS action would become an asset of the bankruptcy estate, and that Clock's creditors may have been entitled to any recovery from the ASCS action, those assertions do nothing to erode Worth's reasonable basis to believe that he breached a duty to Clock by failing to comply with Federal Rule of Civil Procedure 4(d) & (j). [FN10]

> FN10. We also reserve opinion as to whether Worth is correct that Clock would not have benefitted if his creditors had recovered any amounts from the ASCS action. *Cf. Bittel,* 1995 WL 699672, at *2 (noting that monetary recovery for a debtor/bankrupt's creditors "assists the debtor's financial rehabilitation").

The insurance provision excepting coverage for acts and omissions that occurred prior to policy coverage exists for a reason--it encourages would-be insureds to disclose any reasonable basis to believe that a prior act or omission resulted in a breach of professional duty. By inducing would-be insureds to disclose potential or actual breaches of professional duty, the insurer is better able to assess the risk of extending insurance, thereby adjusting premium levels, altering the type of insurance extended, or denying coverage altogether if the insurer believes that such a breach might ripen into a valid malpractice action during the coverage period.

**\*\*10** Even if Worth did not believe that Clock would succeed in proving causation or damages in a malpractice action, he had a reasonable basis to believe that he previously had breached a professional duty when he obtained policy coverage in 1995. Worth nonetheless chose not to report the ASCS dismissal when purchasing a "claims made" insurance policy containing clear and unambiguous language that excluded coverage for known omissions and errors occurring prior to policy coverage. [FN11] Accordingly, we find that based upon the undisputed facts, defendants properly refused to defend and indemnify Worth in Clock's underlying malpractice action, which clearly and obviously is excluded from coverage under Worth's insurance policy.

> FN11. The parties have not informed us whether Worth obtained insurance coverage for the 1991-92 period when his error/omission occurred, and if so, whether Worth informed that insurer of the ASCS dismissal.

*C. Defendants' Investigation of the Malpractice Action and Bad Faith*

Instead of disputing that he breached a professional duty, Worth devotes most of his efforts to establishing that if the defendants had investigated Clock's malpractice claim more thoroughly, they would have discovered three "things" (discussed *supra* ) related to the bankruptcy filing that trigger the defendants' duty to defend in this case. Given the paucity of the additional facts Worth identifies, and our ruling that the defendants properly refused to defend Worth in the underlying malpractice

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

action, Worth's remaining claim sounds in an allegation of bad faith. He contends that defendants violated their duty to act in good faith towards Worth by refusing to defend the malpractice action without first investigating it adequately.

As a preliminary matter, Indiana has long recognized the rule that "insurance companies may, in good faith, dispute claims." *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 520 (Ind.1993). When the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurance company can properly refuse to defend, although it does so at its own peril if its coverage position is later determined to be erroneous. *See Liberty Mut. Ins. Co v. Metzler,* 586 N.E.2d 897, 902 (Ind.Ct.App.1992); *Cincinnati Ins. Co v. Mallon,* 409 N.E.2d 1100 (Ind.Ct.App.1980).

We also are aware that while the Indiana Supreme Court has held that an insurer's "duty to defend is determined solely by the nature of the complaint," *Transamerica Insurance Services v. Kopko,* 570 N.E.2d 1283, 1285 (Ind.1991), the Indiana Court of Appeals subsequently has held that an insurer may have a duty to investigate the facts underlying a complaint before it may refuse to defend. *Compare Kopko,* 570 N.E.2d at 1285 ("When the nature of the claim is obviously not covered by the policy of insurance, there is no duty to defend.") *with Monroe Guar. Ins. Co. v. Monroe,* 677 N.E.2d 620, 623 (Ind.Ct.App.1997) (distinguishing *Kopko* as a case where the parties did not dispute the facts underlying the complaint, and finding that on the facts before the court, the insurer had "a duty to conduct a reasonable investigation into the facts underlying the complaint before it may refuse to defend the complaint"). Worth recognizes that *Monroe Guaranty* never defined what constitutes a "reasonable" investigation by an insurer, but he urges us to declare that the defendants' actions in denying coverage were inadequate and in bad faith. We decline to do so and instead find that the defendants' efforts prior to denying coverage were manifestly reasonable in light of the facts of this case.

**\*\*11** Defendant Tamarack received notice of Clock's malpractice action against Worth on March

18, 1997. Tamarack acknowledged receipt of the claim by sending Worth a return letter on that same date informing Worth that he would be contacted shortly by a litigation manager. Tamarack assigned Carol Ho-Rezvani ("Ho-Rezvani"), a claims manager with 12 years of experience and a law degree, to handle Worth's case. Ho-Rezvani obtained and reviewed Clock's Verified Complaint, this Court's June 26, 1992 Entry dismissing the ASCS action, and copies of the Court's docket verifying the dismissal. She reviewed Worth's insurance policy, including the coverage provisions at issue, and attempted to contact Worth by telephone to no avail.

The next day, March 19, 1997, Worth returned Ho-Rezvani's telephone call and she advised him of potential problems with policy coverage. She informed him that coverage may not exist for Clock's negligence claim because Worth may have had a reasonable basis to believe that he had breached a duty to Clock by failing to perfect service in the ASCS action. Worth also verbally confirmed that in 1992 he had received a copy of this Court's Entry dismissing the ASCS action. On or about March 21, 1997, Ho-Rezvani discussed Worth's claim with in-house counsel and retained outside coverage counsel to render an opinion on whether the insurance policy afforded Worth coverage for Clock's malpractice action. She faxed Clock's malpractice complaint, this Court's Entry dismissing the ASCS action, the docket sheet, and the Worth insurance policy to outside counsel in Chicago. Counsel responded within 4-5 days by providing a draft letter denying coverage for the malpractice action, which Ho-Rezvani revised and sent to Worth on March 26, 1997.

Ho-Rezvani's letter notified Worth that Tamarack was denying coverage for the malpractice action and would not provide him a defense. She included the "Coverage" provision of the policy and noted that he had received this Court's Entry dismissing the ASCS action due to Worth's failure to comply with the service requirements of Rule 4. Therefore, Ho-Rezvani advised that it appeared "clear that, prior to the commencement of the policy period of the Policy, you had a reasonable basis to believe that you had breached a professional duty to Mr. Clock or to foresee that a claim would be made

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 377 (Table)
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

Page 12

against you." *See* Tamarack's Ex. 17 (Ho-Rezvani letter).

On May 2, 1997, Worth accepted process on the malpractice action and forwarded a copy of the complaint to his insurance agent, who forwarded it to Tamarack. On May 9, 1997, Ho-Rezvani sent Worth a second letter repeating the basis for the refusal to defend Worth in the malpractice action. *See* Tamarack's Br. Summ. J. at 13.

Despite these efforts, Worth contends that Tamarack should have taken "statements," engaged in an "evaluation" of the merits of the underlying malpractice claim, and reviewed the file of the Chapter 7 bankruptcy proceedings. Pl.'s Br. Summ. J. at 13. Worth asserts that if defendants had done so they would have learned that Worth filed a bankruptcy petition for Clock and therefore had no reasonable basis to believe he breached a professional duty when this Court dismissed the ASCS action. Yet, as we have discussed previously, the bankruptcy filing occurred well after Worth neglected his duty to manage Clock's ASCS action and played no role in this Court's dismissal of that case. Moreover, taking "statements" (aside from Ho-Rezvani's discussion with Worth), and "evaluating" the underlying claim, would not have affected the undisputed facts that the ASCS action had been dismissed due to Worth's error and omission and that Worth had received a copy of this Court's Entry confirming the dismissal and the basis for it.

**\*\*12** In short, we hold that the defendants acted reasonably in refusing to defend the underlying malpractice complaint based upon the materials they reviewed and the actions they took prior to excluding Worth's claim from policy coverage. Most importantly, defendants made a coverage determination by relying upon a federal district court opinion that confirmed that relevant allegations in the underlying complaint, namely, that Worth's unexcused failure to effect service of process upon the United States in the ASCS action, as mandated by a federal rule of civil procedure, resulted in a permanent dismissal of his client's claim. Upon speaking with Worth and confirming both his receipt of this Court's Entry and his actual knowledge of the dismissal prior to the effective

date of policy coverage, defendants reasonably concluded that the underlying malpractice action was excluded under the unambiguous policy language. To the extent that defendants had a duty to conduct a reasonable investigation into the facts underlying the malpractice complaint, they clearly have done so given both the materials and the judicially-established factual record at their disposal when refusing to defend Worth in the malpractice action.

Additionally, Worth alleges that defendants' investigation was not sufficiently exhaustive, which evidences bad faith and demonstrates their breach of an implied covenant of good faith and fair dealing. *See* Pl.'s Am. Compl. ¶ 9. However, Worth's claim gauntly starves from a barren record, as Worth has adduced no evidence remotely suggestive of defendants' bad faith in refusing to defend Worth against Clock's malpractice claim.

Under Indiana law, an insurer has an obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation. *Erie Ins. Co v. Hickman,* 622 N.E.2d 515, 518-20 (Ind.1993). An insurer has an obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim. *Id.* at 519. If an insurer acts in bad faith in processing an insured's claim, the insured may bring actions for (1) a breach of the covenant of good faith and fair dealing that is implied in every insurance contact, and (2) tortious breach of the insurer's fiduciary duty of good faith to its insured. *See Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 979-981 (7th Cir.1996) (applying Indiana law). Either way, bad faith is a requisite showing. *Id.*

The Indiana Supreme Court has held that "the lack of diligent investigation alone is not sufficient to support an award" for bad faith. *Erie,* 622 N.E.2d at 520. "[A] good faith dispute about ... whether the insured has a valid claim at all will not supply the ground for a recovery in tort for the breach of the obligation to exercise good faith ... even if it is ultimately determined that the insurer breached its contract." *Id.* An insurer may be considered to have

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

210 F.3d 377 (Table)                                                          Page 13
210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.))
**Unpublished Disposition**
**(Cite as: 210 F.3d 377, 2000 WL 101227 (7th Cir.(Ind.)))**

acted in bad faith where it "denies liability knowing that there is no rational, principled basis for doing so." *Id.* Yet, poor judgment or negligence do not amount to bad faith since the "additional element of conscious wrongdoing must also be present." *Colley v. Indiana Farmers Mut. Ins. Group,* 691 N.E.2d 1259, 1261 (Ind.Ct.App.1998).

**\*\*13** Worth offers no evidence whatsoever that Worth acted in bad faith when defendants investigated his claim and refused to defend him in Clock's malpractice action. Defendants twice provided Worth with unambiguous written notices that they would not provide him a defense and the rationale for not doing so. As we have explained above in detail, defendants' basis for excluding the malpractice action from policy coverage not only was rational and principled, but also was correct as a matter of law. Thus, Worth has failed to demonstrate a triable issue of material fact with respect to his claim that the defendants acted in bad faith in investigating and denying his claim for policy coverage. Accordingly, we *GRANT* defendants' motions for summary judgment on Worth's bad faith claim, and we *GRANT* defendants' motions for summary judgment to declare that they have no duty to defend or indemnify Worth in the underlying malpractice action brought against him by his former client. Likewise, we *DENY* Worth's motion for summary judgment both on his bad faith claim and on his request for a declaratory judgment to establish defendants' duty to defend him in the underlying malpractice action.

Conclusion

For the reasons discussed, we *GRANT* defendants' motions for summary judgment as to Worth's bad faith claim, and we *GRANT* defendants' motions for summary judgment to declare that they have no duty to defend or indemnify Worth in Larry Clock's legal malpractice action. Similarly, we *DENY* plaintiff Worth's motion for summary judgment on his bad faith claim, and we *DENY* his motion for summary judgment on his declaratory judgment action seeking to establish defendants' duty to defend and indemnify him in the underlying malpractice action.

210 F.3d 377 (Table), 2000 WL 101227 (7th Cir.(Ind.)), Unpublished Disposition

Briefs and Other Related Documents (Back to top)

• 99-2037  (Docket)

(Apr. 28, 1999)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Civil Action No.:  4:04-1782-27

# ATTACHMENT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

CONTINENTAL CASUALTY COMPANY, )
                                  )
          Plaintiff,            )
                                  )
    vs.                          )   Case No.: 4:04-1782-*27*
                                  )
GEORGE T. SAMAHA, III, CAROLYN    )
HILLS, VICTORIA DOUGHERTY, AND    )
MICHAEL DOUGHERTY,           )
                                  )
        Defendants.          )
_____ )

## DECLARATION OF ERNEST ROSADO

Ernest Rosado declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that

the following statement is true and correct. I am familiar with the document identified

below, and I am competent to testify thereto.

       1.       I am currently employed as a claims consultant for Continental Casualty

Company ("Continental"), the Plaintiff in the above-captioned action.

       2.       I submit this Declaration in support of Continental's contemporaneously filed

Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment.

       3.       Exhibit A hereto is a true and correct copy of Lawyers Professional Liability

Policy No. 169861433 (with Social Security numbers redacted), issued to George T.

Samaha, III for the period April 5, 2002 to April 5, 2003.

I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing statement is true and correct.

Ernest Rosado

October 2 6 , 2004

Civil Action No.:  4:04-1782-27

# EXHIBIT A


INSURANCE IN TOUCH WITH BUSINESS

## LAWYERS PROFESSIONAL LIABILITY POLICY
### DECLARATIONS

| Agency: | Branch: | Policy Number: | |
|---|---|---|---|
| 719624 | 912 | 169861433 | Insurance is provided by Continental Casualty Company. CNA Plaza, Chicago, IL 60685. A Stock Insurance Company. |

**1A. NAMED INSURED AND MAILING ADDRESS:**
George T. Samaha, III
2910C Highway 90 East
Little River, SC 29566

**NOTICE TO POLICYHOLDERS:**
This is a Claims Made and Reported policy. It applies only to those claims that are both first made against the insured and reported in writing to the Company during the policy period. Please review the policy carefully and discuss this coverage with your insurance agent or broker.

**1B. PREDECESSOR FIRM(S):** See Declarations Addendum

**2. POLICY PERIOD:**
Inception: 04/05/2002
*at 12:01 A.M. Standard Time at the address shown above*

Expiration: 04/05/2003

**3. LIMITS OF LIABILITY:**
*Inclusive of Claims Expenses*

Each Claim: $1,000,000
Aggregate: $1,000,000

Death or Disability and Non-Practicing
Extended Reporting Period Limit of Liability:

Each Claim: $1,000,000
Aggregate: $1,000,000

**4. DEDUCTIBLES:**
*Inclusive of Claims Expenses*

Aggregate: $5,000

**5. POLICY PREMIUM:**
Total Policy Premium:

$4,566.00
Includes CNA Risk Management Seminar Credit if applicable

**6. FORMS AND ENDORSEMENTS ATTACHED AT INCEPTION:**
G-118011-A (Ed. 03/1998), G-118012-A (Ed. 03/1999), G-118024-A (Ed. 09/1996), G-118029-A (Ed. 09/1996), G-118037-A (Ed. 03/1998), G-118039-A39 (Ed. 09/1996), G-118045-A99 (Ed. 01/1999)

**7. WHO TO CONTACT:**

To report a claim:
CNA Insurance
40 Wall Street, 8th Floor
New York, New York 10005
Phone (212)-440-7070

Countersignature          Date          Authorized Representative          Date

 INSURANCE IN TOUCH WITH BUSINESS

LAWYERS PROFESSIONAL LIABILITY POLICY
DECLARATIONS ADDENDUM

Item 1.B.  PREDECESSOR FIRM(S):

NONE

 *INSURANCE IN TOUCH WITH BUSINESS*

### CONTINENTAL CASUALTY COMPANY
### CNA PLAZA
### CHICAGO, ILLINOIS 60685

LAWYERS PROFESSIONAL LIABILITY POLICY

ATTORNEY SCHEDULE

Policy Number:    169861433

**Name of Each Lawyer**
George T Samaha, III

**Social Security Number**

ATTYSCH

 INSURANCE IN TOUCH WITH BUSINESS

## CONTINENTAL CASUALTY COMPANY
### CNA PLAZA
### CHICAGO, ILLINOIS 60685

---

### LAWYERS PROFESSIONAL LIABILITY POLICY

### NAMED INDIVIDUAL RETROACTIVE DATE ENDORSEMENT

It is understood and agreed that no coverage is afforded under this Policy for any claims by reason of an act or omission in the rendering of legal services by George T Samaha, III that occurred prior to 04/05/1996. Nor is coverage afforded under this Policy for any claims by reason of related acts or omissions to such acts or omissions that occurred prior to the above specified date.

All other provisions of this Policy remain unchanged.

---

POLICY NO. 169861433

THIS ENDORSEMENT FORMS A PART OF THE ABOVE REFERENCED POLICY, AND TAKES EFFECT ON THE EFFECTIVE DATE AND HOUR OF SAID POLICY UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW, AND EXPIRES CONCURRENTLY WITH SAID POLICY.

ISSUED TO: GEORGE T. SAMAHA, III          EFFECTIVE DATE
                                          OF THIS ENDORSEMENT 04/05/2002

*Complete only when this Endorsement is not prepared with the Policy or is not to be effective with the Policy*
Countersigned by_____
                                    AUTHORIZED REPRESENTATIVE

G-118024-A (Ed. 09/96)

*INSURANCE IN TOUCH WITH BUSINESS*

**CONTINENTAL CASUALTY COMPANY**
**CNA PLAZA**
**CHICAGO, ILLINOIS 60685**

LAWYERS PROFESSIONAL LIABILITY POLICY

RETROACTIVE EXCLUSION CLAUSE ENDORSEMENT

It is understood and agreed that Section I., Insuring Agreement, Paragraph A., is amended to include a new subparagraph (5) as follows:

A(5).  the act or omission occurred on or after 04/05/1996.

All other provisions of this Policy remain unchanged.

---

POLICY NO. 169861433

THIS ENDORSEMENT FORMS A PART OF THE ABOVE REFERENCED POLICY, AND TAKES EFFECT ON THE EFFECTIVE DATE AND HOUR OF SAID POLICY UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW, AND EXPIRES CONCURRENTLY WITH SAID POLICY.

ISSUED TO: GEORGE T. SAMAHA, III            EFFECTIVE DATE
                                            OF THIS ENDORSEMENT  04/05/2002

| *Complete only when this Endorsement is not prepared with the Policy or is not to be effective with the Policy* |
|---|
| Countersigned by_____ |
| AUTHORIZED REPRESENTATIVE |

G-118029-A (Ed. 09/96)



INSUEANCE IN TOUCH WITH BUSINESS

### CONTINENTAL CASUALTY COMPANY
### CNA PLAZA
### CHICAGO, ILLINOIS 60685

---

### LAWYERS PROFESSIONAL LIABILITY POLICY

### TITLE INSURANCE AGENCY'S PROFESSIONAL LIABILITY ENDORSEMENT

In consideration of an additional premium paid, it is understood and agreed that Section III., Definitions, paragraph F., Insured is amended to include as an insured the following title insurance agency:

Waterway Title Agency, Inc.

Further, Section III., Definitions, Paragraph G., "Legal services", is deleted in its entirety and replaced as follows:

G.      "Legal services" mean:

1.      those services performed for others as a lawyer, arbitrator, mediator title agent or as a notary public.

2.      those services performed as an administrator, conservator, receiver, executor, guardian, trustee or any other fiduciary capacity when the act or omission in dispute is in the rendering of services ordinarily performed as a lawyer. This Policy applies only to such act or omission.

3.      those services performed by an Insured as a title abstractor or a title insurance agency listed in this endorsement. However, any activities of said title insurance agency in any other capacity as a title insurance carrier, insurer or guaranty association are not covered by this Policy.

Further, Section IV., Exclusions, is amended to add the following title insurance agency's professional liability exclusions:

1.      to any claim arising out of defects in title not disclosed of public record or of which an Insured had actual or constructive knowledge at the date of issuance of any title insurance policy;

2.      to any claim based upon or arising out of handling or disbursement of funds, including, but not limited to, escrow activities or closing activities and insurance placement;

3.      to any claim for liability assumed by an Insured under any oral or written contract or agreement whereby an Insured has agreed to participate in the payment of a loss, including attorney's fees, court costs and expenses payable under a title insurance policy;

4.      to any claim based upon or arising out of breach of underwriting authority by an Insured in their capacity as agent to a title insurance company;

5.      to any claim arising out of the notarization or acknowledgment of a signature without the physical appearance of the person who is or claims to be the person signing said instrument before an Insured as notary public.

The limits of liability of the Company under this endorsement shall be part of, and not in addition to, the limits of liability of the Company for the policy period.

G-118037-A (Ed. 03/98)

 *INSURANCE IN TOUCH WITH BUSINESS*

No coverage is afforded under this Endorsement for any claims by reason of an act or omission in the rendering of legal services by the above named title insurance agency that occurred prior to 04/05/2000. Nor is coverage afforded under this Endorsement for any claims by reason of related acts or omissions to such acts or omissions that occurred prior to the above specified date.

If the Title Insurance Agency named above should be dissolved or should cease doing business, then this Endorsement will not apply with respect to claims made against an Insured based on any act or omission committed or allegedly committed on or subsequent to the time and date of said dissolution or cessation of business. Coverage will be provided under this Endorsement but only with respect to acts or omissions committed prior to the time and date of any such dissolution or cessation of business in accordance with all other terms and conditions of this Policy.

All other terms and conditions of the Policy remain unchanged.

---

POLICY NO. 169861433

THIS ENDORSEMENT FORMS A PART OF THE ABOVE REFERENCED POLICY, AND TAKES EFFECT ON THE EFFECTIVE DATE AND HOUR OF SAID POLICY UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW, AND EXPIRES CONCURRENTLY WITH SAID POLICY.

ISSUED TO: GEORGE T. SAMAHA, III

EFFECTIVE DATE
OF THIS ENDORSEMENT 04/05/2002

| *Complete only when this Endorsement is not prepared with the Policy or is not to be effective with the Policy* |
| --- |
| Countersigned by _____ |
| AUTHORIZED REPRESENTATIVE |

C-118037-A  (Ed. 03/98)

 INSURANCE IN TOUCH WITH BUSINESS

### CONTINENTAL CASUALTY COMPANY
### CNA PLAZA
### CHICAGO, ILLINOIS 60685

---

#### LAWYERS PROFESSIONAL LIABILITY POLICY

#### AMENDMENT OF TERMINATION PROVISIONS
#### SOUTH CAROLINA

It is understood and agreed that Condition M. Cancellation/Nonrenewal is deleted and replaced in its entirety by the following:

M.    Cancellation and Nonrenewal

    1.    Cancellation

        a.    This Policy may be cancelled by the **Named Insured** by returning it to the **Company**. The **Named Insured** may also cancel this Policy by written notice to the **Company** stating at what future date cancellation is to be effective.

        b.    The **Company** may cancel this Policy by mailing, or by delivery of a written notice of cancellation to the **Named Insured** and to the agent who wrote the Policy, if any, at their addresses last known to the **Company** . Notice will state the effective date of and precise reason for cancellation. The **Company** will provide written notice at least:

            (1)    10 days prior to the effective date of cancellation if the **Company** cancels this Policy because the **Insured** has failed to pay a premium when due or has failed to pay amounts in excess of the limit of the **Company's** liability or within the amount of the deductible; or

            (2)    30 days prior to the effective date of cancellation if the **Company** cancels for any other reason.

        The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **policy period**. Delivery of such written notice either by the **Named Insured** or by the **Company** shall be equivalent to mailing.

        c.    If this Policy has been in effect for 90 days or more, or if it is a renewal of a policy issued by the **Company**, the **Company** may cancel only for one or more of the following reasons:

            (1)    Nonpayment of premium or failure to pay amounts in excess of the limit of the **Company's** liability or within the amount of the deductible;

            (2)    Material misrepresentation or fraud made by the **Named Insured** or with the **Named Insured's** knowledge in obtaining the Policy or in pursuing a claim under the Policy;

            (3)    Substantial change in the risk assumed, except to the extent that the **Company** should reasonably have foreseen the change or contemplated the risk in writing the Policy;

            (4)    Substantial breaches of contractual duties, conditions or warranties; or

**CNA** INSURANCE IN TOUCH WITH BUSINESS

(5) Loss of reinsurance by the Company covering all or a significant portion of the particular policy insured, or where continuation of the Policy would imperil the Company's solvency or place the Company in violation of the insurance laws of South Carolina. If the Company is cancelling for this reason, the Company will notify the South Carolina Commissioner of Insurance at least 60 days prior to cancellation. The Commissioner will, within 30 days of such notification, approve or disapprove such action.

d.    If the Company cancels this Policy, the earned premium shall be computed pro rata. If the Named Insured cancels this Policy, the Company shall retain the customary short rate proportion of the premium. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

2.    Nonrenewal

a.    If the Company elects to nonrenew this Policy, the Company will mail, or deliver written notice of nonrenewal to the Named Insured and to the agent who wrote the Policy, if any, at their addresses last known to the Company, at least 30 days prior to:

(1) the expiration date of this Policy, if the Policy is written for a term of one year or less; or

(2) the anniversary date if the Policy is written for a term of more than one year or for an indefinite term.

Notice will state the effective date of and precise reason for non-renewal. Delivery of such written notice by the Company shall be the equivalent of mailing.

b.    The Company will not refuse to renew a policy issued for a term of more than one year, until expiration of it's full term, if anniversary renewal has been guaranteed by additional premium consideration.

c.    The offering of terms and conditions different from the expiring terms and conditions does not constitute a refusal to renew.

All other terms and conditions of the Policy remain unchanged.

POLICY NO. 169861433

THIS ENDORSEMENT FORMS A PART OF THE ABOVE REFERENCED POLICY, AND TAKES EFFECT ON THE EFFECTIVE DATE AND HOUR OF SAID POLICY UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW, AND EXPIRES CONCURRENTLY WITH SAID POLICY.

ISSUED TO: GEORGE T. SAMAHA, III                EFFECTIVE DATE
                                                OF THIS ENDORSEMENT 04/05/2002

| *Complete only when this Endorsement is not prepared with the Policy or is not to be effective with the Policy* |
| Countersigned by_____ |
| AUTHORIZED REPRESENTATIVE |

G-118039-A39 (Ed. 09/98)

 INSURANCE IN TOUCH WITH BUSINESS

**CONTINENTAL CASUALTY COMPANY**
**CNA PLAZA**
**CHICAGO, ILLINOIS 60685**

LAWYERS PROFESSIONAL LIABILITY POLICY

PUNITIVE DAMAGES

It is understood and agreed that DEFINITIONS E. "Damages" is amended as follows:

Subitem 3.   Punitive or exemplary amounts; is deleted in its entirety; but only where the law applicable to the claim mandates such coverage.

All other provisions of this Policy remain unchanged.

POLICY NO.169861433

THIS ENDORSEMENT FORMS A PART OF THE ABOVE REFERENCED POLICY, AND TAKES EFFECT ON THE EFFECTIVE DATE AND HOUR OF SAID POLICY UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW, AND EXPIRES CONCURRENTLY WITH SAID POLICY.

ISSUED TO: GEORGE T. SAMAHA, III

EFFECTIVE DATE
OF THIS ENDORSEMENT  04/05/2002

*Complete only when this Endorsement is not prepared with the Policy or is not to be effective with the Policy*
DB  7 "                              Countersigned by

# LAWYERS PROFESSIONAL LIABILITY POLICY





**CONTINENTAL CASUALTY COMPANY**
**CNA PLAZA**
**CHICAGO, ILLINOIS 60685**

---

## LAWYERS PROFESSIONAL LIABILITY POLICY

---

*Words and phrases that appear in bold are defined in the Definitions section of this Policy.*

**THIS IS A CLAIMS MADE AND REPORTED POLICY. IT APPLIES ONLY TO THOSE CLAIMS THAT ARE BOTH FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD. PLEASE REVIEW THIS POLICY CAREFULLY AND DISCUSS THIS COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

I.  INSURING AGREEMENT

A.  Coverage
The **Company** agrees to pay on behalf of the **Insured** all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable, provided that:

1.  the **Insured** did not give notice to a **prior insurer** of such **claim** or a **related claim**;

2.  the **Insured** did not give notice to a **prior insurer** of any such act or omission or **related act or omission**;

3.  prior to the inception date of the first policy issued by the **Company** or any subsidiary or affiliate of the **Company**, if continuously renewed, or the date the **Insured** first became a member or employee of the **Named Insured**, whichever is later, no **Insured** had a basis to believe that any such act or omission, or **related act or omission**, might reasonably be expected to be the basis of a **claim**;

4.  there is no other policy, whether primary, contributory, excess, contingent or otherwise, which provides insurance to any **Insured** for the **claim** based on or arising out of an act or omission in the performance of **legal services** by such **Insured** or by any person for whom the **Insured** is legally liable while affiliated with a firm other than the **Named Insured**.

B.  Defense
The **Company** shall have the right and duty to defend in the **Insured's** name and on the

**Insured's** behalf a **claim** covered by this Policy even if any of the allegations of the **claim** are groundless, false or fraudulent. The **Company** shall have the right to appoint counsel and to make such investigation and defense of a **claim** as is deemed necessary by the **Company**. If a **claim** shall be subject to arbitration or mediation, the **Company** shall be entitled to exercise all of the **Insured's** rights in the choice of arbitrators or mediators and in the conduct of an arbitration or mediation proceeding.

C.  Settlement
The **Company** shall not settle a **claim** without the written consent of the **Named Insured**. If the **Named Insured** refuses to consent to a settlement or compromise recommended by the **Company** and acceptable to the claimant, then the **Company's** limit of liability under this Policy shall be reduced to the amount for which the **claim** could have been settled plus all **claim expenses** incurred up to the time the **Company** made its recommendation, which amount shall not exceed the remainder of the limit of liability specified in Section II.A.

D.  Exhaustion of limits
The **Company** is not obligated to investigate, defend, pay or settle, or continue to investigate, defend, pay or settle a **claim** after the applicable limit of the **Company's** liability has been exhausted by payment of **damages** or **claim expenses** or by any combination thereof or after the **Company** has deposited the remaining available limits of liability into a court of competent jurisdiction. In such case, the **Company** shall have the right to withdraw from the further investigation, defense, payment or settlement of such **claim** by tendering control of said investigation, defense or settlement of the **claim** to the **Insured**.

II.  LIMITS OF LIABILITY AND DEDUCTIBLE

A.  Limit of liability - each **claim**
Subject to paragraph B. below, the limit of
liability of the **Company** for **damages** and **claim
expenses** for each **claim** first made against the
**Insured** and reported to the **Company** during
the **policy period** shall not exceed the amount
stated in the Declarations for each **claim**.

B.  Limit of liability - in the aggregate
The limit of liability of the **Company** for dam-
ages and **claim expenses** for all **claims** first
made against the **Insured** and reported to the
**Company** during the **policy period** shall not
exceed the amount stated in the Declarations as
the aggregate.

C.  Deductible
The deductible amount stated in the Declarations
is the total amount of the **Insured's** liability for
all **claims** and applies to the payment of dam-
ages and **claim expenses** for **claims** first made
and reported to the **Company** in writing during
the **policy period**. The deductible shall be paid
by the Named **Insured**, or upon the Named
**Insured's** failure to pay, jointly and severally by
all **Insureds**. The limits of liability set forth in the
Declarations are in addition to and in excess of
the deductible.

D.  Multiple **insureds**, **claims** and claimants
The limits of liability shown in the Declarations
and subject to the provisions of this Policy is
the amount the **Company** will pay as **damages**
and **claim expenses** regardless of the number of
**Insureds**, **claims** made or persons or entities
making **claims**. If **related claims** are subse-
quently made against the **Insured** and reported
to the **Company**, all such **related claims**,
whenever made, shall be considered a single
**claim** first made and reported to the **Company**
within the policy period in which the earliest of
the related **claims** was first made and reported
to the **Company**.

E.  Supplementary payments
Although not **Damages**, the **Company** will pay,
in addition to the applicable limit of liability:
1.  up to $250.00 for loss of earnings to each
**Insured** for each day or part of a day of
such **Insured's** attendance, at the
**Company's** request, at a trial, hearing or
arbitration proceeding involving a **claim**
against such **Insured**, but in no event shall
the amount payable hereunder exceed
$5,000.00 per **Insured** despite the number of
days the **Insured** is in attendance, or the
number of trials, hearings or arbitration
proceedings that the **Insured** is required to

attend. In no event shall the amount
payable hereunder exceed $10,000.00
despite the number of **Insureds** hereunder
or the number of such proceedings.
2.  up to $5,000.00 for any **Insured** and in the
aggregate for attorney fees and other reason-
able costs, expenses or fees resulting from the
investigation or defense of a proceeding
before a state licensing board or a peer review
committee incurred as the result of a notice of
proceeding both first received by the **Insured**
and reported to the **Company** during the
**policy period**, arising out of an act or omis-
sion in the rendering of **legal services** by such
**Insured**. In no event shall the amount
payable hereunder exceed $5,000.00 despite
the number of **Insureds** hereunder or the
number of such proceedings.

III.  DEFINITIONS
Wherever used in this Policy:

A.  **"Bodily injury"** means injury to the body,
sickness or disease sustained by any person,
including death resulting from such injuries; or
mental injury, mental anguish, mental tension,
emotional distress, pain or suffering or shock
sustained by any person whether or not result-
ing from injury to the body, sickness, disease or
death of any person.

B.  "Claim" means a demand received by the
**Insured** for money or services arising out of an
act or omission, including **personal injury**, in
the rendering of or failure to render **legal**
services. A demand shall include the service of
suit or the institution of an arbitration proceed-
ing against the **Insured**.

C.  **"Claim expenses"** mean:
1.  fees charged by attorneys designated by the
**Company** or by the **Insured** with the
**Company's** written consent; and
2.  all other reasonable and necessary fees,
costs and expenses resulting from the
investigation, adjustment, defense and
appeal of a **claim** if incurred by the Com-
pany, or by the **Insured** with the written
consent of the Company, including, but not
limited to, premiums for any appeal bond,
attachment bond or similar bond but
without any obligation of the Company to
apply for or furnish any such bond.
Claim expenses with respect to a **claim** will be
paid first and payment will reduce the amount
available to pay **damages**. **Claim expenses** shall
not include fees, costs or expenses of employees
or officers of the Company. Nor shall **claim**
expenses include salaries, loss of earnings or
other remuneration by or to any **Insured**.

D. **"Company"** means the insurance company named in the Declarations.

E. **"Damages"** mean judgments, awards and settlements, provided any settlement is negotiated with the assistance and approval of the **Company**. **Damages** do not include:
1. legal fees, costs and expenses paid or incurred or charged by the **Insured**, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, set-off or otherwise, and injuries that are a consequence of any of the foregoing;
2. civil or criminal fines, sanctions, penalties or forfeitures, whether pursuant to law, statute, regulation or court rule, including but not limited to awards under 28 U.S.C. §1961, et. seq., or Federal Rules of Civil Procedure 11; and state statutes, regulations, rules or law so providing, and injuries that are a consequence of any of the foregoing;
3. punitive or exemplary amounts;
4. the multiplied portion of multiplied awards;
5. injunctive or declaratory relief;
6. amounts for which the **Insured** is not financially liable or that are without legal recourse to the **Insured**.

F. **"Insured"** means the Named Insured and the persons or entities described below:
1. any lawyer, partnership, professional corporation, professional association, limited liability corporation or limited liability partnership who is or becomes a partner, officer, director, stockholder-employee, associate, manager, member or salaried employee of the **Named Insured** during the **policy period** shown in the Declarations.
2. any lawyer previously affiliated with the **Named Insured** or a **predecessor firm** as a partner, officer, director, stockholder-employee, associate, manager, member or salaried employee but only for **legal services** performed on behalf of the Named **Insured** or a **predecessor firm** at the time of such affiliation. The term "previously affiliated" as used herein does not include a lawyer who, during the **policy period** and while affiliated with the **Named Insured**: a) voluntarily ceases, permanently and totally, the private practice of law; or b) dies or becomes **totally and permanently disabled**. Such a lawyer will be deemed to be an **Insured** under paragraph one above;
3. any lawyer, law firm, partnership, professional corporation, professional association, limited liability corporation or limited

liability partnership who acts as Of Counsel to the **Named Insured**, but only for legal **services** rendered on behalf of the Named **Insured** and only if a fee inured to the **Named Insured** except that no fee need inure to the **Named Insured** where eleemosynary (pro bono) **legal services** are rendered by such Of Counsel **Insured** where at the time of retention, there was approval by the appropriate committee or lawyer within the **Named Insured** as a matter that would be handled without compensation. Any lawyer, law firm, partnership, professional corporation, professional association, limited liability corporation or limited liability partnership who acts as Of Counsel to the **Named Insured**, who previously qualified as an **Insured** under paragraph 1 above, but left the full time practice of law to practice exclusively as Of Counsel to the **Named Insured**, will be deemed to be an **Insured** under paragraph 1 above.
4. any person who is a former or current employee, other than an employed lawyer, of the **Named Insured** or any **predecessor firm**, but solely for services performed by such person within the course and scope of their employment by the **Named Insured** or any **predecessor firm** and provided that the services in dispute are **legal services** of the **Named Insured** or any **predecessor firm**;
5. the estate, heirs, executors, administrators, assigns and legal representatives of an **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would have been provided coverage under this Policy.

G. **"Legal services"** mean:
1. those services performed by an **Insured** for others as a lawyer, arbitrator, mediator, title agent or as a notary public. Any title agency or company, on whose behalf the **Insured** acts as title agent or designated issuing attorney, is not an **Insured** under this Policy;
2. those services performed by an **Insured** as an administrator, conservator, receiver, executor, guardian, trustee or in any other fiduciary capacity if the act or omission in dispute is in the rendering of services ordinarily performed as a lawyer. This Policy applies only to such act or omission.

H. **"Material change"** means:
1. an increase or decrease of more than 25 individuals, or a change of 51% or more, whichever is less, of the total of all individuals who are partners, officers, directors,

stockholder-employees, associates, managers, members or salaried employees of the **Named Insured** whose job responsibilities include the rendering of **legal services**; or

2. the acquisition of the **Named Insured** by another entity, or the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity or the acquisition of all or substantially all of the assets of the **Named Insured** by another entity.

I. **"Named Insured"** means the persons and entities designated in the Declarations.

J. **"Personal injury"** is an injury resulting from an act or omission arising out of: false arrest, detention, or imprisonment; wrongful entry, or eviction, or other invasion of the **right** of private occupancy; libel, slander, or other disparaging or defamatory materials; a writing or saying in violation of an individual's right to privacy; malicious prosecution or abuse of process.

K. **"Policy period"** means the period of time between the inception date and time shown in the Declarations and the date and time of termination, expiration or cancellation of this Policy.

L. **"Predecessor firm"** means a sole proprietor, partnership, professional corporation, professional association, limited liability corporation or limited liability partnership engaged in legal services and:
1. to whose financial assets and liabilities the **Named Insured** is the majority successor in interest; and
2. of which the **Named Insured** retained 50% or more of the attorneys.

M. **"Prior insurer"** means an insurer, including the **Company** and any subsidiary or affiliate of the **Company**, who has issued a lawyers professional liability insurance policy that is applicable to a claim, such policy having an inception date prior to the **policy period**.

N. **"Related acts or omissions"** mean all acts or omissions in the rendering of **legal services** that are temporally, logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.

O. **"Related claims"** mean all claims arising out of a single act or omission or arising out of related acts or omissions in the rendering of **legal services**.

P. **"Totally and permanently disabled"** means that an **Insured** is so disabled as to be wholly

prevented from rendering **legal services** provided that such disability:
1. has existed continuously for not less than six (6) months; and
2. is reasonably expected to be continuous and permanent.

IV. EXCLUSIONS

This Policy does not apply:

A. to any **claim** based on or arising out of any dishonest, fraudulent, criminal or malicious act or omission by an **Insured**;

B. to any **claim** for **bodily injury**, or injury to, or destruction of, any tangible property, including the loss of use resulting therefrom;

C. to any loss sustained by an **Insured** or **claim** made against an **Insured** as beneficiary or distributee of any trust or estate;

D. to any **claim** based on or arising out of the **Insured**'s alleged liability under any oral or written contract or agreement, unless such liability would have attached to the **Insured** in the absence of such agreement;

E. to any **claim** by or on behalf of an **Insured** under this Policy against any other Insured hereunder;

F. to any **claim** based on or arising out of an **Insured**'s capacity as: a former, existing or prospective officer, director, shareholder, partner, manager, or trustee of a business enterprise, trust, or charitable organization or a pension, welfare, profit-sharing, mutual or investment fund or trust (if the above are not named in the Declarations); or a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto or any other similar state or local law;

G. to any **claim** based on or arising out of an **Insured**'s capacity as a public official or an employee or representative of a governmental body, subdivision or agency unless the **Insured** is deemed as a matter of law to be a public official or employee or representative of such entity solely by virtue of rendering **legal** services to it;

H. to any **claim** based on or arising out of legal services performed for any existing or prospective partnership, trust, organization, corporation, company or other business enterprise (including the ownership, maintenance or care

of any property in connection therewith), not named in the Declarations, if at the time of the act or omission giving rise to such claim:

1. any Insured or Insured's spouse controlled, operated or managed or intended to control, operate or manage such enterprise; or
2. any Insured was or was intended to become
   a. a partner or employee of such enterprise, or
   b. more than a 10% shareholder or a sole proprietor of such enterprise, or
3. Insureds cumulatively were or were intended to become more than a 10% shareholder of such enterprise,

except that this exclusion shall not apply to any claim based on or arising out of legal services to any professional legal association, its governing board or any of its committees. As used in this exclusion, the word "partner" shall be deemed to include members of limited liability companies or limited liability partnerships;

I. to any claim based on or arising out of any:
1.  i. financial or investment advice; or
    ii. predictions of future performance, made or given by any Insured regarding specific and identifiable investments;
2. product referrals; or
3. warranties or guarantees made by any Insured.

## V.  CONDITIONS

A. Notice of claims and potential claims
1. The Insured, as a condition precedent to the obligations of the Company under this Policy, shall immediately give written notice to the Company during the policy period:
   a. of any claim made against the Insured;
   b. of the Insured's receipt of any notice, advice or threat, whether written or verbal, that any person or organization intends to hold the Insured responsible for any alleged breach of duty.
2. If during the policy period the Insured shall become aware of any act or omission that may reasonably be expected to be the basis of a claim against the Insured and gives written notice to the Company of such act or omission and the reasons for anticipating a claim, with full particulars, including but not limited to:
   a. the specific act or omission;
   b. the dates and persons involved;
   c. the identity of anticipated or possible claimants;

d. the circumstances by which the Insured first became aware of the possible claim,

then any such claim that is subsequently made against the Insured and reported to the Company shall be deemed to have been made at the time such written notice was given to the Company.

B. Innocent Insured
Whenever coverage under this Policy would be excluded, suspended or lost because of any exclusion relating to criminal, dishonest, fraudulent, or malicious conduct by any person insured hereunder, the Company agrees that such insurance, as would otherwise be afforded under this Policy, shall be applicable with respect to an Insured who did not personally participate or personally acquiesce in or remain passive (including failure to give timely notice) after having knowledge of such conduct. The Company's obligation to pay damages under this Condition B will be excess of the full extent of the assets of any Insured involved in such criminal, dishonest, fraudulent, or malicious conduct.

C. Reimbursement of the Company
If the Company, in the exercise of its discretion and without any obligation to do so, pays any amount in excess of the applicable limits of liability or within the amount of the deductible, the Named Insured, or upon the Named Insured's failure to pay, the Insureds, jointly and severally, shall be liable to the Company for any and all such amounts and, upon demand, shall pay such amounts to the Company.

D. Territory
This Policy applies to an act or omission taking place anywhere in the world, provided that the claim is made and suit is brought against the Insured within the United States of America, Puerto Rico, its territories, possessions or Canada.

E. Material change
The Named Insured shall immediately report to the Company any material change during the policy period. If the material change:
1. is the result of an increase or decrease in the total number of individuals as set forth in the definition of material change, Section III.H.1., then the Company shall have the right to adjust the premium, subject to all the other terms and conditions of this Policy; or
2. is the result of the acquisition or merger of the Named Insured as set forth in the definition of material change, Section III.H.2.,



then the **Company** shall have the right to:

a. adjust the premium, subject to all the other terms and conditions of this **Policy**; or

b. deem this Policy to have ceased with respect to claims made against an **Insured** based on any act or omission committed or allegedly committed on or subsequent to the time and date of said acquisition or merger. In such event, the **policy period** shall remain unaltered and coverage will continue but only with respect to acts or omissions committed prior to the time and date of any such events listed in Section III.H.2 in accordance with all other terms and conditions of this Policy.

F. Alternative dispute resolution

After the final adjudication or settlement of a **claim**, any dispute concerning allegations of bad faith or tort against the **Company** regarding the appropriateness or value of any settlement or final disposition of any **claim** that exceeds the deductible may be submitted to any form of alternative dispute resolution acceptable to the **Company** and the **Insured**. Should the **Company** and the **Insured** be unable to agree on the form of alternative dispute resolution, then such dispute shall be submitted to binding arbitration. Except as set forth below, the rules of the American Arbitration Association shall apply. The arbitration panel shall consist of one arbitrator selected by the **Company**, one arbitrator selected by the **Insured**, and one arbitrator selected by the first two arbitrators. If the two arbitrators selected cannot agree on a third arbitrator, then the American Arbitration Association shall appoint an arbitrator.

G. Other insurance

If there is other insurance that applies to the claim:

1. on a claims made basis, this insurance shall be excess over such other valid and collectible insurance whether such insurance is stated to be primary, contributory, excess, contingent or otherwise. This does not apply to insurance that is purchased by the **Named Insured** specifically to apply in excess of this insurance.

2. on an occurrence basis, this insurance shall be available in the amount by which the limit of liability for this Policy exceeds the applicable limit of liability of such other valid and collectible insurance. The difference shall be the maximum the **Company** shall pay under this Policy with respect to a **claim**. If the applicable limit of liability of such other valid and collectible insurance is

equal to or greater than the maximum payable under this Policy, then this Policy shall not afford any insurance with respect to such **claim**.

H. Assistance and cooperation of the **Insured**

1. The **Insured** shall cooperate with the **Company** and, upon the **Company**'s request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving of evidence, obtaining the attendance of witnesses, and the conduct of suits and proceedings in connection with a **claim**.

2. The **Insured** shall assist in the enforcement of any right of contribution or indemnity against any person or organization who or which may be liable to any **Insured** in connection with a claim.

3. The **Insured** shall not, except at its own cost, voluntarily make any payment, assume or admit any liability or incur any expense without the consent of the **Company**.

I. Action against the **Company**

No action shall lie against the **Company** unless, as a condition precedent thereto:

1. there shall have been full compliance with all the terms of this Policy; and

2. the **Insured**'s obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Company**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy. No person or organization shall have any right under this Policy to join the **Company** as a party to any action against an **Insured**, nor shall the **Company** be impleaded by the **Insured** or his legal representative. Bankruptcy or insolvency of the **Insured** or of the **Insured**'s estate shall not relieve the **Company** of any of its obligations hereunder.

J. Subrogation

In the event of any payment under this Policy, the **Company** shall be subrogated to all the **Insured**'s rights of recovery thereof against any person or organization, including any rights such **Insured** may have against any other **Insured** involved in dishonest, fraudulent, criminal, malicious or intentional conduct. The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure and collect upon such rights. The **Insured** shall do nothing to prejudice such rights.

K.  Changes
Notice to any of the **Company's** agents or
knowledge possessed by any such agent or any
other person shall not act as a waiver or change
in any part of this Policy.  It also will not
prevent the **Company** from asserting any rights
under the provisions of this Policy.  None of the
provisions of this Policy will be waived,
changed or modified except by written endorse-
ment, signed by the **Company**, issued to form a
part of this Policy.

L.  Assignment
No assignment of interest of the **Insured** under
this Policy shall be valid, unless the written
consent of the **Company** is endorsed hereon.

M.  Cancellation/Nonrenewal
1.  This Policy may be canceled by the **Named
Insured** by returning it to the **Company**.
The **Named Insured** may also cancel this
Policy by written notice to the **Company**
stating at what future date cancellation is to
be effective.
2.  The **Company** may cancel or non-renew this
Policy by written notice to the **Named
Insured** at the address last known to the
**Company**. The **Company** will provide
written notice at least sixty (60) days before
cancellation or non-renewal is to be effective.
If the **Company** cancels this Policy because
the **Insured** has failed to pay a premium
when due or has failed to pay amounts in
excess of the limit of the **Company's** liability
or within the amount of the deductible, this
Policy may be canceled by the **Company** by
mailing to the **Named Insured** written notice
stating when, not less than ten (10) days
thereafter, such cancellation shall be effec-
tive.  The time of surrender of this Policy or
the effective date and hour of cancellation
stated in the notice shall become the end of
the policy period. Delivery (where permit-
ted by law) of such written notice either by
the **Named Insured** or by the **Company** shall
be equivalent to mailing.
3.  If the **Company** cancels this Policy, the
earned premium shall be computed pro
rata.  If the **Named Insured** cancels this
Policy, the **Company** shall retain the cus-
tomary short rate proportion of the pre-
mium.  Premium adjustment may be made
either at the time cancellation is effected or
as soon as practicable after cancellation
becomes effective, but payment or tender of
unearned premium is not a condition of
cancellation.
4.  The offering of terms and conditions differ-
ent from the expiring terms and conditions
shall not constitute a refusal to renew.

N.  Entire contract
By acceptance of this Policy the **Insured** agrees
that:
1.  all of the information and statements
provided to the **Company** by the Insured
are true, accurate and complete and shall be
deemed to constitute material representa-
tions made by all of the **Insureds**;
2.  this Policy is issued in reliance upon the
**Insured's** representations;
3.  this Policy, endorsements thereto, together
with the completed and signed application
and any and all supplementary information
and statements provided by the **Insured** to
the **Company** (all of which are deemed to
be incorporated herein) embody all of the
agreements existing between the **Insured**
and the **Company** and shall constitute the
entire contract between the **Insured** and the
**Company**; and
4.  the misrepresentation of any material
matter by the **Insured** or the **Insured's**
agent will render this Policy null and void
and relieve the **Company** from all liability
herein.

O.  Named Insured sole agent
The **Named Insured** shall be the sole agent of
all **Insureds** hereunder for the purpose of
effecting or accepting any notices hereunder,
any amendments to or cancellation of this
Policy, for the completing of any applications
and the making of any statements, representa-
tions and warranties, for the payment of any
premium and the receipt of any return premium
that may become due under this Policy, and the
exercising or declining to exercise any right
under this Policy.

P.  Liberalization
If the **Company** adopts any revision that would
broaden coverage under this policy form G-
118011-A without additional premium at any
time during the policy period, the broadened
coverage will immediately apply to this Policy
except that it will not apply to claims  that were
first made against the **Insured**  prior to the
effective date of such revision.

Q.  Notices
Any notices required to be given by an Insured
shall be submitted in writing to the **Company**
or its authorized representative.  If mailed, the
date of mailing of such notice shall be deemed
to be the date such notice was given and proof
of mailing shall be sufficient proof of notice.

VI.  EXTENDED REPORTING PERIODS
As used herein, "extended reporting period" means
the period of time after the end of the **policy period**

for reporting claims by reason of an act or omission that occurred prior to the end of the **policy period** and is otherwise covered by this Policy.

A. Automatic **extended reporting period**
If this Policy is canceled or non-renewed by either the **Company** or by the **Named Insured**, the **Company** will provide to the **Named Insured** an automatic, non-cancelable **extended reporting period** starting at the termination of the **policy period** if the **Named Insured** has not obtained another policy of lawyers professional liability insurance within sixty (60) days of the termination of this Policy. This automatic **extended reporting period** will terminate after sixty (60) days.

B. Optional **extended reporting period**
1. If this Policy is canceled or non-renewed by either the **Company** or by the **Named Insured**, then the **Named Insured** shall have the right to purchase an optional **extended reporting period**. Such right must be exercised by the **Named Insured** within sixty (60) days of the termination of the **policy period** by providing:
   a. written notice to the **Company**; and
   b. with the written notice, the amount of additional premium described below.
2. The additional premium for the optional **extended reporting period** shall be based upon the rates for such coverage in effect on the date this Policy was issued or last renewed and shall be for one (1) year at 100% of such premium; three (3) years at 175% of such premium; six (6) years at 225% of such premium; or, for an unlimited period at 250% of such premium.

C. Death or disability **extended reporting period**
1. If an **Insured** dies or becomes **totally and permanently disabled** during the policy period, then upon the latter of the expiration of: the **policy period**; any renewal or successive renewal of this Policy; or any automatic or optional **extended reporting period**, such **Insured** shall be provided with a death or disability **extended reporting period** as provided below.
   a. In the event of death, such **Insured's** estate, heirs, executors or administrators must, within sixty (60) days of the expiration of the policy period, provide the **Company** with written proof of the date of death. This **extended reporting period** is provided to the estate, heirs, executors and administrators of such **Insured** until the executor or administrator of the estate of such **Insured** is discharged.

b. If an **Insured** becomes **totally and permanently disabled**, such **Insured** or **Insured's** legal guardian must, within sixty (60) days of the expiration of the **policy period**, provide the **Company** with written proof that such **Insured** is **totally and permanently disabled**, including the date the disability commenced, certified by the **Insured's** physician. The **Company** retains the right to contest the certification made by the **Insured's** physician, and it is a condition precedent to this coverage that the **Insured** agree to submit to medical examinations by any physician designated by the **Company**. This **extended reporting period** is provided until such **Insured** shall no longer be **totally or permanently disabled** or until the death of such **Insured** in which case subparagraph a. hereof shall apply.
2. No additional premium will be charged for any death or disability **extended reporting period**.

D. Non-practicing **extended reporting period**
1. If an **Insured** retires or otherwise voluntarily ceases, permanently and totally, the private practice of law during the policy period and has been continuously insured by the **Company** for at least three consecutive years, then such **Insured** shall be provided with an **extended reporting period** commencing upon the latter of: the **policy period**; any renewal or successive renewal of this Policy; or any automatic or optional **extended reporting period**.
2. This **extended reporting period** is provided until the death of such **Insured** in which case subparagraph C.1. hereof shall apply or, until such **Insured** shall resume the practice of law.
3. No additional premium will be charged for any non-practicing **extended reporting period**.

E. **Extended reporting periods** limits of liability
1. Automatic and optional **extended reporting periods** limits of liability
   a. Where the **Company** has the right to nonrenew or cancel this Policy and it exercises that right, then the **Company's** liability for all claims reported during the automatic and optional **extended reporting periods** shall be part of and not in addition to the limits of liability for the **policy period** as set forth in the Declarations and Section II, Limits of Liability of this Policy.